UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| MAVERICK FUND, L.D.C., MAVERICK FUND USA, LTD., MAVERICK FUND II, LTD., MAVERICK NEUTRAL FUND, LTD., MAVERICK NEUTRAL LEVERED FUND, LTD., MAVERICK LONG FUND, LTD., AND MAVERICK LONG ENHANCED FUND, LTD., | 3:13-cv-1585-J-99TJC-JRK<br><br>SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND STATE LAW |
| Plaintiffs, | |
| vs. | |
| LENDER PROCESSING SERVICES, INC. (n/k/a BLACK KNIGHT INFOSERV, LLC), DOCX, LLC, JEFFREY S. CARBIENER, FRANCIS K. CHAN, LORRAINE BROWN, BLACK KNIGHT HOLDINGS, INC., (f/k/a BLACK KNIGHT FINANCIAL SERVICES, INC.), SERVICELINK HOLDINGS, LLC (f/k/a BLACK KNIGHT FINANCIAL SERVICES II, LLC), BLACK KNIGHT FINANCIAL SERVICES, LLC, and FIDELITY NATIONAL FINANCIAL, INC. | DEMAND FOR JURY TRIAL |
| Defendants. | |

**TABLE OF CONTENTS**

**Page**

I.  SUMMARY OF THE ACTION ....................................................................... 2

II.  JURISDICTION AND VENUE ..................................................................... 5

III.  THE PARTIES ............................................................................................... 5

    A.  Plaintiffs ................................................................................................. 5

    B.  Pre-Merger Defendants ........................................................................ 6

    C.  The Merger Between Fidelity National Financial Inc. and LPS ................ 9

    D.  Post-Merger Successor Liability Defendants ........................................ 19

IV.  DEFENDANTS' FRAUDULENT SCHEME ................................................ 20

    A.  LPS's Business ..................................................................................... 20

    B.  LPS Illegally Created Mortgage-Related Documents to Rapidly (and
        Cheaply) Process Foreclosures and Bankruptcies While Fraudulently
        Inflating Reported Short-Term Profits ................................................. 21

    C.  Contrary to Their Public Statements, Defendants Failed to Maintain
        Adequate Internal Controls ................................................................. 27

    D.  Defendants' Illegal Document Creation Scheme Is Slowly Revealed and the
        Foreseeable Risks of Defendants' Illegal Conduct Materialized, Causing
        LPS's Stock to Drop Even as Defendants Continued to Mislead Plaintiffs ........ 30

    E.  Continuing Revelations of Defendants' Fraud ...................................... 36

V.  SCIENTER ALLEGATIONS ......................................................................... 42

    A.  Defendant Brown Orchestrated the Illegal Document Creation Scheme for
        the Purpose of Falsely Inflating Profits ............................................... 42

    B.  Defendants Carbiener and Chan Knew LPS Did Not Maintain Adequate
        Internal Controls and Were Aware of or Recklessly Disregarded the Illegal
        Document Creation Scheme ................................................................. 42

        1.  Carbiener and Chan Knew Throughout the Relevant Period the
            Company Did Not Maintain Adequate Internal Controls ...................... 43

        2.  In the Early Part of the Relevant Period, Carbiener and Chan Knew or
            Recklessly Disregarded the Illegal Document Creation Scheme ............. 45

i

**Page**

3.   Judge Sigmund Waved A Huge Red Flag in Front of Carbiener and Chan in April 2009 ..................................................................... 46

4.   In October/November 2009, A Whistleblower Alerted LPS and its Auditors to the Illegal Document Creation Scheme and Carbiener Immediately Knew it Was A "Real Problem" ........................................... 47

5.   AHMSI Forced Defendants' Hand by Refusing to Go Along with the Illegal Document Creation Scheme .......................................... 49

6.   Carbiener and Chan Admit to Learning of the Illegal Document Creation Scheme in November 2009, But Continued to Conceal the Truth From Investors for Nearly A Year ................................. 50

7.   Defendants Carbiener and Chan's "Cover Up" Was Itself Exposed as A Fraud Only Months After Defendants Attempted to Downplay the Scope of the Scheme ........................................................ 52

8.   Defendants Carbiener and Chan's Terminations and Other Miscellaneous Factors Indicative of Scienter ............................ 54

C.   LPS Acted with Scienter ......................................................... 54

D.   DocX Acted with Scienter ....................................................... 56

VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ...................................... 57

VII.   RELIANCE ........................................................................................ 100

VIII.  LOSS CAUSATION ......................................................................... 103

IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .................................... 107

X.     CAUSES OF ACTION ...................................................................... 107

XI.    PRAYER FOR RELIEF ...................................................................... 126

XII.   JURY TRIAL DEMAND .................................................................... 126

Plaintiffs Maverick Fund, L.D.C., Maverick Fund USA, Ltd., Maverick Fund II, Ltd., Maverick Neutral Fund, Ltd., Maverick Neutral Levered Fund, Ltd., Maverick Long Fund, Ltd., and Maverick Long Enhanced Fund, Ltd. (hereafter referred to collectively as "Maverick" or "Plaintiffs") make the following allegations based on the investigation conducted by Plaintiffs' counsel, including, but not limited to, a review and analysis of Lender Processing Services, Inc. ("LPS" or the "Company") filings with the United States Securities and Exchange Commission (the "SEC"); Fidelity National Financial, Inc.'s ("FNF") filings with the SEC; media and securities analysts' reports about the Company; analyst conference calls; filings in various criminal proceedings involving LPS employees, and related press releases; the Non-Prosecution Agreement entered into between LPS and United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Middle District of Florida, dated February 14, 2013 (the "NPA"); the Agreed Consent Judgment Entry and Order entered into by the State of Ohio and Lender Processing Services, Inc., LPS Default Solutions, Inc., and DocX, LLC (and other similar agreements entered into with other states); the Consent Order entered into between Lender Processing Services, Inc., DocX, LLC, and LPS Default Solutions, Inc. and the Board of Governors of the Federal Reserve System, the Office of the Comptroller of Currency, the Federal Deposit Insurance Corporation and the Office of Thrift Supervision (the "Federal Reserve Consent Order"); the civil complaint evidencing the investigation by the Attorney General of the State of Nevada; filings in various bankruptcy proceedings involving documents prepared by LPS; court filings in the action styled *City of St. Clair Shores General Employees' Retirement System v. Lender Processing Services, Inc., et al.*, 3:10-cv-01073 (M.D. Fla.) (the "Class Action"); court filings in the action styled *American Home Mortgage Servicing, Inc. v. Lender Processing Services, Inc., and DocX, LLC*, No. 11-10440 (Tex. Dallas Dist. Ct.); court filings in the action styled *Cornett v. Lender*

*Processing Services, Inc.,* 3:12-cv-00233 (M.D. Fla.); testimony of percipient witnesses; consultations with experts; and the review and analysis of other matters of public record. While Plaintiffs have reviewed, and may reference or utilize, these materials, Plaintiffs do not adopt any exculpatory language contained in these materials.

## I.      SUMMARY OF THE ACTION

1.      Plaintiffs purchased LPS common stock at times when the price of the shares was artificially inflated by Defendants' fraudulent scheme.[1]  LPS was in the business of creating mortgage-related documents regularly used in foreclosures and bankruptcies.  In the wake of the housing bubble collapse in 2008 through 2010, business was good.  There was significant and growing demand for LPS's default services.  LPS capitalized on this demand for default services, playing a role in more than 50 percent of all foreclosures in the United States during the relevant period.  To keep up with demand, and report ever growing revenues and earnings, Defendants (unbeknownst to Plaintiffs) cut necessary quality controls and abandoned compliance with legal requirements.  LPS illegally robo-signed or rubber-stamped documents used to take away borrowers' homes.  As Illinois Attorney General Lisa Madigan put it, "LPS and its subsidiaries became a sort of document factory, literally rubber stamping thousands of foreclosures with no regard for fairness and accuracy in the process."

---

[1] References to Defendants generally refers to Lender Processing Services, Inc. (n/k/a Black Knight InfoServ, LLC), DOCX LLC, Jeffrey S. Carbiener, Francis K. Chan and Lorraine Brown.  As detailed in Section III, and Plaintiffs' Eighth Cause of Action, Black Knight Holdings, Inc. (f/k/a Black Knight Financial Services, Inc.,), ServiceLink Holdings, LLC (f/k/a Black Knight Financial Services II, LLC), Black Knight Financial Services, LLC, and Fidelity National Financial, Inc. are named herein exclusively as successors in liability to LPS.

2.      Initially, the scheme went undetected.  LPS would create more than a million illegal documents over the span of years.  LPS reported profits artificially inflated by the Company's low-cost (albeit illegal) business structure.  Unbeknownst to investors, the million-plus fraudulently signed and notarized mortgage-related documents created by LPS were a ticking time bomb that would ultimately cause massive disruptions in foreclosures nationwide.

3.      Slowly at first, journalists, courts and regulators began to voice concerns.  LPS repeatedly and falsely defended its actions.  In spite of published concerns about LPS's practices, a whistleblower complaint and an internal investigation, Defendants continued to assure LPS investors that they had conducted a thorough investigation and any reported problems were isolated incidents.  Defendants steadfastly denied the existence of any widespread wrongdoing.

4.      In late September 2010, the time bomb set by Defendants' scheme was ready to explode.  Foreseeably, as anecdotal evidence of illegal forgeries and notarizations piled up, public faith in the legitimacy of the foreclosure process was shaken.

5.      On September 30, 2010, U.S. Representative Alan Grayson labeled LPS a "factory of fraud" that "created the means to systematize" the falsification of mortgage-related documents throughout the nationwide foreclosure process:

> The system is so organized that there is a company called Lender Processing Services, which allegedly has created the means to **systematize this fraud**.  Lawyers use the LPS system to request which affidavits and documents they need, LPS then has **document mills** where they can magically make an authorized vice president of whoever you need and send you back-dated signed documents saying that you have the right to foreclose.  Courts at first refused to believe this level of **rampant fraud** even exists but more recently they've started to sanction fraud against loan servicers.[2]

---

[2] All emphasis is added unless otherwise noted.

6.      In conjunction with Representative Grayson outing LPS's conduct, several large banks and prominent politicians called for a moratorium on all foreclosures until trust in the legitimacy of the system could be restored.  In recognition of the implications this would have for LPS – including the risk of criminal prosecution and other legal action, damaged customer relationships, and destroyed credibility – LPS's stock price declined by 18%, falling from a close of $33.23 on September 30, 2010 to close at $27.31 on October 5, 2010.

7.      Representative Grayson's characterization of LPS as a "factory of fraud" would be borne out by subsequent investigations.  As the television show *60 Minutes* would later detail, LPS was "recreating missing mortgage assignments for the banks and providing the legally required signatures of bank vice presidents and notaries" to foreclose on homes.  According to the *60 Minutes* investigation, LPS paid high school students and other temporary workers $10 an hour to pose as bank "Vice Presidents" and methodically sign/forge ***at least*** 350 documents an hour – creating thousands of fraudulent mortgage documents a day per person.  The *60 Minutes* investigation was corroborated by other investigations, including the one conducted by the Attorney General for the State of Nevada.

8.      Ultimately, on February 15, 2013, LPS settled criminal allegations against it by entering into a Non-Prosecution Agreement with the Department of Justice ("DOJ") ***admitting*** to the fraud.  According to the DOJ press release:

> Lender Processing Services Inc. (LPS), a publicly traded mortgage servicing company based in Jacksonville, Fla., has agreed to pay $35 million in criminal penalties and forfeiture to address its participation in a six-year scheme to prepare and file more than 1 million fraudulently signed and notarized mortgage-related documents with property recorders' offices throughout the United States.

9.      Defendants' fraudulent scheme had profound impacts on many parties, including Plaintiffs.  Plaintiffs purchased LPS common stock while its price was artificially inflated as a result

- 4 -

of the fraud.  Defendants' false and misleading statements about the true nature of LPS's business artificially inflated the price of LPS stock.  Upon disclosure of the truth concerning Defendants' statements, Plaintiffs were injured when LPS's stock price declined precipitously.  Plaintiffs bring this action to recover investment losses caused by Defendants' fraudulent conduct.

## II.    JURISDICTION AND VENUE

10.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §§1331, 1337, and 1367.  The Court has personal jurisdiction over Defendants (including the Post-Merger Defendants named as successors in interest), as all Defendants are residents of the United States and/or have minimum contacts with this District.

11.    Venue is proper in this District pursuant to §27 of the Securities Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1391 (b) and (c).

12.    LPS transacts business in this District.  Substantial acts in furtherance of the wrongs alleged and/or their effects have occurred within this District.

13.    In connection with the acts and omissions alleged herein, all of the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    THE PARTIES

### A.    Plaintiffs

14.    Non-party Maverick Capital, Ltd. is a registered investment manager managing private investment funds exclusively for qualified investors.  The firm was founded in 1993 by,

among others, Lee S. Ainslie III.  Maverick Capital, Ltd. has offices in Dallas, Texas and New York, New York.  Maverick Capital, Ltd. is the investment manager on behalf of Plaintiffs.

15.     Plaintiffs Maverick Fund, L.D.C., Maverick Fund USA, Ltd., Maverick Fund II, Ltd., Maverick Neutral Fund, Ltd., Maverick Neutral Levered Fund, Ltd., Maverick Long Fund, Ltd., and Maverick Long Enhanced Fund, Ltd. are private investment funds managed by non-party Maverick Capital, Ltd.  Maverick Capital, Ltd., as the money manager for Plaintiffs, had total investment discretion for Plaintiffs' investments.  Maverick Capital, Ltd. maintains an office in New York, New York and Plaintiffs' investment decisions were directed, controlled, and coordinated in New York.

16.     Plaintiffs and Maverick Capital, Ltd., as the investment manager for Plaintiffs, read and relied upon certain of Defendants' false and misleading statements alleged herein, as set forth in greater detail below.  In reliance on Defendants' material misrepresentations and omissions, as described below, Plaintiffs purchased LPS common stock and suffered substantial losses caused by Defendants' wrongful conduct.

17.     Plaintiffs purchased millions of LPS common shares during the period between August 6, 2008 and October 4, 2010, while LPS stock traded at artificially inflated prices.  Plaintiffs held substantial LPS shares through disclosures of the truth concerning, and the materialization of risks concealed by, Defendants' fraudulent scheme.  Plaintiffs' purchases and sales of LPS stock are set forth in Plaintiffs' trade data provided to Defendants by letter dated August 2, 2013.  Plaintiffs' trade data is incorporated by reference herein, which Plaintiffs will submit to the Court under seal upon request.

**B.     Pre-Merger Defendants**

18.     Defendant Lender Processing Services, Inc. (n/k/a Black Knight InfoServ, LLC) was – during the relevant period and prior to the Merger, as defined below – a Delaware company with

its principal executive offices in Jacksonville, Florida. Lender Processing Services, Inc. operated in the mortgage industry and was a leading provider of mortgage processing services, settlement services, and default solutions. Lender Processing Services, Inc. was also a leading provider of integrated data, servicing, and technology solutions for mortgage lenders. Lender Processing Services, Inc. and its subsidiaries pre-Merger, including DocX and LPS Default Solutions, are collectively referred to herein as "LPS." As a result of the Merger, a change of control of LPS occurred on January 2, 2014, and LPS became an indirect subsidiary of Fidelity National Financial, Inc. On January 3, 2014, LPS was converted into a Delaware limited liability company and renamed Black Knight InfoServ, LLC. This Complaint, which primarily concerns events prior to the Merger, refers to the corporate Defendant as Lender Processing Services, Inc. and/or LPS for ease of reading and consistency with Lender Processing Services, Inc.'s name during the relevant period.

19.     DocX, LLC ("DocX") d/b/a LPS Document Solutions Group was, throughout the relevant period, held out to the public as "LPS Document Solutions, a Division of LPS." DocX maintained the bulk of its operations in Alpharetta, Georgia. DocX was, during the relevant period, a wholly owned subsidiary of Lender Processing Services, Inc, and is registered as a Georgia corporation. At all relevant times, Lender Processing Services, Inc. owned and controlled the operations of DocX, LLC.

20.     Defendant Carbiener was, at all relevant times, Lender Processing Services, Inc.'s President and Chief Executive Officer ("CEO"), until his resignation on July 6, 2011.

21.     Defendant Chan was, at all relevant times, Lender Processing Services, Inc.'s Executive Vice President and Chief Financial Officer ("CFO"), until the Company effectively terminated Chan on October 28, 2010.

22.     Defendant Lorraine Brown was during the relevant period an executive of Lender Processing Services, Inc. and the chief executive of DocX until her termination in late 2010. Brown's official title was President and Senior Managing Director of LPS Document Solutions. Brown worked in DocX's Alpharetta, Georgia office where she orchestrated the illegal fabrication of mortgage-related documents.  According to the NPA, the wrongful acts perpetrated by Lorraine Brown as detailed herein and in the NPA were performed within the scope of her employment at LPS.  Brown made direct and indirect false and misleading statements to the public impacting the price of LPS's stock price by falsely representing to, among others, LPS's clients and LPS's accounting department that DocX complied with pertinent laws and regulations and had achieved its earnings and revenues numbers through legitimate business practices.

23.     Defendants Carbiener, Chan and Brown are collectively referred to herein as the "Individual Defendants."

24.     During the relevant period, the Individual Defendants, as senior executive officers of LPS, were privy to confidential and proprietary information concerning LPS, its operations, finances, financial condition, and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning LPS, as discussed in detail below.  Because of their positions with LPS, the Individual Defendants had access to non-public information about LPS's business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly

disregarded that the adverse facts specified herein had been misrepresented and/or had not been disclosed to, and were being concealed from, the investing public.

### C.    The Merger Between Fidelity National Financial Inc. and LPS

25.    In January 2014, FNF acquired LPS and then entered into a series of transactions by which FNF combined and integrated LPS's business units into and with FNF's existing businesses (the "Merger").  The description of the Merger, as alleged herein, is based solely upon publicly available information.  Despite Plaintiffs' requests (*see* Exhibit A), Defendants will not provide further information concerning the Merger, particularly the corporate Reorganization that occurred the day after FNF acquired LPS.  Plaintiffs are currently prevented from obtaining discovery concerning the Merger by the discovery stay imposed by the Private Securities Litigation Reform Act of 1995.  Moreover, LPS has not filed a Certificate of Interested Persons and Corporate Disclosure Statement in this action – nor amended the Certificate of Interested Persons and Corporate Disclosure Statement filed in the Class Action – as required by Federal Rule of Civil Procedure 7.1 and this Court's Docket Entry 31, Attachment 1 Ex. A stating:  "[E]ach party . . . shall file . . . a Certificate of Interested Persons and Corporate Disclosure Statement using the attached mandatory form. . . .  ***Any party who has not already filed and served the required certificate is required to do so immediately***.  Each party has a continuing obligation to file and serve an amended Certificate of Interested Persons and Corporate Disclosure Statement within eleven days of [ ] discovering any ground for amendment . . . ."  (emphasis in original).  Defendants' failure to file a Certificate of Interested Persons and Corporate Disclosure Statement, and refusal to answer Plaintiffs' requests for specific information concerning the corporate Reorganization of LPS and FNF, highlights the need for formal discovery prior to a final determination on the issue of successor liability in this action.  Plaintiffs believe further evidence supporting Plaintiffs' theory of successor

- 9 -

liability exists solely within the possession of Defendants and can be obtained only through formal discovery.

26.    As detailed herein, immediately after acquiring LPS and with full knowledge of LPS's significant liabilities resulting from the conduct alleged in this Complaint, FNF (i) distributed valuable LPS businesses to FNF subsidiaries (the Black Knight Financial Services entities) for little/no consideration, (ii) integrated FNF's and LPS's businesses, (iii) saddled LPS with massive debt far exceeding its assets and/or ability to pay, and (iv) otherwise sought to obtain the benefits of acquiring the LPS businesses while dismissing certain of LPS's creditors – including Plaintiffs – to seek recovery from what is essentially an insolvent entity.

27.    On May 28, 2013, LPS issued a press release announcing that Fidelity National Financial, Inc. and Lender Processing Services, Inc. would merge.  In conjunction with announcing the Merger, both LPS and FNF recognized that the two companies would be combined and integrated to maximize synergies:

> Fidelity National Financial, Inc. (NYSE:FNF), a leading provider of title insurance, mortgage services and diversified services, and Lender Processing Services, Inc. (NYSE:LPS), a leading provider of integrated technology, services, data and analytics to the mortgage and real estate industries, today announced the signing of a definitive agreement under which FNF will acquire all of the outstanding common stock of LPS for $33.25 per common share, for a total equity value of approximately $2.9 billion.

> \* \* \*

> At closing, FNF will combine its ServiceLink business with LPS in a new consolidated holding company and sell a 19% minority equity interest in the new consolidated holding company to funds affiliated with Thomas H. Lee Partners, L.P. for approximately $381 million in cash.  FNF will retain an 81% ownership interest in the new consolidated holding company.

> \* \* \*

"We are excited to welcome LPS and its market-leading technology and services to the FNF family," said FNF Chairman William P. Foley, II. "We have significant experience and familiarity with LPS from our previous ownership of these businesses. This combination will create a larger, broader, more diversified and recurring revenue base for FNF and makes us the nation's leading title insurance, mortgage technology and mortgage services provider. We believe there are meaningful synergies that can be generated through the similar businesses in centralized refinance and default related products, elimination of some corporate and public company costs and the shared corporate campus. We have set a target of $100 million for cost synergies and are confident that we can meet or exceed that goal."

28.    On May 28, 2013, after the Merger was announced, FNF's Chairman Bill Foley, CEO George Scanlon and CFO Tony Parker held a conference call with analysts to discuss FNF's reasons for acquiring LPS. During the conference call, FNF addressed the issue of LPS's alleged wrongdoing and litigation risks associated therewith. FNF implicitly (if not expressly) recognized that FNF understood and acknowledged the litigation risks, which the combined company would assume. Among other things, FNF's Chairman Bill Foley stated: "[A]s we move[d] through this due diligence process with LPS, we became comfortable that the litigation risks are, generally speaking, behind them and that they are -- we can -- and *we can quantify the amount and the depth of that litigation risk at this time*." He also commented: "We've looked at each piece of litigation that remains, and we feel that their reserves are adequate to cover any future litigation risk."

29.    In speaking with investors on May 28, 2013, FNF utilized a presentation filed with the SEC titled "FNF Acquisition of LPS Investor Slides" (the "Presentation"). As set forth in the Presentation, FNF and LPS were a "Strong strategic fit" and parts of each business would be integrated to recognize synergies: "At closing, FNF will combine its ServiceLink business with LPS in a new consolidated holding company named Black Knight Financial Services, Inc. and sell a 19% minority equity interest to THL Partners for $381 million in cash; FNF will retain an 81% ownership interest in the new holding company[.]"

30.    On January 2, 2014, as set forth in the Merger Agreement, dated May 28, 2013, a subsidiary of FNF merged with and into LPS, with LPS surviving as a subsidiary of FNF.  Upon the closing, FNF issued approximately 25.9 million shares of FNF common stock and paid approximately $2.5 billion **to former stockholders and equity award holders of LPS.**  No consideration went directly to LPS, and Plaintiffs were not shareholders at the time of the acquisition and in no way benefitted from FNF's acquisition of LPS.  LPS shares were subsequently delisted from the New York Stock Exchange.

31.    The Merger did not eliminate LPS's liability for the wrongdoing alleged herein.  LPS, as the surviving entity of the merger of LPS and the FNF subsidiary, continued to maintain all the same assets and liabilities existing prior to the merger of these two legal entities.  As set forth in the Merger Agreement:  "The Merger shall have the effects set forth in Section 259 of the DGCL."

32.    On January 3, 2014, at 10:00 a.m., Lender Processing Services, Inc. changed its name to Black Knight InfoServ, LLC.  By changing its name, LPS did not eliminate its liability for the wrongdoing alleged herein.

33.    In a standard triangular merger, the surviving entity exists as an independent subsidiary of the acquiring company.  The surviving entity/independent subsidiary maintains all the same assets and liabilities of its predecessor.  All creditors continue in the same position they were in prior to the triangular merger.

34.    FNF did not maintain LPS/Black Knight InfoServ, LLC as an independent subsidiary.  Rather, FNF's acquisition of LPS was a *de facto* merger of FNF and LPS, with FNF and various FNF subsidiaries (the Black Knight Financial Services entities) integrating the LPS business units with FNF business units and assuming LPS's liabilities.

- 12 -

35.    From the outset, as set forth above, FNF made it clear that it intended to integrate LPS and FNF's businesses immediately after acquiring LPS.  True to its stated intentions, FNF did integrate LPS's business units with FNF's business units immediately.  On January 3, 2014, one day after FNF acquired LPS, FNF caused LPS to enter into a series of transactions as part of a corporate restructuring (the "Reorganization").  LPS (n/k/a Black Knight InfoServ, LLC) was shorn of valuable assets and business units without receiving fair (if any) consideration, and saddled with over $1 billion in additional debt.

36.    On January 3, 2014, FNF issued a press release describing the integration of the old LPS business units and the FNF business units into Black Knight Financial Services:

> Fidelity National Financial, Inc. (NYSE:FNF), a leading provider of title insurance and transaction services to the real estate and mortgage industries, today announced the reorganization of the former Lender Processing Services, Inc. ("LPS") businesses, the formation of a wholly-owned subsidiary called Black Knight Financial Services, Inc. ("Black Knight") and the issuance of a 35% interest in each of Black Knight's two operating subsidiaries, ServiceLink Holdings, LLC ("ServiceLink") and Black Knight Financial Services, LLC ("BKFS"), to funds affiliated with Thomas H. Lee Partners, L.P. and certain related entities.  ***Black Knight, through ServiceLink and BKFS, now owns and operates the former LPS businesses and FNF's ServiceLink business.  FNF's core operating subsidiaries now consist of Fidelity National Title Group, Inc. and Black Knight.***
>
> BKFS consists of LPS' former technology, data and analytics businesses and the technology offerings previously owned by FNF's ServiceLink division.  BKFS' primary products and services include:
>
> - Empower®, PCLender® and LendingSpace® - enterprise-wide loan origination systems that support the correspondent, wholesale and retail markets
> - RealEC® - electronically connects mortgage lenders and their business partners, and supports the company's loan quality offerings
> - MSP® - the leading residential mortgage servicing technology platform in the U.S.
> - LPS Desktop® and Fusion - comprehensive workflow platforms that support mortgage servicing
> - The world's largest U.S. property database, that covers 99.9% of U.S. property records from over 3,000 counties

- 13 -

- Most comprehensive mortgage performance data - represents nearly 70 percent of loans in the mortgage industry and provides the broadest breadth and depth of any single loan-level data source
- Industry-leading analytics - Provide valuable insight that helps effectively manage risk, support regulatory compliance and improve decision-making

\* \* \*

**ServiceLink consists of FNF's former ServiceLink division and LPS's former transaction services business.**  ServiceLink provides a full suite of origination and default related products and services to leading national and regional mortgage originators.  Its primary offerings include:

- A comprehensive suite of title, closing and escrow services and flood certifications
- Market-leading appraisal and valuation solutions
- Default- related services, including asset management, field services and sales and posting

\* \* \*

"We are excited to finalize the reorganization, ownership and management structure of the former LPS and ServiceLink businesses," said [FNF CEO William P.] Foley.  "**We will now focus our efforts on the successful integration of these businesses** to achieve operational efficiencies, drive organic growth and identify investment opportunities to grow this core business."

37.    On January 13, 2014, Black Knight InfoServ, LLC filed a Form 8-K with the SEC describing the Reorganization:

On January 3, 2014, **FNF commenced a series of internal reorganization transactions** ("the Reorganization") in which, among other things, (i) LPS converted into a limited liability company named Black Knight InfoServ, LLC (the "Company"), and the Company distributed its transaction services businesses (collectively, the "TS Subs") to its sole member, Black Knight Financial Services, Inc. (now known as Black Knight Holdings, Inc., "Black Knight") (the "Distribution"); and (ii) following the Distribution, Black Knight contributed (a) its interests in the Company to Black Knight Financial Services, LLC ("BKFS") and (b) the TS Subs to ServiceLink Holdings, LLC (formerly known as Black Knight Financial Services II, LLC, "ServiceLink"), each of which was a wholly owned operating subsidiary of Black Knight. Following the Reorganization, funds affiliated with Thomas H. Lee Partners, L.P. and certain related entities acquired a 35% equity interest in each of ServiceLink and BKFS.

- 14 -

The TS Subs that were contributed to ServiceLink include the following lines of business:

- Title, closing and escrow services and flood certifications
- Appraisal and valuation solutions
- Default-related services, including asset management, field services and agency sales and posting

BKFS retained the technology, data and analytics business within the Company's legacy business.  BKFS also includes the technology offerings previously owned by FNF's former ServiceLink division.  BKFS' primary products and services include:

- Empower®, PCLender® and LendingSpace® - enterprise-wide loan origination systems that support the correspondent, wholesale and retail markets
- RealEC® - electronically connects mortgage lenders and their business partners, and supports the company's loan quality offerings
- MSP® - the leading residential mortgage servicing technology platform in the U.S.
- LPS Desktop® and Fusion – comprehensive workflow platforms that support mortgage default
- The world's largest U.S. property database, that covers 99.9% of U.S. property records from over 3,000 counties
- Most comprehensive mortgage performance data - represents nearly 70 percent of loans in the mortgage industry and provides the broadest breadth and depth of any single loan-level data source
- Industry-leading analytics - Provide valuable insight that helps effectively manage risk, support regulatory compliance and improve decision-making

38.    Black Knight Holdings, Inc. (f/k/a Black Financial Services, Inc.), and its operating subsidiaries, Black Knight Financial Services, LLC and ServiceLink Holdings, LLC (f/k/a Black Knight Financial Services II, LLC), are referred to collectively herein as "Black Knight Financial Services."

39.    LPS's website publicly acknowledged LPS had been integrated into FNF and was now a "part of Fidelity National Financial."  LPS's website informed the public:  "LPS is now Black Knight Financial Services" and provided a link to the Black Knight Financial Services website.  The

Black Knight Financial Services website explained that LPS and FNF combined their businesses to create Black Knight Financial Services:

> Black Knight, which is part of Fidelity National Financial (NYSE: FNF), features two companies:
>
> **Black Knight Financial Services, the technology data and analytics company**
>
> Comprised of technology offerings from ***the union of LPS and ServiceLink, FNF's national lender platform***, Black Knight offers leading software systems; data and analytics offerings; and information solutions that facilitate and automate many of the business processes across the mortgage life cycle.
>
> **ServiceLink, A Black Knight Financial Services Company**
>
> Black Knight's ServiceLink company, ***which unites the transaction services operations from LPS and ServiceLink's operations***, focuses on transaction services for mortgage originators and on default services. Our origination services support many of the processes necessary to originate a loan, while our default services include foreclosure administrative services, property inspection and preservation services, default title and settlement services and default-related valuation services that support loss mitigation and the foreclosure process.
>
> (underlined text highlighted in original)

40.    FNF caused, through the Reorganization, LPS's former businesses to be completely integrated with FNF's business units into Black Knight Financial Services entities, and LPS to be rendered a debt-ridden corporate shell.  LPS (n/k/a Black Knight InfoServ, LLC) was shorn of valuable business units without receiving fair/any consideration.  Further, FNF forced LPS (n/k/a Black Knight InfoServ, LLC) to incur an additional $1.08 billion of debt.  As of September 30, 2013, LPS (n/k/a Black Knight InfoServ, LLC) was saddled with $2.108 billion of debt and total liabilities of $2.424 billion.  Also, as of September 30, 2013, LPS (n/k/a Black Knight InfoServ, LLC) retained assets of only $521 million (after removing goodwill and other intangible assets). LPS (n/k/a Black Knight InfoServ, LLC) liabilities far exceed its tangible assets rendering it essentially insolvent. FNF and Black Knight Financial Services stripped LPS (n/k/a Black Knight InfoServ, LLC) of its

assets and saddled it with massive debts, thereby substantially impairing the ability of LPS creditors – including Plaintiffs – to make a recovery from LPS (n/k/a Black Knight InfoServ, LLC).

41.     FNF and Black Knight Financial Services exercise complete control over LPS (n/k/a Black Knight InfoServ, LLC).  As alleged herein, FNF orchestrated the Reorganization.  Through the Reorganization, Black Knight Financial Services was given complete control over LPS's business units.  After the Merger, LPS is no longer an independent corporate entity.

42.     FNF's Black Knight Financial Services continues to operate LPS's business operations, as evidenced by a continuity of management, personnel, physical location, assets, and general business operations within the Black Knight Financial Services entities.  For example, according to Black Knight Financial Services' website, many of LPS's most senior executives now run Black Knight Financial Services' businesses as part of FNF.  *See* Exhibit B (providing executive biographies of senior Black Knight Financial Services management formerly senior executives at LPS).

43.     Black Knight Financial Services continues to issue public reports concerning national foreclosures statistics as LPS did prior to the Merger.  For example, on January 28, 2013, Black Knight Financial Services issued a press release stating:  "The Data and Analytics division of Black Knight Financial Services (formerly the LPS Data & Analytics division) reports the following 'first look' at December 2013 month-end mortgage performance statistics derived from its loan-level database representing approximately 70 percent of the overall market."  Moreover, LPS's public relations spokeswoman Michelle Kersh, continues to be the contact person on Black Knight Financial Services' press releases.

44.     Similarly, on February 3, 2014, Black Knight Financial Services issued a press release stating:  "The RealEC® Technologies division of Black Knight Financial Services (formerly

LPS) today announced the launch of its Document Delivery Service, an effective, innovative solution that delivers appraisals and other valuation documents to borrowers."

45.    All of Black Knight Financial Services' press releases indicate Black Knight Financial Services is an integration of FNF's former ServiceLink businesses and LPS's legacy businesses.  Each press release states in sum and substance:  "Black Knight Financial Services, a Fidelity National Financial (NYSE:FNF) company, is the mortgage and finance industries' leading provider of integrated technology, data and analytics solutions and related services.  Comprising technology offerings ***from the union of LPS and ServiceLink***, Black Knight Financial Services provides leading software systems; data and analytics; and information solutions that facilitate and automate many of the business processes across the loan life cycle.

46.    Further, as FNF and Black Knight Financial Services assert in press releases and SEC filings, Black Knight Financial Services is taking advantage of LPS's technological platforms and maintaining business relationships with longtime LPS clients.  Black Knight Financial Services continues to use LPS' former physical buildings, which are located within a corporate campus shared with FNF.

47.    To continue to conduct LPS's business operations, FNF also assumed significant liabilities of LPS.  For instance, at or about the same time as the closing of the Merger, FNF entered into a supplemental indenture with LPS to guarantee LPS's obligations with regard to $600 million in outstanding debt related to LPS's 5.75% Senior Notes due 2023.  Further, Black Knight Lending Solutions, Inc. was added as a co-issuer of the Notes.

48.    Similarly, pursuant to the Merger Agreement, FNF agreed to indemnify the officers and directors of LPS against liabilities arising from their work at LPS, including the facts and circumstances alleged herein.

49.     As a consequence of FNF's acquisition of LPS and immediate Reorganization, FNF and its Black Knight Financial Services subsidiaries merged with LPS and assumed the liabilities of LPS and became successors in interest to LPS, including the claims alleged herein.

### D.     Post-Merger Successor Liability Defendants

50.     Defendant Fidelity National Financial, Inc. (NYSE:FNF), according to its website, is a leading provider of title insurance, technology and transaction services to the real estate and mortgage industries.  FNF is the nation's largest title insurance company and issues more title insurance policies than any other title company in the United States.  FNF also provides industry-leading mortgage technology solutions and transaction services, including MSP®, the leading residential mortgage servicing technology platform in the U.S., through its majority-owned subsidiaries, Black Knight Financial Services, LLC and ServiceLink Holdings, LLC.

51.     Defendant Black Knight Holdings, Inc. (f/k/a Black Knight Financial Services, Inc.) is a subsidiary of FNF and the parent company of Black Knight InfoServ, LCC, Black Knight Financial Services, LLC, and ServiceLink Holdings, LLC.  Black Knight Holdings, Inc., itself and through its subsidiaries, combines business units of FNF and LPS.  Black Knight Holdings, Inc.'s website states:  "Black Knight is the leading provider of technology, services, data and analytics to the mortgage industry.  Black Knight also delivers key technology, data and analytics to the consumer lending, capital markets, real estate and various other industries."

52.     Defendant Black Knight Financial Services, LLC is a subsidiary of Black Knight Holdings, Inc. and a subsidiary of FNF.  As set forth in FNF's January 3, 2014 press release, Black Knight Financial Services, LLC "consists of LPS' former technology, data and analytics businesses and the technology offerings previously owned by FNF's ServiceLink division."

53.    Defendant ServiceLink Holdings, LLC (f/k/a Black Knight Financial Services II, LLC) is a subsidiary of Black Knight Holdings, Inc. and is a subsidiary of FNF.  As set forth in FNF's January 3, 2014 press release, ServiceLink Holdings LLC "consists of FNF's former ServiceLink division and LPS's former transaction services business."  ServiceLink Holdings LLC apparently operates certain former FNF and LPS business units, including LPS's former default-related services business units that are at core of Plaintiffs' allegations in this Complaint.

54.    Black Knight Financial Services, Inc., Black Knight Financial Services, LLC, ServiceLink Holdings, LLC, and Fidelity National Financial, Inc. are referred to herein collectively as the "Post-Merger Defendants."  The Post-Merger Defendants are named as successors in liability pursuant to Plaintiffs' Eighth Cause of Action.  Unless otherwise noted, references to Defendants do not include the Post-Merger Defendants.

## IV.    DEFENDANTS' FRAUDULENT SCHEME

### A.    LPS's Business

55.    During the relevant period, according to LPS, the Company was a provider of integrated technology and services to the mortgage lending industry, with market leading positions in mortgage processing and default management services in the United States.  LPS conducted its operations through two reporting segments, Technology, Data and Analytics and Loan Transaction Services.  A large number of financial institutions used LPS's solutions.  LPS's technology solutions included its mortgage processing system, which automates all areas of loan servicing, from loan setup and ongoing processing to customer service, accounting and reporting.  Loan Transaction Services included LPS's default management services, which were used by mortgage lenders, servicers, attorneys and trustees to reduce the expense of managing defaulted loans.

56.     The DocX business maintained a proprietary system called the Recorders Information Database ("RID"), which contained the various filing requirements and fees imposed by each of the thousands of county recorder's offices throughout the United States.  The main clients of the DocX business were residential mortgage servicers (the "servicers"), which typically had undertaken certain services for mortgage lenders.  These duties included, among others, accepting and recording mortgage payments, paying taxes and insurance from borrower escrow accounts, and conducting or supervising the foreclosure process when necessary.

57.     DocX's servicer-clients paid for access to the RID database.  Clients could also hire DocX to assist in creating and executing mortgage-related documents filed with recorders' offices.

**B.      LPS Illegally Created Mortgage-Related Documents to Rapidly (and Cheaply) Process Foreclosures and Bankruptcies While Fraudulently Inflating Reported Short-Term Profits**

58.     LPS's improper business model and the economic downturn generated a tremendous volume of default services work, which Defendants were determined to rapidly process in order to drive market share and profits.  To accomplish this, LPS employed various illicit practices at all of its offices to churn as many files as quickly as possible, including the fabrication of documents, robo-signing, forging or surrogate signing, improper notarization of documents, violation of security protocols, and concealment of known mistakes from courts, attorneys, and clients.

**Defendants Masterminded a Six-Year Scheme to Prepare and File More Than 1 Million Illegally Signed and Notarized Mortgage-Related Documents**

59.     Beginning in or about 2003 and continuing through November 2009, employees of LPS at the direction of Defendant Brown and others began forging and falsifying signatures on the mortgage-related documents that LPS had been hired to prepare and file with property recorders' officers throughout the United States.

- 21 -

60.    Brown implemented these signing practices to enable LPS to generate profit. Specifically, LPS was able to create, execute, and file larger volumes of documents using these signing and notarization practices.  More documents meant more money, and more reported profits.

61.    To further increase profits, LPS hired temporary employees, who (i) worked at much lower costs and without the quality controls represented to LPS clients, and (ii) falsely signed thousands of documents a day.

62.    According to the DOJ, the exact number of documents created by LPS with fraudulent signatures and notarizations is not known, but the DOJ estimates that between 2003 and 2009, LPS created "well over 1 million such documents" that were filed with property recorders' offices throughout the country.

### LPS Fabricated Missing Assignments to Foreclose on Homeowners

63.    To foreclose on a home, a foreclosing entity must establish ownership of the mortgage at issue.  In the recent housing boom, mortgages were generated at an incredible pace and in many cases subsequently transferred to trusts owned by investors who bought securitized packages of mortgages.  Such a transfer requires the creation of a mortgage assignment that transfers ownership from the original lender to the next owner (*i.e.*, trusts).  However, as the media reported, many original lenders never handed over ownership to the trusts.  Only the holder or owner of a mortgage can institute a foreclosure action in the event that the homeowner stops mortgage payments.

64.    Without the assignments, LPS's customers could not complete foreclosures. Accordingly, through DocX, LPS produced significant numbers of invalid assignments on behalf of banks so that its clients could foreclose on homeowners.

### LPS Abused Client Authority and Required Employees to Robo-Sign Documents

65.    LPS managed default services for a significant portion of the industry, and as a result, had to execute and sign millions of documents that often required the signatures of bank officials. Since obtaining signatures on such a significant volume was very time-consuming, each client designated people at DocX with "signing authority" for those clients. Because different states required differently titled employees to sign documents such as Assignments of Title and Releases of Liens, the clients designated several titles to different LPS employees. A corporate resolution between DocX and their clients gave DocX employees the authority to sign as client representatives. This was done solely to speed up the turnaround time.

66.    LPS abused this delegated signing authority to push through the large volume of foreclosures by requiring its employees to robo-sign documents needed to complete files for foreclosure. Robo-signing involved employees signing documents without verifying or reviewing their content and, in many cases, not knowing what they were signing.

**LPS Required Employees to Forge Signatures through an Arrangement Called Surrogate Signing**

67.    To expedite the robo-signing process and keep pace with the significant volume of documents that needed execution, LPS employed surrogate signing, which required its employees to sign or forge the names of those individuals at LPS who had been given signing authority by clients. While there were DocX managers with the authority to sign for banks, DocX instead used lower-level employees to forge the signatures of those authorized managers.

68.    LPS implemented an official policy called the "Document Solutions Group Surrogate Signer Policy," which attempted to legitimize the surrogate signing or forging practice by requiring the "authorized signer" and the corresponding "surrogate signer" to sign the form. This policy provided that internal procedures with respect to surrogate signing had "been established to

minimize loss effectiveness due to a low number of in-house authorized corporate signers at various times."

69.    However, surrogate signing was not authorized by LPS clients and did not legitimize the false and fraudulent forging of signatures.  As evidenced by LPS's litigation with American Home Mortgage Servicing, Inc. ("AHMSI"), a significant LPS client, surrogate signing was not sanctioned by LPS clients.

70.    LPS's surrogate signing practice resulted in forgery of significant quantities of documents.  Surrogates supposedly signing documents were actually forging documents.

71.    According to Chris Pendley's ("Pendley") interview for the television program *60 Minutes*, on his first day as a DocX employee, he was informed that he was going to be signing documents using someone else's name.  He recounted that he would sign documents as though he were a bank officer and would sometimes be "Vice President" of as many as five to six different banks on a given day.  Pendley explained that DocX employees had to sign at least 350 documents an hour and that he alone signed 4,000 a day, earning $10 an hour.  The *60 Minutes* episode also revealed that some of the supposed bank vice presidents at DocX were actually high school students.

72.    LPS's surrogate signing practices were also confirmed by former employee Cheryl Denise Thomas ("Thomas"), who testified that she personally signed an Assignment of Mortgage as a Vice President for Mortgage Electronic Registration Systems, even though she was not a vice president of that company.  Thomas explained that surrogate signers were told surrogate signing was legal and okay.  Thomas further testified that the surrogate signing procedures occurred before and after DocX became part of LPS.

73.    According to the Nevada Attorney General, at the LPS Default Solutions office in Minnesota, the company established a document execution "production line" to execute as many

documents as quickly as possible.  But in the rush to execute documents – and per LPS policies and procedures – LPS employees who signed documents were not placed under oath, did not sign in the presence of notaries, and/or did not have personal knowledge of the information to which they attested.  In an internal newsletter, LPS touted its "Document Execution" team as being "set up like a production line" to resolve each document request within 24 hours and to sign at least 1,000 documents per day.  A former supervisor of the Document Execution team in Minnesota explained that LPS actually executed almost 1,500 documents a day.

### LPS Falsified Notarizations

74.    In addition to forging documents and robo-signing without review, LPS also engaged in improper notarization.  To be valid, assignments and other mortgage-related documents had to be notarized.  Notarization reflects the authenticity of documents and signatures.  Despite the legal significance of notarization, LPS caused huge volumes of documents to be fraudulently notarized.  Mortgage assignments filed in county clerk offices show that LPS's signing and notarization practices were not limited to DocX but also occurred at LPS's other offices.

75.    For example, Thomas testified that she notarized anywhere between one to a thousand documents at DocX on any given day.  Thomas explained that she was instructed not to be in the room when assignments were signed and would notarize documents without seeing them signed.  Thomas raised questions to supervisors as to why many people (whose signatures she notarized) signed as corporate officers (*e.g.*, vice presidents, secretaries, etc.).  She was told to do what she was required to do, that it was "covered," and that there was legal documentation.  Thomas testified that her supervisor at DocX, Renee Gaglione, would keep her away from the signing room and told her it was none of her business who was in the room.  In addition, Thomas stated that she notarized documents she knew a surrogate had signed.

- 25 -

76.     Additionally, according to the Nevada Attorney General's investigation, former employees who notarized documents recalled that they were specifically instructed not to read the documents and were required to notarize a minimum of 250 documents an hour or about 2,000 documents per day per notary.  When the Signing Room at DocX was especially busy, notaries were asked to pre-notarize documents (*i.e.*, notarize documents before signature).

### LPS Used its Improper Business Model to Cross-Sell Services

77.     Through its improper business model and illicit business practices, LPS successfully obtained new customers and generated significant revenues.  LPS brought customers into its system by providing low-cost document processing subsidized by the fraudulent robo-signing and falsification scheme, and then LPS was able to cross-sell a full range of its services to those customers.  The Company explained:  "The broad range of services we offer provides us with the opportunity to expand our sales to our existing customer base through cross-selling efforts.  We have established a core team of senior managers to lead account management and cross-selling of the full range of our services to existing and potential customers at the top 50 U.S. lending institutions."

### LPS's Illicit Practices Drove Revenues, Margins and Income to Rise

78.     Through LPS's improper business model and illicit practices detailed above, Defendants successfully exploited the market for default management services and increased revenues to unprecedented levels in an otherwise terrible economy.  LPS's default management services revenues more than doubled and grew to represent nearly 50% of total revenue.  LPS's default services revenue quadrupled from $277.8 million in 2006 to more than $1 billion of annual revenue for both 2009 and 2010.

79.     Further, LPS was able to convert more of this revenue to income (margins) by artificially keeping costs low by utilizing the illegal practices described herein rather than employing qualified persons to properly prepare the mortgage-related documents for LPS's clients.

80.     Throughout the relevant period, Defendants touted high revenues, margins, income and LPS's significant market share, while deliberately failing to disclose the illicit practices and high-risk business model that drove these achievements.

81.     As detailed below, when the market began to learn of the illicit business practices, Defendants continued their fraud and maintained the artificial inflation in LPS's stock price through outright lies and false assurances to investors.  However, Defendants' scheme would eventually unravel.  When the improper business model and illicit business practices were more fully revealed, the legal and regulatory issues associated with LPS's practices had a significant and negative impact on the financial results of LPS and its customers.

### C.    Contrary to Their Public Statements, Defendants Failed to Maintain Adequate Internal Controls

82.     Prior to and during the relevant period, until LPS's outside auditors were alerted to the scheme by a whistleblower, LPS knowingly failed to employ adequate, if any, controls over DocX and other LPS subsidiaries.

83.     Throughout the relevant period, Defendants repeatedly assured investors that LPS maintained robust internal controls to ensure accurate financial reporting.  For example, in the Company's Form 10-K filings made during the relevant period, Defendants caused LPS to file Form 10-Ks that stated:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f).  Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial

reporting. Management has adopted the framework in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on our evaluation under this framework, our management concluded that our internal control over financial reporting was effective as of the end of the period covered by this annual report.

84.    The Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "Report") indicates that internal controls are supposed to be designed to assure "[c]ompliance with applicable laws and regulations."

85.    The Report also states: "Internal control systems need to be monitored – a process that assesses the quality of the system's performance over time. This is accomplished through ongoing monitoring activities, separate evaluations or a combination of the two."

86.    The Report also notes the importance of internal audit to maintaining proper internal controls: "Internal auditors play an important role in evaluating the effectiveness of control systems, and contribute to ongoing effectiveness. Because of organizational position and authority in an entity, an internal audit function often plays a significant monitoring role."

87.    On April 13, 2011, Defendant Carbiener signed (on behalf of Lender Processing Services, Inc., DocX, LLC, and LPS Default Solutions, Inc.) a Consent Order with the Board of Governors of the Federal Reserve System, the Office of the Comptroller of Currency, the Federal Deposit Insurance Corporation and the Office of Thrift Supervision, which found LPS "Failed to have adequate internal controls, policies and procedures, compliance, risk management, internal audit, and oversight of document execution services that LPS provided to Examined Servicers."

88.    Adequate internal controls would have included reviews of the signing processes employed by DocX. As Defendant Carbiener would admit after the relevant period, such controls would have included samplings of the actual documents executed/signed by DocX to make sure there was no fraud. Any appropriate review of DocX – where temporary employees with no training

- 28 -

forged thousands of documents a day – would have readily revealed the illegal conduct, regardless of whether or not Defendant Brown volunteered the truth.

89.    Defendants did not employ controls over DocX, presumably because Defendants did not want any records of the ongoing DocX fraud.  Prior to November 2009, LPS did not employ adequate internal controls or perform any reasonable internal auditing to prevent the fraud at DocX. Only after a whistleblower complaint to LPS's external auditors did LPS employ adequate controls over the DocX subsidiary.

90.    Indeed, despite Defendants' repeated statements concerning LPS's internal controls over financial reporting made during the relevant period (*see, e.g.*, ¶¶ 83, 193, 194, 208), Defendant Carbiener admitted after the relevant period that LPS was still forming its disclosure controls in November 2009.  Carbiener admitted DocX received little, if any, scrutiny.  He testified, "we'd only been independent for a couple years, and in our prioritization we obviously hit the bigger – the bigger business units . . . .  [W]e hadn't gotten all the way through down to these very small business units [such as DocX]."

91.    Despite the clear importance of internal audit and monitoring to maintaining adequate internal controls, as set forth in the Report, LPS did not have a proper internal audit.  Carbiener testified, as of November 2009, LPS was "a newly spunout company, forming our internal – our internal audit structure."

92.    As Defendants Carbiener and Chan knew, and contrary to their public statements, they had not carried out an adequate evaluation of LPS's disclosure controls and procedures over financial reporting to ensure they were effective in conveying material information to senior management.

**D.    Defendants' Illegal Document Creation Scheme Is Slowly Revealed
and the Foreseeable Risks of Defendants' Illegal Conduct
Materialized, Causing LPS's Stock to Drop Even as Defendants
Continued to Mislead Plaintiffs**

93.    Defendants, like most perpetrators of fraud, did not simply admit to their fraudulent

conduct all at once.  Rather, the truth concerning LPS's fraudulent practices came to light in bits and

pieces.

94.    Beginning no later than April 3, 2010, through a series of partial revelations, the

market slowly began to learn the truth of the various illegal business practices that Defendants were

engaged in to drive LPS's earnings, revenue growth and market share.  As detailed below, rather

than reveal the truth about LPS's illegal business practices, and Defendants' involvement in the

fraud, Defendants repeatedly denied any wrongdoing and misled the market about the true nature of

LPS's business practices, their pervasiveness, the steps Defendants had taken to address those

practices, and the impact of the illegal practices on LPS's financial condition.  Through their

misrepresentations, omissions and outright lies and wrongdoing, Defendants endeavored to keep the

truth hidden from the market and maintain an appearance of legitimacy.  Nonetheless, LPS had

fraudulently "robo-signed"/surrogate-signed/forged and notarized so many mortgage documents, that

Defendants couldn't conceal their wrongdoing indefinitely under the scrutiny of attorneys, judges

and journalists who eventually uncovered the scheme.

95.    On Saturday April 3, 2010, *The Wall Street Journal* published an expose revealing

that problems with foreclosure documents created by LPS were more widespread and blatant than

LPS had previously indicated.  Moreover, according to sources who spoke with *The Wall Street

Journal*, the previously disclosed investigation of LPS was far more serious than the Company had

indicated and was being pursued as a criminal inquiry:

Judges across the U.S. have prevented foreclosures after finding that the materials banks had submitted to them to support their claims were wrong.

Now a subsidiary of a company that is a top provider of the documentation to banks for foreclosure actions is under investigation by federal prosecutors.

Prosecutors are "reviewing the business processes" of the subsidiary of Lender Processing Services Inc., based in Jacksonville, Fla., according to the company's annual securities filing released in February. ***People familiar with the matter say the inquiry is criminal in nature.***

\* \* \*

Some lawyers representing homeowners have claimed that banks ***routinely file erroneous paperwork showing they have a right to foreclose when they don't.*** Firms that process the paperwork are either "producing so many documents per day that ***nobody is reviewing anything, even to make sure they have the names right, or you've got some massive software problem***," said O. Max Gardner, a consumer-bankruptcy attorney in Shelby N.C., who has defended clients against foreclosure actions.

LPS was recently referred to in a case involving Sylvia Nuer, a Bronx, N.Y., homeowner who had filed for bankruptcy protection in 2008. Diana Adams, a U.S. government lawyer who monitors bankruptcy courts, said in a brief filed earlier this year that LPS signed a document that wrongly said J.P. Morgan Chase &Co. had once owned Ms. Nuer's loan.

Documents related to the loan were "***patently false or misleading***," she wrote. J.P. Morgan Chase, which has withdrawn its request to foreclose, declined to comment.

\* \* \*

LPS has acknowledged problems in its paperwork.  In its annual securities filing, in which it disclosed the federal probe, the company said it had found "an error" in how Docx handled notarization of some documents. ***Docx also has processed documents used in courts that incorrectly claimed an entity called "Bogus Assignee" was the owner of the loan, according to documents reviewed by*** <u>***The Wall Street Journal.***</u>

Ms. Kersch said the "bogus" phrase was used as a placeholder. "***Unfortunately, on a few occasions, the document was inadvertently recorded before the field was updated***," she said.

- 31 -

96.     On April 5, 2010, to falsely reassure investors and prop-up LPS's stock price, LPS issued a press release responding to *The Wall Street Journal* article.  Defendants' press release described the issue as merely an "error in the notarization of certain documents" by a subsidiary that performed services for "a limited number of customers" that were "unrelated to the Company's core default management services" and "immaterial to the Company's financial results."  LPS assured the public that it "immediately corrected the business process and has completed the remedial actions necessary to minimize the impact of the error."

97.     Following the publication of *The Wall Street Journal* article, and despite Defendants' false and misleading press release, shares of LPS stock dropped 4.12%, or $1.57 per share, on April 5, 2010, to close at $36.54, on heavy trading volume.  Had Defendants not falsely reassured the market with the misleading statements in their press release, this stock drop would have been even more significant.

98.     As LPS so proudly boasted, its technology was utilized in more than 50 percent of all foreclosures in the United States during the relevant time period.  However, by executing over a million fraudulently signed and notarized mortgage-related documents for use in foreclosures around the country, LPS had created an undisclosed time bomb that could (and ultimately did) cause massive disruptions in foreclosures nationwide.  Beginning on September 29, 2010, and continuing through October 5, 2010, the material risks created by LPS's illegal and fraudulent signing practices materialized.  As evidence of the practices piled up, public faith in the foreclosure process was so shaken that banks and politicians alike called for a widespread moratorium on all foreclosures.

99.     On September 29, 2010, J.P. Morgan Chase – one of LPS's two biggest clients – revealed it would freeze foreclosures because it was concerned about widespread forgeries.  As the *Washington Post* reported:

J.P. Morgan Chase, one of the nation's leading banks, announced Wednesday that it will freeze foreclosures in about half the country because of flawed paperwork, a move that Wall Street analysts said will pressure the rest of the industry to follow suit.

The bank's decision will affect 56,000 borrowers in 23 states where allegations of *forged documents and signatures* and other similar problems are being used to try to overturn court-ordered evictions. Yet the impact may be much broader, given J.P. Morgan's stature in the industry. If other banks adopt the same approach, the foreclosure process in many parts of the country will grind to a halt.

100. On September 30, 2010, U.S. Representative Alan Grayson ("Grayson") posted a video on youtube.com, discussing various issues with respect to mortgage fraud and connecting the roles played by the banks, servicers and LPS. In particular, he detailed LPS's illicit practices and called LPS a "factory of fraud." Grayson revealed:

Fraud is rampant [in the foreclosure process.]

* * *

[B]ig bureaucratic loan servicers are . . . foreclosing with forged documents. . . .

* * *

[The banks] didn't keep good records and violated the laws mandating that they file records with the county clerk on who owned what mortgage title. . . .

* * *

Obviously, the banks do not want to grapple with the consequences of trillions of dollars of securitized mortgages, having no legal standing to foreclose. *So they have simply created a system where servicers hire foreclosure mill law firms, whose business is to forge documents showing or purporting to show that they have a legal right to foreclose.* Some of these foreclosure mills have been featured in *The New York Times.*

And, so-called robo-signers, people whose names appear on thousands of affidavits. These appear despite obvious forgeries and overt omissions and in cases where these people admit that they had no knowledge of what they were signing.

The system is so organized that there is a company called Lender Processing Services, which allegedly has created the means to systematize this fraud.  Lawyers use the LPS system to request which affidavits and documents they need, ***LPS then has document mills where they can magically make an authorized vice president of whoever you need and send you back-dated signed documents saying that you have the right to foreclose.  Courts at first refused to believe this level of rampant fraud even exists but more recently they've started to sanction fraud against loan servicers.***

Here are some examples of signature forgeries used on documents filed with the courts.  These are four clearly forged signatures of document mill employee Linda Green.  Here are six signatures of Christina Wang and here are three obvious forgeries of Taiwana Thomas.

Finally, this is a mortgage assignment filed with the recorders office in which the foreclosing firm forgot to put the name of the assignee.  So they instead put "bogus assignee."  The filing firm simply forgot to change the template for whose home, which family's home, they wanted to take.  ***This is a factory of fraud.***

101.    On October 3, *The New York Times* reported:

As some of the nation's largest lenders have conceded that their foreclosure procedures might have been improperly handled, lawsuits have revealed myriad missteps in crucial documents.

The flawed practices that GMAC Mortgage, JPMorgan Chase and Bank of America have recently begun investigating are so prevalent, lawyers and legal experts say, that additional lenders and loan servicers are likely to halt foreclosure proceedings and may have to reconsider past evictions.

Problems emerging in courts across the nation are varied but all involve documents that must be submitted before foreclosures can proceed legally.  Homeowners, lawyers and analysts have been citing such problems for the last few years, but it appears to have reached such intensity recently that banks are beginning to re-examine whether all of the foreclosure papers were prepared properly.

102.    On October 4, 2010, in response to continued media reports and government investigations calling into question LPS's default-related services that it provides to mortgage lenders and servicers, LPS issued a press release commenting on what it considered "recent mischaracterizations in the media regarding the default-related services LPS provides to mortgage

lenders/servicers." The press release was LPS's attempt at a cover-up of the truth. The ticking time bomb LPS created was blowing up. Defendants' efforts to assuage investor concerns were overwhelmed as the evidence of their wrongdoing continued to surface.

103.    On October 5, 2010, *The New York Times* published an article entitled "Foreclosure Furor Rises; Many Call for a Freeze," describing "an uproar over bad conduct by mortgage lenders" by federal lawmakers (including U.S. Senators Al Franken and Robert Menendez) and state law enforcement figures calling for a federal investigation and freezes on foreclosures. The article addressed concerns about robo-signing and specifically noted LPS's role in the foreclosure process and its recent stock price slide:

> Meanwhile, shares of a major foreclosure outsourcing company, Lender Processing Services of Jacksonville, Fla., fell 5 percent on Tuesday, adding to a slide that began last week.

> The company's documentation practices are stirring questions, including how the same employee can have wildly varying signatures on mortgage documents. L.P.S. blamed a midlevel manager's decision to allow employees to sign forms in the name of an authorized employee. It says it has stopped the practice.

> The United States Attorney's Office in Tampa began investigating L.P.S. in February. An L.P.S. representative could not be reached Tuesday for comment.

104.    As the foreseeable risks inherent in Defendants' undisclosed, illegal signing practices began to materialize, the price of LPS common stock plummeted 18%, falling from a close of $33.23 on September 30, 2010 to close at $27.31 on October 5, 2010, on unusually heavy trading volume.

105.    Investors and the market understood the Company's sharp stock price decline from October 1 through October 5 was the direct result of disclosures concerning the Company's falsification of mortgage-related documents, and the materialization of the risk associated with such illegal conduct. Indeed, as *The Florida Times Union* reported on October 6, 2010:

- 35 -

Lender Processing Services Inc.'s stock dropped Tuesday for the third straight trading day as news reports about bogus documents in the mortgage foreclosure process also served to highlight the company's role in foreclosures and allegations of wrongdoing against LPS.

\* \* \*

But in the past two weeks, several of the nation's biggest lenders have halted foreclosure proceedings because of concerns that mortgage companies are filing cases without proper documentation to show who holds the mortgage. Those lenders include Bank of America, JPMorgan Chase and GMAC Mortgage.

That has made investors nervous about LPS for two reasons. One is that a slowdown in mortgage foreclosures will reduce the company's revenue from the default services business. Second, the foreclosure halt has once again raised concerns that Docx or other LPS subsidiaries may have acted improperly to create new documents when mortgage lenders did not have the proper paperwork for a foreclosure.

LPS' stock fell $1.75 Friday and dropped another $2.72 on Monday. And after trading as low as $25.50 Tuesday afternoon - its lowest level since April 2009 - it closed at $27.31, down $1.45 on the day.

106.    Similarly, on October 7, 2010, *The Florida Times Union* reported LPS's stock had recently fallen "as much as $7.73 over three trading days to a 18-month low of $25.50 . . . ***prompted by concerns about LPS' role in the mortgage foreclosure process nationwide, amid reports that lenders seeking to foreclose don't have the proper documentation to proceed and are producing false documents***."

## E.    Continuing Revelations of Defendants' Fraud

107.    On October 13, 2010, *The Wall Street Journal Online* published an article entitled "Probe Targets Foreclosure Paperwork; Tens of Thousands of Proceedings Are Suspected of Being Tainted; Return of the 'Robo Signers.'" The Florida Attorney General was investigating the practices of LPS and four foreclosure law firms that may have led to "'fabricated documents' [being] used in foreclosure actions in court" and "improper paperwork taint[ing] tens of thousands of

- 36 -

foreclosures."   The article quoted Florida Attorney General Bill McCollum:  "There was a long

history, apparently, of robo-signings."

108.    On October 28, 2010, LPS issued a Form 8-K announcing that Chan would no longer

serve as CFO and would be leaving LPS effective November 21, 2010.

109.    On October 29, 2010, LPS held an earnings conference call with securities analysts in

which Carbiener addressed various legal and regulatory issues facing LPS, including a subpoena

recently received from the Florida Attorney General and other recent inquiries from state and federal

regulators.  Carbiener admitted that LPS's signing issues had existed for "a long period of time" and

that he and others had discovered such issues in the course of their "on-going reviews of internal

business processes, including our document preparation and signing processes."   Specifically,

Carbiener stated:

> As a matter of course, we have historically performed on-going reviews of internal
> business processes, including our document preparation and signing processes.
>
> * * *
>
> [O]ur reviews led to the discovery of the signing issues previously disclosed in Docx,
> a small company that became part of LPS when we spun out of FIS in mid-2008.
>
> * * *
>
> [I]n late 2009, LPS discovered that a manager of Docx had allowed some employees
> to sign another authorized employee's name on certain documents with that
> employee's written consent. We immediately halted the practice, dismissed the
> manager, remediated the impacted documents, forwarded the remediated documents
> to our clients or their attorneys, and closed the operation.

110.    On December 6, 2010, *Reuters* released an investigative report on LPS entitled,

"Special Report: Legal Woes Mount for a Foreclosure Kingpin."   The report detailed myriad legal

issues surrounding LPS's dubious documentation practices, including an "intensifying" criminal

investigation by federal prosecutors and the FBI.  *Reuters* observed that the documentation issues

"pose a bigger threat to the company than Carbiener let on," extending not only to DocX, but to LPS Default Solutions, a unit that "produced documents of dubious authenticity in far larger quantities than it has disclosed, and over a much longer timespan," and to signing operations conducted by LPS personnel at client locations.  The report also noted that, despite Carbiener's public assertion that LPS had taken immediate remedial actions upon discovery of DocX's wrongdoing in late 2009, LPS allowed the troubled subsidiary to continue signing documents until May 2010 and to remain in existence until August 2010.

111.    On April 3, 2011, the television program *60 Minutes* aired a segment on LPS, detailing the robo-signing and forging of documents that occurred at DocX.  The television show also detailed that LPS was "recreating missing mortgage assignments for the banks and providing the legally required signatures of bank vice presidents and notaries" to foreclose on homes.

112.    On April 13, 2011, Lender Processing Services, Inc., DocX, LLC, and LPS Default Solutions, Inc. entered into the Federal Reserve Consent Order with various government regulators that oversee the United States banking system, on the grounds that LPS's illegal acts alleged herein were performed for banking institutions (referred to as "Examined Servicers").  The Federal Consent Order required LPS to perform an extensive review and remediation of the documents LPS improperly created.  Further, the Consent Order, which was signed by Defendant Carbiener, found, among other things:

> WHEREAS, in providing document execution services to Examined Servicers, including services that facilitated completing foreclosures, LPS and its employees allegedly:
>
> (a) Executed numerous affidavits and similar sworn statements (collectively, "Affidavits") making various assertions, such as the ownership of the mortgage note and mortgage (or deed of trust), the amount of principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the Affidavit were made based on personal knowledge or based on a

review by the affiant of the relevant books and records, when, in many cases, they were not based on such knowledge or review.  LPS executed these Affidavits on behalf of Examined Servicers knowing they would be filed in state courts and in connection with bankruptcy proceedings in federal courts;

(b) Executed assignments of mortgages containing inaccurate information pertaining to matters including the identity and location of the assignee and beneficiary and the effective date of the assignment. LPS recorded or caused to be recorded these assignments of mortgages in local land record offices, or executed them on behalf of Examined Servicers knowing they would be filed in state courts or in connection with bankruptcy proceedings in federal courts;

(c) Executed Affidavits, assignments of mortgages, and other mortgage-related documents (collectively, "Mortgage Documents") on behalf of Examined Servicers without authority to execute the Mortgage Documents, specifically without having been duly appointed as an agent or officer of the Examined Servicers to execute documents on behalf of the Examined Servicers;

(d) Recorded or caused to be recorded in local land records offices numerous Mortgage Documents that were not properly notarized, including those not signed or affirmed in the presence of a notary, or knew that such Mortgage Documents would be filed in state and federal courts;

(e) Failed to respond in a sufficient and timely manner to the increased level of foreclosures by increasing financial, staffing, and managerial resources to ensure that LPS adequately handled the document execution services that LPS provided to Examined Servicers; and

(f) Failed to have adequate internal controls, policies and procedures, compliance, risk management, internal audit, and oversight of the document execution services that LPS provided to Examined Servicers;

113.    On July 6, 2011, Defendant Carbiener resigned.

114.    On August 23, 2011, AHMSI, one of LPS's largest clients, filed a petition against LPS and DocX alleging millions of dollars in losses "as a result of [LPS and DocX's] unauthorized execution and notarization of assignments affecting more than 30,000 residential mortgages in Texas and throughout the United States."  At issue was the use of surrogate signers to execute mortgage assignments on behalf of individuals specifically authorized by AHMSI.  AHMSI asserted that the scope of this practice "was far greater than [LPS] initially represented," forcing AHMSI to address

"a myriad of legal issues, problems and proceedings in venues around the country" and resulting in the delay or restart of thousands of foreclosure actions. Of particular note, AHMSI's petition revealed that LPS knew of surrogate signing practices at DocX no later than November 2009, and knew such issues were significant. Indeed, the lawsuit revealed the issues were significant enough that AHMSI had sought indemnification from LPS in February 2010 – far earlier than Defendants ever disclosed the truth to Plaintiffs.

115.    On November 20, 2012, Defendant Lorraine Brown pleaded guilty to committing wire and mail fraud. According to the DOJ:

> A former executive of Lender Processing Services Inc. (LPS) – a publicly traded company based in Jacksonville, Fla. – pleaded guilty today, admitting her participation in a six-year scheme to prepare and file more than 1 million fraudulently signed and notarized mortgage-related documents with property recorders' offices throughout the United States.

> \* \* \*

> "Lorraine Brown participated in a scheme to fabricate mortgage-related documents at the height of the financial crisis," said Assistant Attorney General Breuer. "She was responsible for more than a million fraudulent documents entering the system, directing company employees to forge and falsify documents relied on by property recorders, title insurers and others."

> \* \* \*

> Also according to plea documents, Brown implemented these signing practices at DocX to enable DocX and Brown to generate greater profit. Specifically, DocX was able to create, execute and file larger volumes of documents using these signing and notarization practices. To further increase profits, DocX also hired temporary workers to sign as authorized signers. These temporary employees worked for much lower costs and without the quality control represented by Brown to DocX's clients. Some of these temporary workers were able to sign thousands of mortgage-related instruments a day. Between 2003 and 2009, DocX generated approximately $60 million in gross revenue.

> After these documents were falsely signed and fraudulently notarized, Brown authorized DocX employees to file and record them with local county property records offices across the country. Many of these documents – particularly mortgage

assignments, lost note affidavits and lost assignment affidavits – were later relied upon in court proceedings, including property foreclosures and federal bankruptcy actions. Brown admitted she understood that property recorders, courts, title insurers and homeowners relied upon the documents as genuine.

116.    On January 29, 2013, Defendants Lender Processing Services, Inc. and DocX, LLC signed an Agreed Consent Judgment Entry and Order in which these Defendants stipulated to the fact that DocX and other subsidiaries of Lender Processing Services, Inc. had generated and/or executed mortgage loan documents with defects (including unauthorized signatures, improper notarizations, and/or attestations of fact not personally known to or verified by the affiant) and caused such documents to be filed in courts and/or used in foreclosure processes.   Moreover, Defendants Lender Processing Services, Inc. and DocX, LLC stipulated:  "***On or around November 2009, Lender Processing Services, Inc., conducted an internal review of DocX and identified certain Mortgage Loan Documents that contained inaccuracies, unauthorized signatures, notarization defects, or other deficiencies.***"

117.    On January 31, 2013, LPS announced a "multi-state settlement, which includes an aggregated payment by LPS of $127 million, resolves inquiries surrounding the company's default operations, including former document preparation, verification, signing and notarization practices of certain operations."   According to the Illinois Attorney General Lisa Madigan, "LPS and its subsidiaries became a sort of document factory, literally rubber stamping thousands of foreclosures with no regard for fairness and accuracy in the process."

118.    On February 15, 2013, Defendant LPS entered into the Non-Prosecution Agreement with the U.S. Department of Justice.

119.    In conjunction with entering into the NPA, LPS agreed to pay $35 million in criminal penalties and forfeiture for its participation in a six-year scheme to prepare and file more than one

million fraudulently signed and notarized mortgage-related documents with property recorders'
offices throughout the United States.

120.    On June 25, 2013, Defendant Brown was sentenced to serve five years in prison.

## V.    SCIENTER ALLEGATIONS

### A.    Defendant Brown Orchestrated the Illegal Document Creation
Scheme for the Purpose of Falsely Inflating Profits

121.    Defendant Brown masterminded a six-year scheme in which LPS made money by
knowingly and illegally forging over a million mortgage-related documents to be filed with property
recorders' offices throughout the country and used in bankruptcy and other court proceedings.

122.    According to the DOJ, Brown "was responsible for more than a million fraudulent
documents entering the system, directing company employees to forge and falsify documents relied
on by property recorders, titled insurers and others."

123.    According to the plea agreement Brown entered into with the government, Brown
implemented the illegal signing practices to enable LPS and Brown to generate greater profit.
Specifically, LPS was able to create, execute and file larger volumes of documents using illegal
practices – rather than by running legitimate business operations as Defendants had represented to
the investing public.

124.    Brown, in her plea agreement, admitted she knew documents forged by LPS would be
used and relied upon by courts, title insurers, property recorders and others.

### B.    Defendants Carbiener and Chan Knew LPS Did Not Maintain
Adequate Internal Controls and Were Aware of or Recklessly
Disregarded the Illegal Document Creation Scheme

125.    Throughout the relevant period, Carbiener and Chan knew, or were severely reckless
in not knowing, of LPS's illicit business practices and improper business model.  As detailed below,
Carbiener's and Chan's scienter is evidenced by: (a) Defendant Carbiener's admission that LPS, as a

- 42 -

newly public company, was still forming its internal controls and had not addressed controls over subsidiaries like DocX; (b) the relative importance of DocX to the LPS growth story, and Carbiener's and Chan's access to non-public information concerning DocX's business and rapid growth, which information would have made the massive fraud readily apparent; (c) numerous red flags requiring that Carbiener and Chan investigate LPS's document execution services, including, but not limited to, DocX's operations, prior to publicly speaking to the market; (d) credible whistleblower revelations of the DocX fraud; (e) Carbiener's admitted investigation of LPS's document execution practices; (f) Carbiener's and Chan's involvement with constant media scrutiny, litigation, and government investigations into LPS's business; (g) Carbiener's and Chan's repeated assertions of knowledge concerning the business units directly committing the illegal practices described herein; (h) the speed and ease with which the illegal document signing practices were discovered once the whistleblower letter was reported to LPS's outside auditor; and (i) Defendants' year-long cover-up of the truth concerning the scope and nature of the illegal practices. Collectively, these indicia demonstrate that Carbiener and Chan knew, or, at a minimum, were severely reckless in not knowing, of LPS's illicit business practices during the relevant period.

### 1.    Carbiener and Chan Knew Throughout the Relevant Period the Company Did Not Maintain Adequate Internal Controls

126.    Throughout the relevant period, Defendants repeatedly assured investors that LPS maintained robust internal controls to ensure accurate financial reporting.  For example, in the Company's Form 10-K filings made during the relevant period, Defendants caused LPS to file Form 10-Ks that stated:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f).  Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial

reporting.  Management has adopted the framework in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).   Based on our evaluation under this framework, our management concluded that our internal control over financial reporting was effective as of the end of the period covered by this annual report.

127.    Moreover, Defendants Carbiener and Chan repeatedly stated the Company conducted internal reviews of the business processes used by its business units, including DocX, and this information was reported to Carbiener and Chan.

128.    Further still, both Carbiener and Chan have extensive auditing experience.  Carbiener is a Certified Public Accountant who worked at a predecessor entity of Deloitte & Touche.  Chan is also a Certified Public Accountant, with experience working at KPMG LLP.  Chan also worked for seven years as Corporate Controller at Fidelity National Financial, Inc.  Thus, both Carbiener and Chan knew of the importance of maintaining appropriate internal controls and procedures.

129.    As evidenced by the Federal Reserve Consent Order, signed by Defendant Carbiener, LPS did not maintain adequate internal controls.

130.    As Defendant Carbiener has testified, appropriate internal controls would have included reviews of the signing processes employed by DocX, including samplings of the actual documents executed/signed by DocX.  Similarly, LPS's current CEO testified that Clay Cornett, a former LPS senior executive responsible for DocX, knew or should have known of the DocX fraud.

131.    Defendants did not employ controls over DocX, presumably because Defendants did not want any records of the ongoing DocX fraud.  Prior to November 2009, LPS did not employ adequate internal controls or perform any reasonable internal auditing to prevent the fraud at DocX.  Only after a whistleblower complaint to LPS's external auditors did LPS employ adequate controls over the DocX subsidiary.

132.    Indeed, despite Defendants' repeated statements concerning LPS's internal controls made during the relevant period, Defendant Carbiener admitted after the relevant period that LPS was still forming its disclosure controls in November 2009.  He testified, as of November 2009, LPS was "a newly spunout company, ***forming*** our internal – our internal audit structure."

133.    Carbiener further admitted DocX received little, if any, scrutiny.  He testified, "we'd only been independent for a couple years, and in our prioritization we obviously hit the bigger – the bigger business units . . . .  [W]e hadn't gotten all the way through down to these very small business units [such as DocX]."

134.    As Defendants Carbiener and Chan knew, and contrary to their public statements, they had not carried out an evaluation of LPS's internal controls and procedures over financial reporting to ensure they were effective in conveying material information to senior management.

### 2.    In the Early Part of the Relevant Period, Carbiener and Chan Knew or Recklessly Disregarded the Illegal Document Creation Scheme

135.    As alleged herein, illegal document "robo-signing" and other improper practices happened at multiple LPS business units.  In particular, the illegal document creation scheme was running rampant at DocX.  DocX was an important component of the LPS growth story.  DocX's services were important to LPS's cross-selling efforts to capture more of each client's mortgage-related business.  And, DocX was important to LPS's earnings and revenue growth.

136.    The vast bulk of DocX's business, however, was based on a fraudulent scheme. DocX created out of thin air fabricated loan documents.  DocX created thousands of such forged, fabricated documents a day.  DocX did so at minimal cost.  DocX didn't hire the quantity and quality of employees that would be needed to properly handle such paperwork; rather, DocX had temporary employees making $10 per hour cranking out thousands of forged, fabricated documents a day.  The

numbers simply didn't make sense.  Every day DocX created thousands of time and labor-intensive, critically important documents, requiring individual attention – without incurring any substantial overhead and without having to hire large numbers of qualified employees.  DocX was a blatant fraud hidden beneath only the most cursory veneer of plausible deniability.

137.    DocX was a fraud that Defendants Carbiener and Chan welcomed so long as it helped create profit for LPS and went undetected.  No CEO or CFO could have possibly been ignorant to the ongoing rampant fraud at DocX.

138.    Defendants Carbiener and Chan's willful ignorance and/or knowledge of the rampant fraud perpetrated at DocX is further highlighted by their repeated assertions of knowledge about DocX and its business practices.   Throughout the relevant period, Carbiener and Chan addressed investors' questions concerning DocX, demonstrating a close familiarity with the business and its operations.

139.    Defendants Carbiener and Chan's willful ignorance and/or knowledge of the rampant fraud perpetrated at DocX is further highlighted by their obligation to investigate and represent to investors that LPS's disclosures to the market were truthful and complete, as set forth in Carbiener's and Chan's Sarbanes-Oxley ("SOX") certifications alleged herein.

### 3.    Judge Sigmund Waved A Huge Red Flag in Front of Carbiener and Chan in April 2009

140.    On April 16, 2009, after the market closed, the *Dow Jones Daily Bankruptcy Review* published an article entitled "DOJ Probing Mortgage Data Processing Firms."  The article reported on an opinion issued by The Honorable Bankruptcy Judge Diane Weiss Sigmund.  Judge Sigmund, as reiterated in the article, warned LPS its proprietary loan document processing system was making mistakes that offended the judicial process.  Of note, Judge Sigmund cautioned:  "***The thoughtless mechanical employment of computer-driven models and communications to inexpensively***

*traverse the path to foreclosure offends the integrity of our American bankruptcy system*." Similarly, Judge Sigmund warned that although LPS's system "has many features that make a volume business process more efficient, the *users may not abandon their responsibility for fairness and accuracy to the seduction of electronic communication.*" Judge Sigmund asserted the use of the LPS system "*sacrificed accuracy and fairness to efficiency and cost-savings*." In sum, Judge Sigmund warned Defendants Carbiener and Chan that LPS's processes needed to be closely scrutinized because they were making material mistakes.

141. In light of the rampant, ongoing fraud at DocX, any investigation by Carbiener and Chan would have readily uncovered the falsification and forgery of loan documents.

142. Rather than finding and disclosing the fraudulent practices, on April 17, 2009, Defendants issued a press release (as detailed in ¶ 212), refuting the suspicion raised by the *Dow Jones Daily Bankruptcy Review* article and Judge Sigmund's Order, as it concerned LPS's business practices.

143. Despite Judge Sigmund's clear admonition of potential problems with DocX's systems for processing mortgage-related documents, Defendants continued to falsely reassure investors that LPS and DocX were running an efficient, and professional business that complied with applicable laws and regulations.

### 4. In October/November 2009, A Whistleblower Alerted LPS and its Auditors to the Illegal Document Creation Scheme and Carbiener Immediately Knew it Was A "Real Problem"

144. According to the NPA: "In October 2009, an individual sent a letter to LPS's external auditors who transmitted it to LPS corporate headquarters in Jacksonville alleging fraud and forgery in the execution of documents related to his mortgage by DocX. Upon receipt of the letter,

LPS corporate representatives confronted Brown." Shortly thereafter, LPS terminated Brown's employment.

145.    In sworn testimony, Defendant Carbiener admitted he and CFO Chan received the whistleblower's allegations from LPS's external auditors in early November 2009. Carbiener further admitted the package contained allegations put together by a person in Ohio and "it included samples of documents where you could clearly see that on Document A, let's just say, Jane Doe had a certain signature, but then on Document B Jane Doe had a completely different signature." Carbiener testified that he, Chan, and LPS's General Counsel all immediately reviewed the package and knew LPS had a problem at that point in time.

146.    Carbiener testified that a legal team was sent in the next day to review DocX's operations, to interview people and to determine LPS's legal exposure. According to Carbiener, it "was apparent that there was a real problem" on "that same day." Carbiener admitted it was readily apparent there was a "glaring" problem.

147.    LPS's Chief Litigation Officer, Sheryl Newman ("Newman), testified she "received a copy of the whistleblower letter on or about November 2nd, and on November 4th, 2009, I flew up to Alpharetta [DocX's headquarters] to meet with the business group" at DocX. Newman knew there were "some significant issues" at DocX within 30 minutes of visiting the DocX office.

148.    Upon being confronted, Defendant Brown asserted the signing issues were the result of a couple of rogue employees, which was clearly a lie. DocX had hired temporary employees to sign (other people's names) thousands of times a day on very important documents – many of which were to be used in court and foreclosure proceedings. Brown was immediately fired.

149.    Notably, Plaintiffs met with Defendants LPS, Carbiener and Chan on November 9-10 at LPS's headquarters. Even though Plaintiffs and Defendants discussed all facets of LPS's

business, including LPS's role in the foreclosure process, Defendants omitted to disclose the known problems at DocX.  Indeed, Defendants continued to conceal the existence of any problem at DocX for months, and would later intentionally obscure the true scope and severity of the problem for nearly a year.

### 5.    AHMSI Forced Defendants' Hand by Refusing to Go Along with the Illegal Document Creation Scheme

150.    Initially, on November 12, 2009, LPS – through its counsel Newman –attempted to have AHMSI ratify the practice of "surrogate signing" by LPS.  Significantly, LPS did not disclose, but obscured, the parameters of the "surrogate signing" practice in its communications to AHMSI's board of directors – and did not reveal the host of problems evident at DocX.  AHMSI's board of directors refused to provide the requested ratification.  Notably, as a matter of law, AHMSI did not have authority to approve LPS's use of perjury to create mortgage related documents.

151.    In November 2009, subsequent to AHMSI's refusal to provide the requested ratification, LPS disclosed to AHMSI it used a surrogate signing practice, but again failed to disclose the scope of fraudulent/illegal practices at DocX.

152.    AHMSI demanded that LPS remedy the problem, and reimburse AHMSI for any damages resulting from LPS's illegal conduct.

153.    As set forth in documents filed in open court, Newman and LPS's Executive Vice President, General Counsel and Corporate Secretary Todd Johnson ("Johnson"), were involved in discussions with AHMSI over the surrogate signing practices at LPS at least as early as November 12, 2009.

154.    Even though LPS – including Defendants Carbiener and Chan – were on notice of the problems at DocX, and knew that these problems would cause significant issues with clients and

courts, Defendants Carbiener and Chan continued to conceal both the nature and scope of the illegal practices that were rampant at LPS.

155.    Indeed, throughout the period from February 2010 through October 2010, while Defendants were continually reassuring investors that the problems at LPS were minimal and had been "remediated" – AHMSI was in constant contact with LPS.    During this period, AHMSI repeatedly informed LPS that LPS needed to do more to discover the scope of the improperly processed documents, fix the problem and reimburse AHMSI.  For example, by letter dated October 11, 2010, AHMSI sought "reimbursement in the amount of $4,111,446.00 for expenses, including attorney fees and costs, incurred to date in connection with AHMSI's on-going remediation efforts relating to restarting foreclosures that have become invalid in the state of New York due to the 'surrogate signor' program."  Defendants Carbiener and Chan didn't disclose the scope of the problems at LPS, but rather repeatedly concealed these problems from investors.

### 6.    Carbiener and Chan Admit to Learning of the Illegal Document Creation Scheme in November 2009, But Continued to Conceal the Truth From Investors for Nearly A Year

156.    On November 20, 2012, far after the relevant period and after Defendant Brown pleaded guilty to federal criminal charges in Florida for her role in the fraud to falsify mortgage-related documents, LPS spokeswoman Michelle Kersch admitted:  "When **LPS discovered these practices in November 2009**, it immediately discontinued the practices, terminated Ms. Brown and shut down the operations of DocX."

157.    Similarly, LPS **stipulated** in agreements with various State Attorneys General to discovering the illegal signing practices in November 2009:  "On or around November 2009, Lender Processing Services, Inc., conducted an internal review of DocX and identified certain Mortgage

- 50 -

Loan Documents that contained inaccuracies, unauthorized signatures, notarization defects, or other

deficiencies."

158.    As set forth in ¶¶ 145-148, Defendant Carbiener testified he and Chan learned of the

problems at DocX through a whistleblower letter, and subsequent investigation by LPS counsel, in

early November 2009, and that he appreciated this was a significant problem for LPS.  LPS counsel

testified receiving the whistleblower letter on November 2, 2009, and knowing DocX was a

significant problem on November 4, 2009, upon visiting DocX's offices.

159.    Thus, Defendants have admitted to learning about LPS's subsidiary DocX's

falsification and forgery scandal at least as early as November 2009.  Defendants Carbiener and

Chan knew about, but concealed, the rampant falsification of mortgage-related documents from (at

least) November 2009 through October 2010, when it could no longer be hidden.

160.    In an effort to downplay the widespread fraudulent nature of LPS's default solutions

unit, and spin the truth of what happened and avoid creating massive problems with foreclosures

around the nation, Defendants Carbiener and Chan belatedly disclosed the existence of a ***minor***

problem at DocX, ***but*** falsely asserted (i) it was isolated, (ii) that LPS fixed the problem, and (iii) it

was not material to investors.

161.    On April 23, 2010, Carbiener spoke at length of his initial discovery of the problems

at DocX, but in doing so he concealed the true scope of the issues plaguing LPS:

> Now, as part of our enterprise risk management process, we were reviewing the
> business processes of that subsidiary late last year, ***and we discovered that there was***
> ***a problem with one of the processes that caused an error in the notarization***
> ***process***.  So when we found or when we saw that error, we stepped in, we quickly
> corrected the process, we notified the impacted customers, and we began the
> remediation process.
>
> The one thing I will add because that's all in the disclosure, is that part of our
> remediation was to sit down with the management of that subsidiary, interview the

- 51 -

management of that subsidiary so that we could make sure that in our minds, the business process that broke down was ***because of bad judgment, not because of ill intent***.  And through those efforts, we became very satisfied that ***we could remediate***, and that it was just true poor judgment and bad process.

<div align="center">* * *</div>

So again, we can say that with the actions we've taken to date, we believe that we have taken the necessary remedial action, and we've satisfied ourselves that the issue was the result of poor decision-making, not ill or criminal intent.

162.    On October 29 2010, Defendant Carbiener similarly tried to spin what had occurred, stating that "in late 2009, LPS discovered that a manager of DocX had allowed some employees to sign another authorized employee's name on certain documents with that employee's written consent.  We immediately halted the practice, dismissed the manager, remediated the impacted documents, forwarded the remediated documents to our clients or their attorneys, and closed the operation."

163.    As we now know, the document signing issues at DocX were clearly the result of ***widespread*** illegal conduct, ***not isolated*** incidents.  Any real review of DocX's practices would have quickly uncovered hundreds of thousands, if not millions, of illegally created documents.  Moreover, LPS was alerted to the problems not through its own risk management procedures, but by a whistleblower.  Defendant Carbiener's April and October 2010 statements reveal not only that he was aware of the fraud at least as early as late 2009 – but that he was either extraordinarily reckless in his account of the truth or that he was actively engaged in covering up the scope of the fraud.

**7.    Defendants Carbiener and Chan's "Cover Up" Was Itself
Exposed as A Fraud Only Months After Defendants Attempted
to Downplay the Scope of the Scheme**

164.    Defendants Carbiener and Chan would have the public and this Court believe that as soon as they discovered improper signing practices at DocX, they fully and truthfully informed the public of the problem and closed down this subsidiary.  However, only months after Carbiener and

<div align="center">- 52 -</div>

Chan purported to come clean on the DocX scheme, *Reuters* published an expose showing Carbiener

and Chan's story was lacking in both accuracy and completeness.

165.    On December 6, 2010, *Reuters* published a story titled:  "Legal Woes Mount for a

Foreclosure Kingpin."   According to *Reuters*:

> Lender Processing Services is riding the waves of foreclosures sweeping the
> United States, but in late October its CEO, Jeff Carbiener, found himself needing to
> reassure investors in the $2.8 billion company.

> Although profits were rolling in, LPS's stock had taken a hit in the wake of
> revelations that mortgage companies across the country had filed fraudulent
> documents in foreclosures cases.  Earlier in the year, the company, which handles
> more than half of the nation's foreclosures, had disclosed that it was under federal
> criminal investigation and admitted that employees at a small subsidiary had falsely
> signed foreclosure documents.

> Still, Carbiener told the Wall Street analysts in an October 29 conference call
> that LPS's legal concerns were overblown, and the stock has jumped 13 percent since
> its close the day before the call.

> ***But a Reuter's investigation shows that LPS's legal woes are more serious
> than he let on.  Public records reveal that the company's LPS Default Solutions
> unit produced documents of dubious authenticity in far larger quantities than it
> has disclosed, and over a much longer timespan***.

166.    Similarly, *Reuters* poked other holes in the narrative told by Carbiener and Chan.

For example, *Reuters* reported:

> In his October 29 conference call with analysts, Carbiener said that when the
> company discovered the DocX wrongdoing in December 2009, it immediately
> stopped it and soon shut DocX down.  But it turns out that DocX continued operating
> much longer than LPS originally had acknowledged.  In a written response last week
> to questions from Reuters, LPS's Kersch confirmed that DocX actually wasn't closed
> until August 2010.

167.    That *Reuters* could – without the same access to LPS's internal documents and

employees – readily demonstrate the scope of the fraud was far greater than indicated by Carbiener

and Chan significantly undermines any competing inference that Defendants acted without intent to

defraud investors. The scope of the illegal signing practices would have been readily apparent to Defendants, who had far more access to relevant evidence than did *Reuters*. Evidence that a Defendant has taken steps to cover-up a misdeed is strong proof of scienter.

### 8. Defendants Carbiener and Chan's Terminations and Other Miscellaneous Factors Indicative of Scienter

168. Shortly after the end of the relevant period, upon indications of the true scope of the illegal document fabrication and forgery scheme at LPS, Defendant Chan was unceremoniously terminated by LPS when, on October 28, 2010, LPS announced that Chan would no longer serve as CFO of the Company, and would be leaving the Company effective as of November 21, 2010.

169. Similarly, on July 6, 2011, Defendant Carbiener resigned.

170. Defendants repeatedly spoke on, among other things, market concerns over LPS's document signing practices. Defendants' own statements revealed familiarity with the issues at the heart of this litigation, and therefore supported strong inference of scienter.

171. Defendants Carbiener and Chan repeatedly assured investors that reports of errors in documents prepared by LPS were isolated incidents immaterial to LPS's overall business, when in reality LPS had engaged in widespread fraud impacting over a million documents that would cause the Company to suffer massive penalties and expenses. Statements so objectively out of line with the truth contribute to a strong inference of scienter.

### C. LPS Acted with Scienter

172. LPS's scienter can be inferred from the strong inference of scienter pleaded as to Defendant Brown. Defendant Brown was an employee of LPS, acting with the scope of her employment when she conducted the acts detailed herein. Brown was acting in furtherance of LPS's goals; *i.e.,* increasing profits. Defendant Brown was an executive at LPS. Further, Defendant

Brown furnished false information to LPS regarding the DocX subsidiary knowing such information would become the basis of LPS's false and misleading public statements.

173.    LPS's scienter can be inferred from the strong inference of scienter pleaded as to Defendants Carbiener and Chan, who made and/or authorized the false statements at issue herein.

174.    Other high-level officers, known and unknown, contributed to the preparation and issuance of LPS's false and misleading statements made during the relevant period, and their scienter may be attributed to the Company.

175.    Notably, pursuant to Section 307 of SOX and 17 C.F.R. §205, LPS's in-house counsel were required to inspect the truthfulness of SEC filings and report violations of securities laws by the issuer.  LPS's in-house counsel – Newman and Johnson – knew of LPS's illegal document creation practices from the whistleblower complaint, their visit to DocX headquarters, their involvement in the AHMSI dispute and subsequent litigation.  In November 2009, LPS notified AHMSI of the surrogate signing practice – a euphemism for forgery.  At least as early as November 12, 2009, Newman and Johnson knew that LPS had used in the past "designees" as surrogate signers on assignments and mortgage and lien releases.  As attorneys, Newman and Johnson would have known this was perjury.  Nonetheless, despite knowing no later than November 2009 that LPS committed rampant perjury, Newman and Johnson allowed LPS to file its Form 10-Q with the SEC on November 16, 2009 without any disclosure whatsoever of the illegal document signing scheme. Moreover, once the Company made a minimal and obtuse disclosure of the illegal document signing scheme, Johnson and Newman knowingly allowed LPS to issue false and misleading statements asserting the issue was isolated, immaterial, and remediated.  Their knowledge, as individuals responsible for the preparation and/or issuance of LPS's false and misleading statements throughout the relevant period, is attributable to LPS.

176.    The inference of scienter is also supported by the significant reforms LPS was forced to implement by government regulators, as set forth in the Consent Order entered into between Lender Processing Services, Inc., DocX, LLC, and LPS Default Solutions, Inc. and the Board of Governors of the Federal Reserve System, the Office of the Comptroller of Currency, the Federal Deposit Insurance Corporation and the Office of Thrift Supervision (the "Federal Reserve Consent Order").   Under the Federal Reserve Consent Order, LPS was required to conduct a document execution review to determine whether: (a) factual assertions made in mortgage documents executed by LPS and its employees were correct; (b) LPS had authority to execute mortgage documents on behalf of the servicers; (c) LPS' notarization practices were consistent with their attestations; (d) LPS-executed mortgage documents complied with legal requirements; and (e) LPS' practices and assertions resulted in financial harm to borrowers.   Based on this review, LPS was required to prepare a written report of its findings and submit a remediation plan.   In addition, LPS was required to submit a plan to the federal regulators to strengthen the board's oversight of default management services that LPS provides to servicers.   LPS also had to submit a compliance program addressing its compliance with legal requirements and enhance its internal audit program.   Additionally, LPS was required to retain an independent consultant to conduct a risk assessment of its default management services.

### D.    DocX Acted with Scienter

177.    DocX's scienter can be inferred from the strong inference of scienter pleaded as to Defendant Brown.  Defendant Brown was the chief executive of the DocX operations.  Brown was acting in furtherance of DocX's goals; *i.e.,* increasing profits.  Further, Defendant Brown furnished false information to LPS regarding the DocX subsidiary knowing such information would become the basis of LPS's false and misleading public statements.

## VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

178.    The false and misleading statements set forth herein were widely disseminated to the securities markets, investment analysts, and to the investing public.  Those statements caused and maintained the artificial inflation of the price of LPS common stock, which consequently traded at prices in excess of its true value.

179.    Plaintiffs are entitled to the presumption of reliance established by the fraud-on-the-market doctrine.  At all times relevant to this Complaint, the market for LPS common stock was an efficient market.  LPS common stock was actively traded on a highly efficient and automated market.  LPS filed periodic public reports with the SEC and was followed by numerous securities analysts employed by leading brokerage firms and investment banks who wrote reports about the Company.  LPS regularly issued press releases, which were carried by national and international news wires, and which were publicly available and entered into the public marketplace.  As a result, and which is empirically evident, the market for LPS equity securities promptly digested current information regarding LPS from all publicly-available sources and reflected such information in the LPS common stock price.

180.    Plaintiffs are also entitled to the presumption of reliance established by the *Affiliated Ute* doctrine as Defendants failed to disclose material known facts to the market concerning Defendants' illegal scheme to falsify and fabricate mortgage related documents.

181.    Plaintiffs also read, or listened to, and relied on certain of Defendants' materially false and misleading statements prior to purchasing LPS common stock at artificially inflated prices.  Plaintiffs specifically read and relied upon Defendants' false and misleading statements pertaining to, among other things, the Company's purported technological advantage to aid servicers, the Company's publicly reported financial results, adequacy of internal controls, compliance with

pertinent regulations and legal requirements, any investigations, and the scope of reported inaccuracies in documents produced by LPS.

182.    Plaintiffs specifically read (and/or listened to) and relied upon the false and misleading statements alleged herein at ¶¶ 186-288, which include the false and misleading statements contained in (i) LPS's public press releases, as alleged herein; (ii) LPS's SEC filings on Forms 10-Q and 10-K filed with the SEC, as alleged herein; (iii) LPS's analyst conference calls alleged herein; and (iv) various direct communications between Defendants and Plaintiffs.

183.    Throughout the relevant period, Defendants issued statements in press releases and SEC filings, among other things, that were false and misleading for the reasons set forth in ¶¶ 58-177, *supra*.

184.    The Class Period set forth in the Class Action commences on August 6, 2008, one day after LPS reported its second quarter 2008 financial results and held a conference call with analysts after the market closed on August 5, 2008.  Defendants' illegal falsification and fabrication of mortgage related documents predates the Class Period, and artificial inflation in the stock price predates the Class Period.

185.    Throughout the relevant period, Defendants repeatedly highlighted the Company's growing revenues attributable to default services, indicating this would turn into earnings and cash flow in the future.  As set forth in the Company's Form 10-K filed with the SEC on March 16, 2009:

> Historically, some of our default management businesses have had lower margins than our loan facilitation businesses.  However, as our default volumes have increased, our margins have improved significantly on the incremental sales in 2007 and 2008.  Because we are often not paid for our default services until completion of the foreclosure, default does not contribute as quickly to our cash flow from operations as it does to our revenues.

**Second Quarter 2008 Earnings Release and Conference Call**

186.    On August 5, 2008, LPS reported issued a press release stating:  "Lender Processing
Services, Inc. (NYSE:LPS), a leading provider of integrated technology and services to the mortgage
industry, today reported consolidated and combined revenues of $460.4 million for second quarter
2008, an increase of 8.3% compared to second quarter 2007, and net earnings of $63.5 million
compared to $60.5 million in the prior year quarter."  The press release was concurrently filed on
Form 8-K with the SEC.  The Company attributed the financial results to "strong market growth and
our ability to continue to gain market share."

187.    William P. Foley, II ("Foley"), Chairman of the LPS Board of Directors, declared:
"Second quarter results were very strong despite difficult market conditions and overall weakness in
the economy.  LPS, with its solid market position and unique capabilities, remains well-positioned as
a stand-alone public company to grow in the second half of 2008 and beyond."

188.    Carbiener added, "Overall, earnings were in line with our expectations.  Strong results
in our Default Services business more than offset a decline in our Loan Facilitation business."  He
concluded, "We're off to a strong start as an independent public company and while the broader
economic environment and the real estate market in particular, remain challenging, LPS with its
unique mix of businesses is well-positioned for the future."

189.    Also on August 5, 2008, LPS hosted a conference call with various securities analysts
to discuss second quarter 2008 financial results.  Carbiener and Chan participated in this call.
Carbiener started by highlighting LPS's continued excellent results due to its default services
business and strong positioning in that segment:

- Carbiener noted that, despite a sluggish economy and a challenging mortgage market,
  "LPS is unique [sic] well positioned to offer solutions to lending institutions to help them
  through this period and in fact enable them to realize much sought-after efficiencies and
  cost savings."

- Carbiener boasted that LPS's "comprehensive suite of default management services
enables us to manage the outsourcing of these services and deliver meaningfully
efficiencies to our customers." He further touted LPS's expanded market share across all
default product lines, leveraged by "market-leading positions in desktop and foreclosure
services" and tight integration of other services (such as default title and REO
management) into LPS's core technology platforms, which lead to "a number of
agreements including new of [sic] expanded default title agreements with three of the
nation's top lenders" during the second quarter. He added, "Bottom line, our ability to
enable customers to complete services more easily, quickly, and less expensively, creates
a win-win situation."

- Carbiener touted LPS's year-over-year revenue growth in default services (89.7%)
driven by accelerating foreclosure activity and "increasing demand for our services that
support all activities over the foreclosure and REO life cycle." He added that LPS stood
to benefit from "challenges in the mortgage industry" and was well-positioned for long-
term growth in its Loan Transaction Services segment (including anticipated 2008
growth in the low-to-mid teens) due to long-term origination, refinance, and default
trends as well as expected market share gains.

190.    Chan echoed these sentiments during the conference call:

- Chan highlighted increased year-over-year revenues in LPS's Loan Transaction
Services segment and default services business (14.4% and 89.7%, respectively), as
well as increased year-over-year consolidated revenues of 8.3%.

- Chan emphasized strong customer demand for LPS's services, the expansion of
LPS's "market-leading presence," and the benefits of LPS's "highly diversified
model" that would enable LPS to grow despite difficult economic conditions. He
added that "as Jeff [Carbiener] noted, market trends and dynamics, such as continued
flight to quality, a trend to outsource, centralized lending, and a need for lenders to
lower internal costs will continue to benefit us."

- Chan expressed confidence "that we are well positioned to perform better than the
market metrics, and will continue to grow when the market stabilizes. On the default
services side, we are well positioned to expand our growth." He added, "As we have
noted in the past, based on our current projections, demand for our outsourced
default services is expected to remain strong over the next few years."

**Second Quarter 2008 Form 10-Q**

191.    On August 13, 2008, LPS filed its quarterly report for the second quarter of 2008 on

Form 10-Q for the period ending June 30, 2008. The Form 10-Q reaffirmed the false financials

announced in the August 5, 2008 press release and conference call.

192.    Further, the second quarter 2008 Form 10-Q attributed the Company's financial results to "strong market growth as well as continued market share gains."

193.    Carbiener and Chan signed SOX certifications that falsely stated the second quarter 2008 Form 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in [the second quarter 2008 Form 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report." Further, the certifications falsely stated that Carbiener and Chan had:

a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

194.    Defendants also made the following statements about LPS's disclosure controls and procedures in the Form 10-Q:

As of the end of the period covered by this report, we carried out an evaluation, under the supervision and with the participation of our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) under the Exchange Act. Based on this evaluation, our principal executive officer and principal financial officer concluded that our disclosure

controls and procedures are effective to provide reasonable assurance of timely alerts
to material information required to be included in our periodic SEC reports.

As a result of the spin-off, we now have additional external reporting
requirements. Accordingly, ***we have made*** certain changes in management personnel
and oversight responsibilities.

195.    Defendants' statements in the 2008 second quarter Form 10-Q and the August 5, 2008

press release and earnings conference call set forth above were materially false and misleading when

made for the reasons set forth in §§IV and V, more specifically because: (a) throughout the relevant

period, LPS's earnings and revenues were artificially inflated by the use of illicit practices that

enabled the Company to process a greater volume of mortgage related documents at lower cost

without regard for accuracy and while exposing the Company to significant risk; (b) to push through

the volume of work created by LPS's business model, LPS employed myriad illicit business

practices at its various locations, including the fabrication of documents, robo-signing, surrogate

signing, improper notarization, and the violation of security protocols; (c) LPS created a culture

which valued speed over accuracy and led to significant errors in the default services it provided; (d)

such errors were knowingly concealed from clients, attorneys, and courts; (e) as a result of these

illicit practices, Defendants caused significant numbers of deficient, erroneous, and otherwise

fraudulent documents to be filed with county records offices and courts nationwide; (f) as a result of

Defendants' schemes, LPS's earnings revenues and other financial metrics were artificially inflated;

(g) LPS's Forms 10-Q and 10-K failed to disclose known trends, demands, commitments, events,

and uncertainties that were reasonably likely to have a material effect on LPS's product sales,

revenues, net income, accounts receivable, and gross profit margins as required by Item 303 of

Regulation S-K; (h) Defendants admittedly had not developed adequate internal controls, indeed no

meaningful internal controls over DocX and other subsidiaries existed; and, (i) for the reasons

detailed herein, Defendants' statements concerning LPS's internal controls and the SOX
certifications signed by Defendants and incorporated in LPS's Forms 10-Q and 10-K were false and
misleading.

**Third Quarter 2008 Earnings Release and Conference Call**

196.    On October 29, 2008, LPS issued a press release stating:  "Lender Processing
Services, Inc. (NYSE:LPS), a leading provider of integrated technology and services to the mortgage
industry, today reported consolidated revenues of $472.7 million for third quarter 2008, an increase
of 11.1% compared to third quarter 2007, and net earnings of $51.3 million or 54 cents per share."
The press release was concurrently filed with the SEC on Form 8-K.  LPS attributed the reported
financial results to "strong growth in the default market and our ability to continue to expand market
share."

197.    Foley further boasted:  "LPS had strong results in its first quarter as a stand-alone
company despite challenging market conditions and a difficult macro-economic environment
affecting some of its businesses.  With its strong market position and unique capabilities, LPS
remains well-positioned to grow in the fourth quarter and beyond."

198.    Carbiener falsely and/or misleadingly stated the Company enjoyed "[c]ontinued
strong results in our Default Services business [that] more than offset a decline in our Loan
Facilitation services" and added that, despite continued challenges in the broader economy and real
estate market, "LPS has a strong presence in each of its markets and remains well positioned to grow
profitably."

199.    During the October 29, 2008 conference call, Defendant Carbiener touted the
capabilities and importance of the default solutions division:

Default services more than made up for the decline in loan facilitation services as revenues grew 97.1% compared to last year driven by the strong growth in foreclosure volumes and increasing demand for our services to support all activities over the foreclosure and REO life cycle, especially in the area of REO asset management. Clients in this environment are facing significant pressure to manage accelerating foreclosure and REO activity in a timely and cost efficient manner. Our comprehensive suite of default management services enables us to manage the outsourcing of these services and deliver meaningful efficiencies to our customers.

Additionally, by leveraging our market-leading positions in desktop and in foreclosure outsourcing, coupled with the tight integration of our other services like default title and REO asset management into our core technology platforms, we have continued to expand our market share across all of our default product lines. Specifically during the quarter we signed four deals that should generate approximately $10 million in annual revenues once fully implemented.

200.    Chan made similar comments during his opening remarks:

- Chan announced that year-over-year default services revenues were $241.8 million, a 97.1% increase, and that "foreclosures nationwide increased, and coupled with strong demand for our services, we continue to expand our market-leading presence."

- Regarding default services, Chan stated, "we remain well positioned to expand our growth both in depth and breadth of our offerings" and, due to ongoing customer challenges and pressure to manage accelerating foreclosures and REO assets owned, "the demand for our outsourced default services is expected to remain strong over the next few years."

- Chan emphasized LPS's "diversified end-to-end model that we believe will enable us to grow during this difficult market and economic environment as well as the various cycles of the industry."

### Third Quarter 2008 Form 10-Q

201.    On November 14, 2008, LPS filed its quarterly report for the third quarter of 2008 on Form 10-Q for the period ending September 30, 2008. The third quarter 2008 Form 10-Q reaffirmed the financials announced in the October 29, 2008 press release and conference call. Further, it contained substantially the same SOX certifications that were included in LPS's second quarter 2008 Form 10-Q, which were also signed by Carbiener and Chan, and similar false statements concerning LPS's disclosure controls and procedures. *See* ¶¶ 193-194. Moreover, the third quarter 2008 Form

10-Q attributed revenue and earnings performance "to strong market growth as well as continued market share gains" in LPS's default services unit.

202. The foregoing statements regarding the third quarter 2008 results were materially false and misleading for the same reasons articulated in §§IV and V, and ¶ 195. In particular, LPS did not have "unique capabilities" that enabled the Company to grow market share, but rather cut corners to meet customer demand without regard for legal requirements. LPS was not providing "meaningful efficiencies" to customers, it was fabricating documents. These "efficiencies" and "unique capabilities" were only achieved by violating the law. LPS's earnings were likewise not sustainable, or at least highly risky, as the earnings were inflated by Defendants' illegal practices and did not reflect the true costs of running the business in compliance with the law, or the true costs of mitigating the damage caused by the illegal activities. And, as Defendant Carbiener would later admit, the Company had not designed adequate disclosure controls with respect to subsidiaries like DocX.

**Fourth Quarter and Fiscal Year 2008 Earnings Release and Conference Call**

203. On February 11, 2009, LPS issued a false and misleading press release stating: "Lender Processing Services, Inc. (NYSE:LPS), a leading provider of integrated technology and services to the mortgage industry, today reported consolidated revenues of $476.1 million for the fourth quarter of 2008, an increase of 8.5% compared to the fourth quarter of 2007, and net earnings of $54.3 million or 57 cents per share." The press release was filed concurrently with the SEC on Form 8-K. LPS attributed its financial results "to continued strength in the default market and our ability to gain market share." LPS also noted that overall operating income for the Loan Transaction Services segment grew ($82.9 million, or 14.8%, compared to fourth quarter 2007) due to "higher income in Default Services."

204.    Foley declared, "LPS had a solid fourth quarter despite continued difficult market conditions and a tenuous macro-economic environment impacting some of its businesses.  LPS, with its unique capabilities and market leading presence, remains well positioned to achieve its growth objectives in 2009 and beyond."  Carbiener made similar comments, noting that "[w]e had a strong finish in 2008 . . . and remain[] well-positioned to grow earnings in 2009."  Carbiener added, "Our Default Services business continued to deliver strong results which more than offset a decline in our Loan Facilitation Services."

205.    Also on this date, LPS held an earnings conference call with various securities analysts to discuss fourth quarter 2008 and 2008 fiscal year-end financial results.  Carbiener and Chan participated in this conference call.  Carbiener reiterated the strong performance and outlook of LPS's default services and LPS's ability to leverage "market leading positions" in Desktop technology and foreclosure outsourcing:

- Carbiener touted solid revenue growth "driven by continued strong performance in default services" and anticipated "increasing demand for our services to support all activities over the foreclosure and REO lifecycle."  Carbiener projected 2009 revenue growth in the range of 11% to 13%, driven in part by "continued market share gains" and "default volumes."

- Carbiener also boasted the expansion and leveraging of LPS's default services and Desktop platform: "Outside of MSP, we continued to see strength in the desktop sales pipeline, driven by opportunities in default as well as opportunities to expand the desktop platform into other areas in the Lender's origination and servicing operation."  Carbiener also touted expanded market share "across all of our default product lines" (including the signing of "eight deals that should generate approximately $5 million in 2009 revenues") as a result of "leveraging our market leading positions in desktop and in foreclosure outsourcing and the integration of our other services like default title and REO asset management."  Carbiener added, "These dynamics combined with our market leading products position us well for continued profitable growth."

206.    Chan echoed these comments during his opening remarks:

- 66 -

- Chan touted increasing demand for LPS's services and the successful expansion of "our market leading presence even in these difficult times." He added that LPS's "diversified end to end model" would "enable to us grow during this difficult market and economic environment as well as the various cycles of the industry."

- With respect to LPS's default services, Chan announced a 68.3% increase ($243.7 million) in revenues over the prior year and projected "solid" 2009 growth. He stated that LPS was "focused on greater penetration of our current [default services] offerings and continued expansion of our technology and product capabilities." He added that "the demands for outsource default services is expected to remain strong over the next few years."

207.    In the following question-and-answer session, Chan again highlighted the market share potential for default services, stating that "as we've shown in last quarter we really don't need foreclosure starts for to us grow our revenue" and that LPS would "continue to sell downstream and be able to pick up additional market share" across LPS's "series of default products."

**Fiscal Year 2008 Form 10-K**

208.    On March 16, 2009, LPS filed its annual report for its fiscal year ended December 31, 2008 on Form 10-K. The Form 10-K reaffirmed the financial results announced in the February 11, 2009 press release and conference call. Further, it contained substantially the same SOX certifications that were included in LPS's second quarter 2008 Form 10-Q, which were also signed by Carbiener and Chan. Similarly, the Form 10-K falsely stated:

> As of the end of the year covered by this report, the Company carried out an evaluation, under the supervision and with the participation of its principal executive officer and principal financial officer, of the effectiveness of the design and operation of its disclosure controls and procedures, as such term is defined in Rule 13a-15(e) under the Exchange Act. Based on this evaluation, the Company's principal executive officer and principal financial officer concluded that its disclosure controls and procedures are effective to provide reasonable assurance that its disclosure controls and procedures will timely alert them to material information required to be included in the Company's periodic SEC reports.

* * *

- 67 -

Management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting. Management has adopted the framework in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on our evaluation under this framework, our management concluded that our internal control over financial reporting was effective as of the end of the period covered by this annual report.

209. Moreover, the Form 10-K touted, among other things, the growth and market share of LPS's Loan Transaction Services segment and default management services business, the range and quality of its default management services, and increased revenues and margins in its default management services business:

- LPS compared revenue figures from 2006 through 2008 to demonstrate the extent to which rising default management revenues can offset declines in loan facilitation revenues. LPS also noted that "***as our default volumes have increased, our margins have improved significantly*** on the incremental sales in 2007 and 2008." LPS further touted the growth of its default management services as follows: "Based in part on ***the range and quality of default management services*** we offer and our focus on customer service, our default management business has grown significantly and we are now the largest mortgage default management outsourced service provider in the U.S."

- LPS disclosed increased consolidated processing and services revenues in 2008 (an increase of $171.3 million, or 10.1%, compared to 2007) "primarily driven by growth in our Loan Transaction Services segment which resulted from growth in default services . . . . Additionally, the increase was supported by growth in our Desktop application and applied analytics services." LPS made similar comments with respect to an increase in consolidated revenues from 2006 to 2007.

- LPS also disclosed increased processing and services revenues for the Loan Transaction Services segment in 2008 (an increase of $181.9 million, or 16.2%, compared to 2007) "primarily driven by our default management services due to strong market growth as well as continued market share gains." LPS made similar comments when comparing an increase in the segment's revenues from 2006 to 2007.

210.    The foregoing statements regarding the fourth quarter and full-year 2008 results were

materially false and misleading for the same reasons articulated in §§IV and V, and ¶¶ 195, 202.  In

particular, the assertion that "our margins have improved significantly" as "our default volumes have

increased" was false and misleading because, among other things, Defendants employed low-skilled

workers to robo-sign thousands of documents without regard to accuracy or legality.    Had

Defendants complied with legal requirements, the costs of doing business would have hurt margins

as default volumes increased.  Furthermore, LPS did not maintain adequate internal controls over

financial reporting; as Defendant Carbiener subsequently admitted after the relevant period, the

Company had not paid much, if any, attention to its smaller subsidiaries such as DocX.

**The April 16, 2009 *Dow Jones Daily Bankruptcy Review* Article and Response**

211.    On April 16, 2009, the *Dow Jones Daily Bankruptcy Review* published an article

detailing an Order issued by The Honorable Bankruptcy Judge Diane Weiss Sigmund, concerning

the accuracy of documents filed in her Court by parties using LPS's services.  The article, which is

quoted at ¶ 140, asserted LPS's system jeopardized accuracy to achieve cost savings and efficiency.

212.    The following day, April 17, 2009, LPS issued a press release that was false and

misleading.  The press release stated:

> The Honorable Diane Weiss Sigmund issued an opinion on April 16, 2009, with
> respect to the Niles C. Taylor and Angela J. Taylor proceeding, in which the
> activities of the participants in the case were reviewed.  LPS was not a party to this
> case.  LPS, however, voluntarily demonstrated the use of its system for Judge
> Sigmund and provided all information requested by the U.S. Trustees Offices in
> connection with this case.  In Judge Sigmund's opinion issued at the conclusion of
> the proceeding, Judge Sigmund stated that LPS was not responsible for any errors in
> the conduct of the case.

213.    Not only did Plaintiffs closely read the press release, Plaintiffs also spoke directly

with LPS several times for clarification of the judicial opinion and LPS's business practices as it

concerned LPS's role in bankruptcy proceedings. As contemporaneously documented in Plaintiffs' internal documents, LPS falsely and misleadingly asserted any problems were caused by attorneys using LPS's system. The problems were not caused by the LPS system or LPS processes. Defendants falsely claimed LPS only provided the desktop software to aid attorneys, and attorneys were responsible for the accuracy of documents filed in court proceedings. LPS, again, falsely and misleadingly denied the fundamental concerns raised by the Court's opinion, that LPS jeopardized accuracy to achieve cost savings and efficiency.

214.    Defendants knew the April 17, 2009 press release, and their direct communications with Plaintiffs, were false and misleading for the same reasons articulated in §§IV and V, and ¶¶ 195, 202, and 210. Judge Sigmund highlighted anecdotal evidence of systemic problems with LPS's systems – and it was wrong to suggest LPS did not cause any errors to be filed with the Court. Despite the technical ruling of Judge Sigmund on the matters before her, it was highly misleading to assert that LPS had no responsibility in the creation of the false documents at issue in that specific case – or, for that matter, more generally.

**First Quarter 2009 Earnings Release and Conference Call**

215.    On April 29, 2009, LPS issued a press release stating: "Lender Processing Services, Inc. (NYSE:LPS), a leading provider of integrated technology and services to the mortgage industry, today reported consolidated revenues of $529.8 million for the first quarter of 2009, an increase of 19.4% compared to the first quarter of 2008, and net earnings of $50.0 million or 53 cents per share." The press release also noted that "[o]verall operating income for the segment grew due to higher income in Default Services." The press release was filed concurrently with the SEC on Form 8-K.

216.    Carbiener highlighted the success of Default Services, which "continued to deliver strong results which more than offset a decline in our Loan Facilitation Services."  He also announced that LPS was "off to a solid start in 2009," had "a strong presence in each of its businesses and remains in a good position to grow earnings in 2009," and expected revenues to "grow 13%-15% compared to 2008 and adjusted earnings to come in at the higher end of the $2.64-$2.74 per diluted share guidance."

217.    Also, on April 29, 2009, LPS hosted an earnings conference call with analysts to discuss first quarter 2009 financial results.  Carbiener and Chan participated in the call.  Carbiener misleadingly downplayed the recent *Dow Jones Daily Bankruptcy Review* article discussing the U.S. Trustee's probe into LPS and misleadingly assured investors that LPS's systems were fully compliant with pertinent law and the concerns raised by the Bankruptcy Judge were ***not*** indicative of a systemic problem:

- Carbiener claimed the *Dow Jones Daily Bankruptcy Review* article contained many statements that were either "incorrect or taken significantly out of context," and that its purpose was to "***sensationalize*** the participation of the US Trustee" in the *Taylor* case.

- Carbiener insisted that "there is no nationwide investigation of LPS by the Department of Justice.  And based upon conversations between our outside counsel and the US Trustee's office, we have ***no reason to believe*** that the US Trustee is conducting any type of nationwide investigation of LPS."

- Carbiener asserted that LPS "voluntarily provided unprecedented access regarding the use of our system" to the Trustee and the Court, and that, after observing LPS's system demonstration and various documents, "***the judge fully exonerated LPS*** in *Taylor* and the US Trustee's office has confirmed to LPS that their review of our contact in this case is over."  He assured the market that "[a]s far as we are concerned, ***this matter is concluded***."

218.    Carbiener also commented positively on LPS's first quarter financial results and future prospects, particularly with respect to increasing revenues and market share in its default services business:

- Regarding LPS's Default Services, Carbiener touted "strong 51% revenue growth," "increasing demand for our services that support all activities over the foreclosure and REO lifecycle," and continued expansion of market share "across all of our default product lines" resulting from the leveraging of "our market-leading positions in desktop and in foreclosure outsource, and the integration of our other services, like default title and REO asset management." As evidence of such market share expansion, Carbiener referenced deals signed during the prior quarter that "should generate approximately $30 million in annualized revenues."

- Carbiener also announced that LPS was "increasing our expectations for full year of 2009 revenue growth to a range of 13% to 15%" driven in part by "continued market share gains," "penetration of new products," and "origination and default volumes." He added that "LPS is well-positioned to not only weather these challenging times, but in fact benefit from them" and projections of profitable growth and "***above-average returns to shareholders in 2009 and beyond***" are due to LPS's "strong market position" and "balanced portfolio."

219.    Chan made similarly positive comments during his opening remarks:

- Chan touted Default Services revenues of $255.3 million, a 51% increase compared to the first quarter of 2008. He added, "We continue to expand our depth and breadth of our service offerings, and when coupled with some of the recent lifting of direct and indirect foreclosure moratoria, we expect to expand our market-leading presence."

- Chan noted that "the demand for our outsourced default services is still expected to remain strong over the next few years" given the dynamics surrounding accelerating foreclosures and REO assets owned.

**First Quarter 2009 Form 10-Q**

220.    On May 13, 2009, LPS filed its quarterly report for the first quarter of 2009 on Form 10-Q for the period ending March 31, 2009. The first quarter 2009 Form 10-Q reaffirmed the financial results announced in the April 29, 2009 press release and earnings conference call. Further, it contained substantially the same SOX certifications that were included in LPS's second quarter 2008 Form 10-Q, which were also signed by Carbiener and Chan, and similar false statements concerning LPS's disclosure controls and procedures. *See* ¶¶ 193, 194.

221.    Moreover, the first quarter 2009 Form 10-Q contained the following statements touting the growth and financial success of LPS's default management services business, which in turn led to increased revenues from LPS's Desktop services:

- LPS compared revenue figures to "demonstrate the extent to which rising default management revenues can offset declines in loan facilitation revenues."  It added that, "*as our default volumes have increased, our margins have improved significantly on the incremental sales during the first quarter of 2008 and 2009*."

- LPS reported increased year-over-year processing and services revenues both on a consolidated basis ($86.2 million, or 19.4%) and within its Loan Transaction Services segment ($63.4 million, or 20.4%) during the first quarter of 2009.   Regarding consolidated revenues, LPS stated that "[t]he increase was primarily driven by growth in our Loan Transaction Services segment which resulted from growth in default services." Regarding Loan Transaction Services revenues, specifically, LPS attributed the increase primarily to "growth in our default management services due to strong market growth as well as continued market share gains."

222.    Concerning regulatory matters, LPS generically disclosed that it received from time-to-time "inquiries and requests for information from various state and federal regulatory agencies" (including informal or formal requests or civil investigative subpoenas) due to "the heavily regulated nature of the mortgage industry."  LPS assured the market, however, "[w]e do not expect that any such inquiries would have a material adverse effect on our financial condition or our ability to operate our businesses."

223.    For the reasons stated in §§IV and V, and as detailed herein including ¶¶ 195, 202, 210 and 214, the statements made in the 2009 first quarter Form 10-Q and the April 29, 2009 press release and earnings conference call set forth above, which touted, among other things, LPS's strong financial results, growth in default services revenue leading to "above-average returns to shareholders," that LPS's systems had been "fully exonerated" and there was no basis for any investigation, the quality of default management services, and expanding market share, were

materially false and misleading when made or omitted material facts to make such statements not false or misleading.

**Second Quarter 2009 Earnings Release and Conference Call**

224.    On July 29, 2009, LPS issued a press release stating:  "Lender Processing Services, Inc. (NYSE:LPS), a leading provider of integrated technology and services to the mortgage and real estate industries, today reported consolidated revenues of $613.2 million for the second quarter of 2009, an increase of 35.3% compared to the second quarter of 2008, and net earnings of $75.2 million or 78 cents per diluted share."  In the release, LPS's Chairman of the Board of Directors, Lee A. Kennedy ("Kennedy"), declared, "LPS had a very strong second quarter despite a challenging macroeconomic environment.  LPS, with its comprehensive end-to-end solutions for the mortgage and real estate industries, remains well positioned for an outstanding year in 2009 and to continue to grow profitably in 2010 and beyond."  Added Carbiener, "Second quarter earnings were very solid across all our businesses.  Our Default Services business continued to deliver strong results while our Loan Facilitation Services benefitted from the improved origination environment."

225.    LPS further reported increases in revenues from its Loan Transaction Services segment ($448.0 million, or 42.1%) and its Default Services business ($299.5 million, or 51.9%) compared to the second quarter of 2008.  LPS attributed the Default Services gains primarily to "ongoing strength in the default market and our ability to continue to gain market share."  LPS also reported higher overall operating income from the Loan Transaction Services segment due in part to higher income "across all major services in Default."

226.    On the following day, LPS hosted an earnings conference call with analysts.  Carbiener and Chan participated in this call.  Carbiener began his opening remarks by reiterating

LPS's success and future prospects, particularly with respect to increasing revenues and market share in the Loan Transaction Services segment and default services business:

- Carbiener announced that overall financial performance in the second quarter "exceeded our expectations," with revenue growth "favorably impacted by increasing year-over-year foreclosure and origination volumes, stable loan servicing accounts and increasing market share across all segments." He attributed this to strong demand, and stated that LPS was well-positioned to grow its top and bottom line.

- Carbiener noted a 42.1% year-over-year increase in second quarter Loan Transaction Services revenue, attributed to strong Default Services revenue growth (51.9%) and increased demand for LPS's services supporting "all activity over the foreclosure and REO lifecycle."

- Carbiener also touted expanded market share across all default product lines "by leveraging our market-leading positions in desktop, and in foreclosure outsourcing and the integration of our other services." Specifically, he noted second quarter deals expected to generate approximately $17 million in annualized revenues. Carbiener projected such market expansion to continue, given that LPS was "just starting to drive penetration in many of the Default Services we offer."

227.    Chan's opening remarks were similarly optimistic, citing increased year-over-year consolidated and default services revenues (35.3% and 51.9%, respectively) and "strong growth results from our comprehensive, diversified and balanced business model, reflecting significant contributions from both of our operating segments" that will "enable us to grow during this difficult market and economic environment as well as the various cycles of the industry." Chan projected growth in the low-to-mid teens and the potential for continued market and product penetration by "leveraging our market-leading technology presence to expand utilization of our comprehensive and integrated default offerings and continuing to provide our customers with a more robust integrated solution that also provides them with better processing transparency."

228.    Carbiener further extolled the opportunities in LPS's Default Services business ("So we feel good about our opportunities for -- in Default."). He projected strong default volumes through 2011 and LPS's ability to gain "more market share in each of the [default services] products

I talked about, not just relying on the fact that foreclosure starts were going to be increasing."
Carbiener also touted LPS's ability to leverage its Desktop system to gain business: "The fact that
we are able to see better than 50% of the foreclosure starts that occur in this country, because they do
flow into that desktop technology and we manage those processes, we have gotten a hold of those
transactions." He elaborated as follows: "[W]e also view our workflow technology that's desktop
technology as being a solid tool to use throughout the servicing organization. . . . And by going after
the foreclosure side, what we were able to do was gain credibility that we could ***put together a good,
solid business case and business model for what our systems can do and just how much cost they
can take out*** of a department by automating the various processes that occur within departments. . . .
So we are seeing tangible results from pushing these technologies into these other areas."

229.    Carbiener also dismissed any ongoing concerns regarding a federal investigation into
LPS. When asked, "Is there any change in the DOJ investigation, or should we just presume this is
completely behind us now?" Carbiener responded, "I don't even remember that."

230.    Defendants misleadingly highlighted increased margins, particularly in the default
services unit, contributed to higher earnings without disclosing that those margins were achieved by
cutting costs by hiring temporary employees to robo-sign documents. Defendant Carbiener stated:
"Operating margins year-over-year were actually up 140 basis points. . . . The increases in operating
income and operating margins were driven by margin expansion in both of our key business
segments." Defendant Chan stated: "The default margins remained strong and expanded on a
sequential-quarter basis. . . . [W]e are extremely pleased with our operating margins."

**Second Quarter 2009 Form 10-Q**

231.    On August 14, 2009, LPS filed its quarterly report for the second quarter of 2009 on
Form 10-Q for the period ending June 30, 2009. The second quarter 2009 Form 10- Q reaffirmed

the financial results announced in the July 29, 2009 press release and July 30, 2009 conference call. Further, it contained substantially the same SOX certifications that were included in LPS's second quarter 2008 10-Q, which were also signed by Carbiener and Chan, and similar false statements concerning LPS's disclosure controls and procedures. *See* ¶¶ 193, 194. Moreover, the second quarter 2009 10-Q depicted LPS's financial results in a positive light, highlighting increased revenues, margins, demand, and market share in its default management services business:

- LPS touted rising default management revenues, the ability of such revenues to offset potential declines in loan facilitation revenues, and default management margins that "have improved significantly on the incremental sales during the first six months of 2008 and 2009."

- LPS reported increased year-over-year processing and services revenues both on a consolidated basis ($159.9 million, or 35.3%) and within its Loan Transaction Services segment ($132.7 million, or 42.1%) during the second quarter of 2009. Regarding consolidated revenues, LPS stated that "[t]he increase was primarily driven by growth in our Loan Transaction Services segment resulting from increased demand for our services that support the default life cycle." Regarding Loan Transaction Services revenues, specifically, LPS stated that the increase was "primarily driven by growth in our default management services due to strong market growth and continued market share gains." LPS also reported increased year- over-year processing and services revenues both on a consolidated basis ($246.1 million, or 27.4%) and within its Loan Transaction Services segment ($196.2 million, or 31.3%) during the first six months of 2009, citing factors similar to those driving the second quarter 2009 gains.

232.    The Form 10-Q also allayed any concerns over regulatory inquiries or investigations concerning LPS. LPS generically disclosed that it received from time-to-time "inquiries and requests for information from various state and federal regulatory agencies" (including informal or formal requests or civil investigative subpoenas) due to "the heavily regulated nature of the mortgage industry." However, LPS assured the market: "***We do not expect that any such inquiries would have a material adverse effect on our financial condition or our ability to operate our businesses***."

233.    The foregoing statements regarding the second quarter 2009 financial results were materially false and misleading for the same reasons articulated in §§IV and V, and ¶¶ 195, 202, 210, 214 and 223.  In particular, the assertion that "increases in operating income and operating margins were driven by margin expansion" was false and misleading because, among other things, Defendants employed low-skilled workers to robo-sign thousands of documents without regard to accuracy or legality.  Had Defendants complied with legal requirements, the costs of doing business would have hurt margins as default volumes increased.  Similarly, the assertion that LPS was able to take cost out of a servicer's business was false and misleading because these cost savings were premised on illegal and improper business practices that cut costs but exposed the servicers and LPS itself to significant legal and financial risk.

**Third Quarter 2009 Earnings Release and Conference Call**

234.    On October 22, 2009, LPS issued a press release stating:  "Lender Processing Services, Inc. (NYSE:LPS), a leading provider of integrated technology and services to the mortgage and real estate industries, today reported consolidated revenues of $619.4 million for the third quarter of 2009, an increase of 32.7% compared to the third quarter of 2008, and net earnings of $75.5 million or 78 cents per diluted share."  This press release was filed concurrently on Form 8-K with the SEC.  LPS attributed the Default Services gains primarily to "ongoing strength in the default market and our ability to continue to gain market share."  LPS also reported higher overall operating income from the Loan Transaction Services segment due in part to higher income from Default Services.

235.    In the release, Kennedy highlighted that "LPS delivered strong results in the third quarter despite an ongoing difficult business environment.  LPS with its broad-based, technology-

driven end-to-end solutions for the mortgage and real estate industries, remains well positioned for the fourth quarter and to continue to grow profitably in the years ahead."

236.    Carbiener echoed Kennedy's sentiments, stating that "our Default Services business continued to deliver very strong results" and "LPS with its solid market presence remains well positioned for a strong finish in 2009 and to continue to grow revenue and earnings in 2010."

237.    On October 23, 2009, LPS held a conference call with various securities analysts to discuss LPS's third quarter 2009 financial results. Carbiener and Chan participated in this call. Carbiener opened the call by touting "exceptionally strong" revenue growth, strong demand, and increasing market share largely attributable to LPS's default services business:

- Carbiener stated that "demand for our solutions remains strong and that we are well-positioned to continue to grow our top and bottom line," citing revenue growth favorably impacted by increasing year-over-year foreclosure and origination volume, growing loan servicing counts, and increasing market share across all segments.

- According to Carbiener, third quarter revenues in the Loan Transaction Services segment were 33.7% above the prior year based on strong growth in both Default Services and Loan Facilitation Services. Default Services finished with a "very strong" revenue growth rate of 25.6%, noting increasing demand for all activities over the foreclosure and REO lifecycles.

- Carbiener expressed confidence that "market revenues will remain significant and that we are well-positioned to grow our approximate 20% marketshare," noting that "we are just starting to drive penetration in many of the Default Services we offer." As in prior earnings calls, Carbiener spoke of LPS's opportunity to "leverage our 50% marketshare in Desktop and our integrated offerings to increase penetration across all default-related product lines."

- Carbiener announced that, as a result of LPS's strong results and growth expectations, adjusted earnings per share guidance was increased to a range of $3.07 to $3.09 per diluted share for full year 2009.

238.    Defendant Chan highlighted the Company's continued high margins – but failed to disclose that those high margins were achieved by illegal business practices: "The Default Services margin[s] remained strong . . . . In summary, we are pleased with our operating margins."

Similarly, Defendant Carbiener answered a question from a Goldman Sachs analyst regarding reported margins and indicated the Company was very focused margins in the Default Services unit and keeping those margins high.

239.    Chan further boasted of continued market share gains in LPS's default services business:

- Chan noted that, despite a more challenging environment for foreclosures, LPS "continued to gain marketshare through both customer and additional product wins." He credited such favorable results to "the comprehensive, diversified and balanced business model that we believe will enable us to grow during this difficult market and economic environment, as well as the various cycles of the industry."

- Chan announced that year-over-year Default Services revenues increased ($303.8 million, or 25.6% increase) and that Default Services was expected to "remain strong" over the next few years (with projected growth in the low 20% range) due to increased total foreclosure market revenues and "our continued pursuit to expand both our marketshare and product penetration. These efforts include leveraging our market-leading technology presence to expand utilization of our comprehensive and integrated Default offerings."

**November 9-10 Meeting at LPS Offices**

240.    On November 9-10, 2009, Plaintiffs (along with other institutional investors) met with LPS, Defendant Carbiener and Defendant Chan in Jacksonville. Plaintiffs discussed with Defendants all aspects of LPS's business, including LPS's role in the foreclosure process, and the regulatory environment and its impact on LPS's business operations. Defendants – who had already received the whistleblower complaint and launched an investigation of DocX that revealed "real," "glaring," and "significant issues" with illegal document signing practices – misleadingly failed to disclose the existence of these material problems during their discussions with Plaintiffs. *See, e.g.,* ¶¶ 144-149 (describing LPS's receipt of whistleblower letter from its external auditors and subsequent investigation of DocX).

**Third Quarter 2009 Form 10-Q**

241.    On November 16, 2009, LPS filed its quarterly report for the third quarter of 2009 on Form 10-Q for the period ending September 30, 2009.  The third quarter 2009 Form 10-Q reaffirmed the financial results announced in the October 22, 2009 press release and the October 23, 2009 conference call.  Further, it contained substantially the same SOX certifications that were included in LPS's second quarter 2008 10-Q, which were also signed by Carbiener and Chan, and similar false statements concerning LPS's disclosure controls and procedures.  *See* ¶¶ 193, 194.  Moreover, the third quarter 2008 10-Q touted LPS's financial success, particularly fueled by increased revenues, margins, and market share in its default management services business:

- LPS stated that its default management services provided a "natural hedge" against real estate volatility because a weaker economy tends to increase the volume of consumer mortgage defaults, thereby benefitting LPS's default management services business. LPS noted that its Desktop services also benefitted from a weaker economy given that the Desktop application was primarily used in connection with default management.

- LPS stated that, as its default volumes have increased, "***our margins have improved*** significantly on the incremental sales during the first nine months of 2008 and 2009."

- LPS reported increased year-over-year processing and services revenues both on a consolidated basis ($152.6 million, or 32.7%) and within its Loan Transaction Services segment ($111.0 million, or 33.7%) during the third quarter of 2009.  Regarding consolidated revenues, LPS stated that such increase was "primarily driven by growth in our Loan Transaction Services segment resulting from increased demand for our services that support the default life cycle."  Regarding Loan Transaction Services revenues, specifically, LPS stated that the increase was "primarily driven by growth in our default management services due to strong market growth and continued market share gains." LPS also reported increased year-over-year processing and services revenues both on a consolidated basis ($398.7 million, or 29.2%) and within its Loan Transaction Services segment ($307.2 million, or 32.1%) during the first nine months of 2009, citing factors similar to those driving the third quarter gains.

242.    Further, in reference to regulatory inquiries and investigations, Defendants unequivocally stated:  "We do not expect that any such inquiries will have a material adverse effect on our financial condition or our ability to operate our businesses."

243.    Further, Defendants assured investors that the Company was not concerned by potential legal exposure, claiming it was merely subject to "customary litigation incidental to our business" and "we do not believe that the ultimate disposition of these lawsuits will have a material adverse impact on our financial position."

244.    The foregoing statements regarding the third quarter 2009 financial results were materially false and misleading for the same reasons articulated in §§IV and V, and ¶¶ 195, 202, 210, 214, 223, 233, and 240.  In particular, LPS's revenue, income and margin numbers were false and misleading because, among other things, Defendants employed low-skilled workers to robo-sign thousands of documents without regard to accuracy or legality.  Had Defendants complied with legal requirements, the costs of doing business would have hurt revenues, income and margins.

245.    Further, by no later than November 2, 2009, Defendants had received the whistleblower complaint alerting them to the true facts concerning the DocX fraud.  By November 16, 2009, Defendants had conducted an investigation of the DocX fraud and fired Defendant Brown.  Nonetheless, Defendants continued to conceal the existence of the illegal document signing scheme from investors, even though Defendants knew at the time the illegal document signing scheme exposed LPS to massive liability.  Plaintiffs purchased nearly 4 million LPS shares at artificially inflated prices from November 16, 2009 through October 2010.  Plaintiffs would not have purchased these shares at such prices, had Defendants disclosed the truth concerning DocX in November 2009 when LPS received the whistleblower complaint and conducted its investigation.

**Fourth Quarter and Fiscal Year 2009 Earnings Release and Conference Call**

246.    On February 8, 2010, LPS issued a press release misleadingly stating:  "Lender Processing Services, Inc. (NYSE:LPS), a leading provider of integrated technology and services to the mortgage and real estate industries, today reported consolidated revenues of $608.1 million for

the fourth quarter of 2009, an increase of 28.3% compared to the fourth quarter of 2008, and net earnings of $74.9 million or 77 cents per diluted share." The press release was filed concurrently on Form 8-K with the SEC.

247.    According to Kennedy, "LPS had a strong fourth quarter despite challenging market conditions and a fragile macro-economic environment. LPS with its market-leading presence and its unique technology-driven solutions for the mortgage and real estate industries, remains well positioned to achieve its growth objectives in 2010 and beyond."

248.    Carbiener continued, "Our Loan Facilitation business posted record growth as it benefitted from a better year-over-year origination market while our Default Services business continued to deliver very strong results." He added that LPS had "an exceptional year in 2009" and was "well positioned to grow revenue and earnings in 2010" due to the strong presence in each of LPS's businesses.

249.    On the following day, February 9, 2010, Defendants hosted an earnings conference call with analysts to discuss LPS's fourth quarter 2009 and 2009 fiscal year-end financial results. Carbiener and Chan participated in this call. Carbiener led the call reiterating LPS's successes and future prospects, particularly with respect to its default services business:

- Carbiener stated that LPS's full year 2009 results reflected its "continuing ability to drive market share gains in each of our primary business segments," including "default services which grew revenues at 33.5% despite nationwide foreclosure starts increasing an estimated 25% in 2009."

- Carbiener stated that fourth quarter revenue growth "was again exceptionally strong as consolidated revenues grew 28.3% [$134 million in absolute dollars] driven by solid performance in every business segment." He attributed such growth to increasing foreclosure and origination volumes and "increasing market share across all segments," demonstrating that "demand for our solutions remain[ed] strong" and LPS was "well positioned to continue to grow our top and bottom line."

- Regarding the Loan Transaction Services segment, Carbiener announced year-over-year revenue growth of 28.7% for the fourth quarter of 2009 "as we experienced strong growth in both default services and loan facilitation services," reflecting a trend toward outsourcing and centralization of lending processes. He maintained that LPS was "well positioned to drive greater product penetration within both new and existing customers," pointing to fourth quarter deals "that should generate approximately $5 million in annualized revenues."

- In the context of default services, Carbiener highlighted "revenue growth rate of 14.3% which was very strong" despite external factors that slowed foreclosure starts and sales. He touted "increasing demand for our services that support all activities over the foreclosure and REO life cycles" and newly signed fourth quarter deals "that should generate over $10 million in annualized revenues."

- Carbiener concluded his opening remarks by touting LPS's "unique portfolio" and "strong market position" in all businesses, predicting that LPS would continue to "grow profitably and deliver above average returns to shareholders in 2010 and beyond."

250.    Defendant Chan misleadingly asserted, without disclosing that margins were artificially inflated by illegal business practices: "The default services margin remains strong. . . . In summary, we are pleased with our operating margins. . . ."

251.    Chan reinforced the "strong growth" of LPS's financials, noting a year-over-year increase in consolidated revenues ($608.1 million, or 28.3%) reflecting "the balanced contribution from each of our key business segments" (including a 28.7% revenue gain in the Loan Transaction Services segment). Regarding default services, in particular, Chan noted increased year-over-year revenues of $278.6 million, or 14.3%, for the fourth quarter of 2009.

**Fiscal Year 2009 Form 10-K**

252.    On February 23, 2010, LPS filed its annual report for the fiscal year ending December 31, 2009 on Form 10-K. The Form 10-K reaffirmed the 2009 fourth quarter and fiscal year-end financial results announced in the February 8, 2010 press release and February 9, 2010 conference call. Moreover, the 2009 Form 10-K described year-over-year increases in annual processing and services revenues generated by the Loan Transaction Services segment ($401.1 million, or 31.3%, in

2009 and $209.5 million, or 19.5%, in 2008), which were "primarily driven by our default management services due to strong market growth as well as continued market share gains."

253.    LPS also described the significant growth of its default management services, making LPS "now one of the largest mortgage default management services providers in the U.S." It attributed this in part to the "range and quality of default management services we offer and our focus on technology and customer service."

254.    The 2009 Form 10-K contained substantially the same SOX certifications that were included in LPS's second quarter 2008 10-Q, which were also signed by Carbiener and Chan. The 2009 Form 10-K also included the false and misleading statement that Defendants established and maintained adequate internal controls over financial reporting, substantially identical to the statement in the 2008 Form 10-K at ¶ 208.

255.    The foregoing statements regarding the fourth quarter 2009 financial results were materially false and misleading for the same reasons articulated in §§IV and V, and ¶¶ 195, 202, 210, 214, 223, 233, 240, and 244.  In particular, LPS's revenue, income and margin numbers were false and misleading because, among other things, Defendants employed low-skilled workers to robo-sign thousands of documents without regard to accuracy or legality. LPS's description of its business as providing "quality" default management services was a misrepresentation and/or omission as LPS was utilizing low-wage employees to robo-sign and/or fabricate massive numbers of documents without any regard to veracity, without being signed by the person purporting to sign the document, and without being legally notarized.  Since Defendants' default management services were intended for use in foreclosures and bankruptcy proceedings, the production of these documents did not come close to complying with the rigorous standards required.  And, Defendants did not maintain adequate internal controls over financial reporting.

256.    The 2009 Form 10-K also misleadingly disclosed the discovery and scope of the problems at LPS's DocX subsidiary.  The 2009 10-K falsely and misleadingly stated:

> Recently, during **an internal review** of the business processes used by our document solutions subsidiary, **we identified** a **business process** that caused an error in the **notarization** of certain documents, some of which were used in foreclosure proceedings in **various jurisdictions** around the country.  The services performed by this subsidiary were offered to a **limited number** of customers, were unrelated to our core default management services and were **immaterial to our financial results**.  We **immediately corrected** the business process and began to take remedial actions necessary to **cure the defect** in an effort to minimize the impact of the error.  We subsequently received an inquiry relating to this matter from the Clerk of Court of Fulton County, Georgia, which is the regulatory body responsible for licensing the notaries used by our document solutions subsidiary.  In response, we met with the Clerk of Court, along with members of her staff, and reported on **our identification of the error** and the status of the corrective actions that were underway.  **We have since completed our remediation efforts with respect to the affected documents.** Most recently, we have learned that the U.S. Attorney's office for the Middle District of Florida is reviewing the business processes of this subsidiary. We have expressed our willingness to fully cooperate with the U.S. Attorney.  **We continue to believe that we have taken necessary remedial action with respect to this matter**.

257.    Defendants' purported disclosure of the problems at DocX was highly misleading as set forth in ¶ 255.  The Company did not discover the problem; rather, the problems and DocX were only disclosed after a whistleblower letter was sent to the Company's external auditor who forced the Defendants to conduct an investigation of the allegations.  The problems were not caused by a "business process," but by intentional criminal conduct.  The Company had not completed its remediation efforts with respect to the affected documents – indeed, LPS was Ordered to perform remediation in 2011 and the process of fixing affected documents may still be ongoing today.  The problem was not immaterial to the Company's financial results; as LPS and its senior executives have admitted, the DocX scandal had a huge impact on the Company.  The error was not simply limited to notarizations.  At the time of this disclosure, Defendants knew, but failed to reveal, that the problems at DocX were extremely significant for LPS.  The illegal and fraudulent signing

practices concerned over a million fraudulent documents filed with property recorders' offices throughout the country and used in bankruptcy and other court proceedings.

**April 5, 2010 Press Release**

258.    On Saturday April 3, 2010, *The Wall Street Journal* published an article revealing that problems with foreclosure documents created by LPS were more widespread and blatant than LPS had previously indicated.  Moreover, according to sources who spoke with *The Wall Street Journal*, the investigation was a serious matter that was being pursued as a criminal inquiry:

> Judges across the U.S. have prevented foreclosures after finding that the materials banks had submitted to them to support their claims were wrong.

> Now a subsidiary of a company that is a top provider of the documentation to banks for foreclosure actions is under investigation by federal prosecutors.

> Prosecutors are "reviewing the business processes" of the subsidiary of Lender Processing Services Inc., based in Jacksonville, Fla., according to the company's annual securities filing released in February.  ***People familiar with the matter say the inquiry is criminal in nature.***

> \* \* \*

> Some lawyers representing homeowners have claimed that banks ***routinely file erroneous paperwork showing they have a right to foreclose when they don't.*** Firms that process the paperwork are either "producing so many documents per day that ***nobody is reviewing anything, even to make sure they have the names right, or you've got some massive software problem***," said O. Max Gardner, a consumer-bankruptcy attorney in Shelby N.C., who has defended clients against foreclosure actions.

> LPS was recently referred to in a case involving Sylvia Nuer, a Bronx, N.Y., homeowner who had filed for bankruptcy protection in 2008.  Diana Adams, a U.S. government lawyer who monitors bankruptcy courts, said in a brief filed earlier this year that LPS signed a document that wrongly said J.P. Morgan Chase &Co. had once owned Ms. Nuer's loan.

> Documents related to the loan were "***patently false or misleading***," she wrote. J.P. Morgan Chase, which has withdrawn its request to foreclose, declined to comment.

- 87 -

* * *

LPS has acknowledged problems in its paperwork.  In its annual securities filing, in which it disclosed the federal probe, the company said it had found "an error" in how Docx handled notarization of some documents.  ***Docx also has processed documents used in courts that incorrectly claimed an entity called "Bogus Assignee" was the owner of the loan, according to documents reviewed by The Wall Street Journal.***

Ms. Kersch said the "bogus" phrase was used as a placeholder. "***Unfortunately, on a few occasions, the document was inadvertently recorded before the field was updated***," she said.

259.    On April 5, 2010, prior to the market open, LPS issued a press release to counter the article in *The Wall Street Journal*:

Lender Processing Services, Inc. (NYSE: LPS), a leading provider of integrated technology and services to the mortgage industry, today provided clarification to a recent article published by the Wall Street Journal.

As indicated in LPS' most recent Form 10-K, filed in February 2010, LPS reported that during an internal review of the business processes used by its document solutions subsidiary, the Company identified a business process that caused an error in the notarization of certain documents, some of which were used in foreclosure proceedings in various jurisdictions around the country.

The services performed by this subsidiary were offered to a limited number of customers, were unrelated to the Company's core default management services and were immaterial to the Company's financial results. LPS immediately corrected the business process and has completed the remedial actions necessary to minimize the impact of the error.

* * *

LPS continues to believe that it has taken necessary remedial action with respect to this matter.

260.    The foregoing statements regarding the fourth quarter and year-end 2009 financial results were materially false and misleading for the same reasons articulated in §§IV and V, and ¶¶ 195, 202, 210 and 214, 223, 233, 240, 244, 255, 257.  In particular, the Company had not completed its remediation efforts, the problem was not simply limited to notarizations, and the mistakes were

- 88 -

not a "few occasions" or inadvertent.  As LPS would later admit, the problem was massive,
intentional and concerned over a million fraudulent documents filed with property recorders' offices
throughout the country and used in bankruptcy and other court proceedings.

**First Quarter 2010 Earnings Release and Conference Call**

261.    On April 22, 2010, LPS issued a press release stating:  "Lender Processing Services,
Inc. (NYSE:LPS), a leading provider of integrated technology and services to the mortgage and real
estate industries, today reported consolidated revenues of $592.4 million for the first quarter of 2010,
an increase of 11.8% compared to the first quarter of 2009.  Net earnings of $72.5 million or 75
cents per diluted share in the first quarter of 2010 increased from $50.0 million or 53 cents per
diluted share in the first quarter of 2009."  The press release was filed concurrently on Form 8-K
with the SEC.

262.    Kennedy boasted, "LPS is off to a strong start in 2010 despite difficult market
conditions and a challenging broader macro-economic environment.  LPS, with its strong market
presence and its unique portfolio of services, remains well positioned to achieve its growth
objectives in 2010 and beyond."

263.    Carbiener touted LPS's "strong start in 2010" and "good position to grow revenue
and earnings in 2010" based on LPS's "market-leading presence in each of its businesses."  In
particular, "[o]ur Default Services business grew year-over-year as well, despite being impacted by
broader industry slowdowns."  He announced expected 2010 revenue growth of 8% to 10% based in
part on "key customer wins in our Desktop business," "a solid run rate in March in Default
Services," and "continued growth in foreclosure activity."

264.    On the next day, April 23, 2010, LPS hosted a conference call with securities analysts
to discuss its first quarter 2010 financial results.  Carbiener and Chan participated in this call.

Carbiener began with encouraging remarks about LPS's growth, including in the Default Services business, which had "a revenue growth rate [of] 5.2%," "primarily driven by market share gains, along with an increase primarily in March in later-stage delinquency volumes."

265.    Chan proceeded with similar praise, noting "strong" growth in year-over-year revenues on a consolidated basis ($592.4 million, or 11.8%, due to "diverse and balanced contributions from each of our key business segments"), in the Loan Transaction Services segment (10.9%), and in the Default Services business ($268.7 million, or 5.2%, "primarily the result of market share gains as we continue to offer timely solutions").  He noted that, despite decreased foreclosure starts, "we are encouraged by the improving [Default Services] volume trends and the related positive impact on margins, especially going into the second quarter."

266.    Defendant Chan highlighted the Company's continued high margins – but failed to disclose that those high margins were achieved by illegal business practices:  "The Default Services margin[s] remained strong . . . .  In summary, we are pleased with our operating margins."

267.    Carbiener reinforced the importance of LPS's growing market share and "upside" in its Default Services segment:  "We were already increasing that [21% current] market share, leveraging off of our current desktop customers.  Now that we've expanded that desktop customer base, we have even more faith in our ability to expand off of that low, low 21% share."  He also discussed the prospect of expanding LPS's 50% market penetration in foreclosures (via LPS's desktop solution) "even higher," to achieve "greater visibility into our market growth potential on the default side."

268.    Moreover, Carbiener misleadingly downplayed the significance of regulatory and legal actions stemming from the illicit behavior of DocX employees and other LPS personnel, characterizing DocX as small and insignificant, and stressing that LPS had quickly corrected the

problem and completed necessary remedial actions ("***So from our standpoint, we've done
everything we need to do. We are satisfied there's not a problem***."):

> That being said, I can make a couple of comments to review what was put
> into that [2009 Form 10-K] disclosure and also to expand a little bit. For those on the
> call that haven't really gone through that disclosure, the issue really related to one of
> our small subsidiaries ***that did limited document prep for a couple of clients, not
> extensive processes. The financial results of that sub, it's hard to say they are even
> material. They're very, very small. And the services that they provide don't in any
> way tie into anything else we do from our core default processing***.

> Now, as part of our enterprise risk management process, we were reviewing
> the business processes of that subsidiary late last year, and we discovered that there
> was a problem with one of the processes that caused an error in the notarization
> process. So when we found or when we saw that error, we stepped in, we quickly
> corrected the process, we notified the impacted customers, and we began the
> remediation process.

> ***The one thing I will add because that's all in the disclosure, is that part of
> our remediation was to sit down with the management of that subsidiary, interview
> the management of that subsidiary so that we could make sure that in our minds,
> the business process that broke down was because of bad judgment, not because of
> ill intent. And through those efforts, we became very satisfied that we could
> remediate, and that it was just true poor judgment and bad process.***

> So thinking about it, the respective regulatory bodies over the areas where the
> documents were filed, we had to expect that they would become aware that
> documents with incorrect notarization had been filed. And that's exactly the case.

> And when a regulatory body sees an error, they're going to want to ask
> questions as to why the error occurred and ask the party that created the error what
> was the intent. So, that's exactly what happened with the clerk of the court in
> Atlanta, and we talk them through what happened. We walked them through the
> processes. We walked them through our corrective actions. They were completely
> satisfied. And as was disclosed in one of the articles, they closed their investigation,
> and it's over and done with.

> From our standpoint, we believe the US attorney is making inquiries into the
> subsidiary and the processes of that subsidiary for the exact same reason. So again,
> ***we can say that with the actions we've taken to date, we believe that we have taken
> the necessary remedial action, and we've satisfied ourselves that the issue was the
> result of poor decision-making, not ill or criminal intent.***

And I think as we've stated before as well, we are cooperating fully with the US attorney. We've actually expressed our willingness to meet, and we're just waiting on their schedule to accommodate the meeting. ***So from our standpoint, we've done everything we need to do. We are satisfied there's not a problem. We are satisfied there's not bad intent. We've already confirmed that through working with one relevant regulatory agency, and we expect to be able to work through this.***

269. The foregoing statements regarding the first quarter 2010 financial results were materially false and misleading for the same reasons articulated in §§IV and V, and ¶¶ 195, 202, 210, 214, 223, 233, 240, 244, 255, 257, and 260. In particular, Defendants' assertion that they had conducted an extensive investigation and determined that the problem was not significant or material to investors was highly misleading because any investigation would have unearthed that the problem was massive, intentional and concerned over a million fraudulent documents filed with property recorders' offices throughout the country and used in bankruptcy and other court proceedings. Further, reported earnings, revenues and margins were falsely and misleadingly inflated through the use of illegal business practices.

**First Quarter 2010 Form 10-Q**

270. On May 6, 2010, LPS filed its quarterly report for the first quarter of 2010 on Form 10-Q for the period ending March 31, 2010. The first quarter 2010 Form 10-Q reaffirmed the financial results announced in the April 22, 2010 press release and April 23, 2010 conference call. Further, it contained substantially the same SOX certifications that were included in LPS's second quarter 2008 Form 10-Q, which were also signed by Carbiener and Chan, and similar false statements concerning LPS's disclosure controls and procedures. *See* ¶¶ 193, 194. Moreover, the first quarter 2010 Form 10-Q contained the following statements emphasizing LPS's revenue and market share gains, particularly in the area of default management services:

- LPS projected an increase in the size of the overall default market due to a growing inventory of delinquent mortgage loans and loans in foreclosure, "which should in turn have a positive effect on our default revenues." LPS added that a weaker economy favorably affects both its default management operations and its Desktop solution, given that the Desktop application was used primarily used in connection with default management.

- LPS reported increased year-over-year processing and services revenues both on a consolidated basis ($62.6 million, or 11.8%) and within its Loan Transaction Services segment ($40.8 million, or 10.9%) during the first quarter of 2010. LPS attributed such gains partly to "growth in our default management services due to continued market share gains [5.2% during the quarter]."

271.    Regarding ongoing regulatory matters, Defendants misrepresented the true scope of their employees' illicit conduct and LPS's potential liability for such conduct. LPS stated generically that it received, from time to time, regulatory inquiries and requests as a function of "the heavily regulated nature of the mortgage industry." More specifically, LPS disclosed the following regarding documentation issues at DocX, assuring the market that DocX's services were limited and immaterial and that LPS had "immediately corrected" the problem and completed all necessary remedial action:

Recently, during *an internal review* of the business processes used by our document solutions subsidiary, *we identified* a *business process* that caused *an error in the notarization of certain documents*, some of which were used in foreclosure proceedings in various jurisdictions around the country. The services performed by this subsidiary were offered to a *limited number* of customers, were unrelated to our core default management services and were *immaterial to our financial results*. We *immediately corrected* the business process and began to take remedial actions necessary to *cure the defect* in an effort to minimize the impact of the error. We subsequently received an inquiry relating to this matter from the Clerk of Court of Fulton County, Georgia, which is the regulatory body responsible for licensing the notaries used by our document solutions subsidiary. In response, we met with the Clerk of Court, along with members of her staff, and reported on our identification of the error and the status of the corrective actions that were underway. We have since *completed our remediation efforts with respect to the affected documents*, and we believe that the matter with the Clerk of Court is closed. Most recently, we have learned that the U.S. Attorney's office for the Middle District of Florida is reviewing the business processes of this subsidiary. We have expressed our willingness to fully

cooperate with the U.S. Attorney.  We continue to believe that *we have taken necessary remedial action* with respect to this matter.

272.    The foregoing statements regarding the first quarter 2010 financial results were materially false and misleading for the same reasons articulated in §§IV and V, and ¶¶ 195, 202, 210, 214, 223, 233, 240, 244, 255, 257, 260, and 269.  In particular, Defendants' assertion that they had conducted an extensive investigation and determined that the problem was not significant or material to investors was highly misleading because any investigation would have unearthed that the problem was massive, intentional and concerned over a million fraudulent documents filed with property recorders' offices throughout the country and used in bankruptcy and other court proceedings.  Further, reported earnings, revenues and margins were falsely and misleadingly inflated through the use of illegal business practices.

**May 14, 2010 *The Florida Times Union* Article and Carbiener's Response**

273.    On May 14, 2010, in an article entitled "Florida investigating 'bogus' foreclosure records," it was reported in *The Florida Times Union* that Florida's Attorney General was investigating whether LPS was involved with forging real estate documents for foreclosure lawsuits. LPS, through its spokeswoman Michelle Kersch, responded that "the company hasn't done anything wrong."

274.    On May 20, 2010, Defendant Carbiener wrote a letter to the Editor in response to the May 14 article:

> LPS is very involved in the Jacksonville community and highly values its role and reputation as a good corporate citizen.

> Therefore, I believe it is vitally important to provide clarification to the May 14 article in *The Florida Times-Union*, "Florida Investigating 'Bogus' Foreclosure Records."

- 94 -

The article discusses LPS' subsidiary, Docx LLC, which provided a document preparation service to its customers and/or their attorneys from 2008 to 2009.

When a customer or its attorney requested that Docx prepare a document, Docx downloaded the information provided in the customer or attorney order into a pre-approved form provided by the customer or its attorney.

When preparing the documents, if specific pieces of information were not provided by the customer or attorney, Docx used the phrases "Bogus Assignee" and "Bad Bene" as highly visible placeholders that would then be replaced when the missing information was provided to Docx.

Unfortunately, on a few occasions, documents containing the placeholder phrases were inadvertently recorded before the field was updated.

While to our knowledge, none of these documents have been used in actual court proceedings, LPS deeply regrets this error.

However, these placeholder phrases had no other meaning other than to indicate that more information was needed.  Docx is not a party to any court proceedings and our role ends when the prepared documents are returned to the attorney or customer.

*In a separate matter, LPS reported in February that it identified a business process that caused an error in the notarization of certain documents, some of which were used in foreclosure proceedings.  LPS immediately corrected the business process and believes it has <u>completed</u> the remedial actions necessary to minimize the impact of the error.*

Finally, although LPS has not been contacted by the Florida attorney general regarding this or any other matter, LPS continues to express its willingness to cooperate with any governmental agency that contacts us.

JEFF CARBIENER,
president and CEO,
Lender Processing Services,
Jacksonville

275.   LPS and Defendant Carbiener fraudulently and misleadingly downplayed the

significance of the illegal forgeries and fabricated document creation at DocX.  Indeed, as set forth

herein (*see*, *e.g.*, ¶ 112 (LPS ordered to perform extensive remediation by government regulatory

agencies in April 2011)), LPS was not even close to having completed the remedial actions to fix the over one million documents impacted by the illegal scheme. Carbiener and LPS knew that the problems at DocX had not been remedied, because, for example, the Company was still in ongoing negotiations with AHMSI with regards to necessary steps to be taken and indemnification expenses.

**May 20, 2010 Annual Shareholder Meeting**

276.    On May 20, 2010, LPS hosted its annual shareholder meeting. Defendant Carbiener told shareholders the year "was very much a success" and touted "our earnings are quality earnings. They translate into cash flow." Further, Carbiener said: "Because we have a strong business model, we're able to weather economic challenges." Finally, Carbiener added: "We've had good success and we expect that success to continue into the future."

**June 7, 2010 National Mortgage News Article**

277.    On June 7, 2010, the *National Mortgage News* that the Florida Attorney General's office had launched a civil investigation implicating LPS in the use of fabricated documents in foreclosure cases. In the article, Kersch explained how incomplete documents had been inadvertently recorded in foreclosure proceedings before missing information was obtained. However, LPS was said to be conducting its own investigation and, to date, had not found that any inadvertently recorded documents were used in a court proceeding. Kersch added, "Moreover, Docx has no involvement in deciding whether or when documents are used in any court proceeding."

278.    The foregoing statements regarding the first quarter 2010 financial results were materially false and misleading for the same reasons articulated in §§IV and V, and ¶¶ 195, 202, 210, 214, 223, 233, 240, 244, 255, 257, 260, 269, and 272. In particular, Defendants' assertion that they had conducted an extensive investigation and determined that the problem was not significant or material to investors was highly misleading because any investigation would have unearthed that

the problem was massive, intentional and concerned over a million fraudulent documents filed with

property recorders' offices throughout the country and used in bankruptcy and other court

proceedings.  Further, the assertion that LPS did not decide if documents were used in court

proceedings was misleading as Defendants knew documents they prepared would be used in court

proceedings, but utilized illegal means to prepare the documents regardless.

**Second Quarter 2010 Earnings Release and Conference Call**

279.    On July 22, 2010, LPS issued a press release stating:  "Lender Processing Services,

Inc. (NYSE:LPS), a leading provider of integrated technology and services to the mortgage and real

estate industries, today reported consolidated revenues of $599.1 million for the second quarter of

2010, a decrease of 2.3% compared to the second quarter of 2009; however, net earnings of $80.4

million or 85 cents per diluted share in the second quarter of 2010 increased from $75.2 million or

78 cents per diluted share in the prior year quarter."  The press release was filed concurrently on

Form 8-K with the SEC.

280.    In this press release, Kennedy assured investors, "LPS had a strong quarter despite

very difficult conditions in both the origination and default markets and a sustained challenging

macro-economic environment.  LPS, with its comprehensive end-to-end solutions for the mortgage

and real estate industries, remains well positioned for a solid 2010 and to continue to grow profitably

in 2011 and beyond."

281.    Carbiener added that "we continued to expand market share" in both the Loan

Facilitation and Default Services businesses.

282.    On the following day, July 23, 2010, LPS hosted an earnings conference call with

analysts to discuss second quarter 2010 financial results.  Carbiener and Chan participated in this

call.  Carbiener focused on LPS's growing market share, especially in its default services segment.

He stated that a year-over-year revenue decline of 8.2% in default services "was actually a strong performance when compared to the 16% decline in foreclosure starts . . . primarily driven by market share gains and increasing revenues in our asset management services business." He added: "And we anticipate that the Desktop conversions mentioned earlier will open up additional opportunities for growth into our default businesses over the next few years, as we have shown a strong track record of leveraging technology relationships to drive sales of our other solutions."

283.    Chan reinforced the same, stating that, although revenues for default services decreased 8.2%, industry foreclosure starts declined by a greater percentage, a difference "primarily the result of market share gains, as we continue to offer timely solutions to our customers in this increasingly regulated environment."

284.    Defendant Carbiener stated: "These results demonstrate our ability to maintain strong margins and earnings in a very challenging marketplace."

285.    Thereafter, when asked about potential business from "three major lenders" that recently implemented LPS's Desktop technology, Carbiener described "a lot of upside across the Board" with respect to default services given that "the three major lenders we're talking about control a lot of the volumes in the country." He credited LPS's ability to "penetrate with the technology." LPS leveraged Desktop to gain additional default services revenues: "So, it's really the integration of the individual services back into the core platform, our ability to tie the whole thing together for a lender so that they have one vendor to deal with. Not just for the technology, but also for the various services that have to take place over the course of the foreclosure."

**Second Quarter 2010 Form 10-Q**

286.    On August 9, 2010, LPS filed its quarterly report for the second quarter of 2010 on Form 10-Q for the period ending June 30, 2009. The second quarter 2010 Form 10- Q reaffirmed

the financial results announced in the July 22, 2010 press release and July 23, 2010 conference call.

Further, it contained substantially the same SOX certifications that were included in LPS's second

quarter 2008 Form 10-Q, which were also signed by Carbiener and Chan, and similar false

statements concerning LPS's disclosure controls and procedures.  *See* ¶¶ 193, 194.  Moreover, the

second quarter 2010 Form 10-Q contained the following statements touting "continued market share

gains" in default management services and the expectation that market factors would positively

affect default revenues:

- LPS projected a stable or slightly smaller overall default market in 2010 (compared to 2009) due to a growing inventory of delinquent mortgage loans and loans in foreclosure, "which should in turn have a positive effect on our default revenues." LPS added that a weaker economy favorably affects both its default management operations and its Desktop solution, given that the Desktop application was used primarily in connection with default management.

- LPS reported decreased year-over-year processing and services revenues both on a consolidated basis ($48.5 million, or 4.2%) and within its Loan Transaction Services segment ($32.5 million, or 7.3%) during the second quarter of 2010 due to decreasing industry trends, but stated that such decreases were offset by continued market share gains in both loan facilitation and default management services.

287.    Additionally, Defendants continued to downplay the severity of ongoing regulatory

matters, again pointing generically to the "heavily regulated nature of the mortgage industry" as the

reason for inquiries and requests for information from various regulators "from time to time."  LPS

referenced specific inquiries by the U.S. Attorney and Florida General, but assured the market that

such inquiries would not have a material adverse impact on LPS:

As previously disclosed, the U.S. Attorney's office for the Middle District of Florida has been conducting an inquiry concerning certain business processes of our document solutions business.  The Florida Attorney General has initiated a similar civil inquiry.  We have been cooperating and we have expressed our willingness to continue to fully cooperate with these inquiries, and we do not believe that the outcome of these inquiries will have a material adverse impact on our business or results of operations.

- 99 -

288.    The foregoing statements regarding the second quarter 2010 financial results were materially false and misleading for the same reasons articulated in §§IV and V, and ¶¶ 195, 202, 210, 214, 223, 233, 240, 244, 255, 257, 260, 269, 272, and 278.  In particular, it was misleading for Defendants to assert that they did "not believe that the outcome of these inquiries will have a material adverse impact on our business or results of operations."  Any investigation would have shown the problem was material, intentional and exposed the Company to significant risk.

## VII.    RELIANCE

289.    The false and misleading statements set forth herein were widely disseminated to the securities markets, investment analysts, and to the investing public.  Those statements caused and maintained the artificial inflation of the price of LPS common stock, which consequently traded at prices in excess of its true value.

290.    Plaintiffs are entitled to the presumption of reliance established by the fraud-on-the-market doctrine.  At all relevant times, the market for LPS's common stock was efficient for the following reasons, among others:

a.    LPS common stock met the requirements for listing, and was listed and actively traded on the NYSE (symbol LPS), a highly efficient and automated market;

b.    As a regulated issuer, LPS filed regular reports with the SEC;

c.    LPS regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.      LPS was regularly followed by numerous securities analysts employed by major

brokerage firms headquartered in the United States and overseas who wrote reports that were

distributed to the sales forces and certain customers of their respective brokerage firms.

Many of these reports were publicly available and entered the public marketplace;

e.      The material misrepresentations and omissions alleged herein would tend to induce a

reasonable investor to misjudge the value of LPS's securities; and

f.      Without knowledge of the misrepresented or omitted facts, Plaintiffs purchased or

otherwise acquired LPS common stock between the time that the Defendants made the

material misrepresentations and omissions and the time that the truth was revealed, during

which time the price of LPS common stock was artificially inflated by the Defendants'

misrepresentations and omissions.

291.    As a result of the foregoing, the market for LPS common stock promptly reacted to

current information regarding LPS from publicly available sources and reflected such information in

the trading price of LPS common stock.  Under these circumstances, a presumption of reliance

applies pursuant to the fraud-on-the-market doctrine.

292.    Plaintiffs are also entitled to the presumption of reliance established by the *Affiliated

Ute* doctrine as Defendants failed to disclose material known facts to the market, including the

magnitude of LPS's illegal document signing practices as detailed herein, and other facts concerning

LPS's business.

293.    Plaintiffs also can establish actual reliance.

294.    Plaintiffs, through its investment manager Maverick Capital, Ltd, read, or listened to,

and relied on Defendants' materially false and misleading statements alleged herein prior to

purchasing LPS common stock at artificially inflated prices.  Plaintiffs specifically read and relied

upon Defendants' false and misleading statements pertaining to, among other things, the Company's

role in default proceedings, internal controls, risk management practices, and reported earnings and

financial well-being, and any disclosures concerning document signing practices.

295.    Plaintiffs (and their investment manager) recollect, as supported by Plaintiffs' internal

documents, that Plaintiffs, through their investment manager Maverick Capital, Lt., specifically read

(and/or listened to) and relied upon the false and misleading statements alleged herein, including the

specific false and misleading statements alleged herein, particularly as they concerned LPS's

document signing practices, including (i) LPS's public press releases alleged herein; (ii) LPS's SEC

filings on Forms 8-K, 10-Q and 10-K filed with the SEC during 2008 through 2010, that are alleged

herein; and, (iii) LPS's analyst conference calls concerning quarterly financial results during 2008-

2010.

296.    In addition, Plaintiffs, through their investment manager Maverick Capital, Ltd., read

and reviewed research analyst reports repeating Defendants' false statements and/or the analysts'

communications with Defendants, in which Defendants misrepresented, among other things, LPS's

business practices, including the illegal document signing practices.

297.    Plaintiffs, through their investment manager Maverick Capital, Ltd., engaged in

numerous (tens, if not a hundred) direct communications with Defendants during the relevant period,

including direct phone calls, meetings at brokerage houses in New York City, and meetings at LPS's

offices, during which direct communications Defendants omitted to disclose the truth and other

material facts known to them about LPS's illegal document signing practices.

298.    Plaintiffs and their investment manager, Maverick Capital, Ltd., are professional

investors, who routinely engage in thorough research before purchasing any security and continue to

monitor all of their investments through extensive research.    This research includes review of

relevant media, research analyst reports, SEC filings, press releases, conference calls, and any other information source likely to provide important information on the business. Plaintiffs' investment in LPS was no different. Plaintiffs' personal recollection (and that of its investment manager) and internal documents reflect this.

299.    Moreover, prior to and at the time of their LPS purchases during the relevant period, Plaintiffs and their investment manager, Maverick Capital, Ltd., were aware of government scrutiny of business involved in the business of mortgage foreclosures. Plaintiffs and Maverick Capital, Ltd. were also aware that LPS was engaged in the mortgage foreclosure business. Accordingly, Plaintiffs were sensitive to any disclosures LPS made concerning its compliance with regulatory or legal requirements impacting its foreclosure business.

300.    Plaintiffs relied to their detriment on Defendants' materially false and misleading statements and/or the integrity of the market, in purchasing LPS common stock at artificially inflated prices. Had Plaintiffs or their investment manager known the truth, Plaintiffs would not have purchased the securities.

## VIII.  LOSS CAUSATION

301.    As detailed herein, Defendants engaged in a scheme to artificially inflate the value of LPS common stock. LPS cut costs by eliminating quality controls and abandoning compliance with legal requirements, thereby artificially inflating reported profits. Defendants' conduct put the Company at huge, undisclosed risk.

302.    As alleged *supra* at ¶¶ 93-106, on April 3, 2010, the first of a series of partial disclosures revealing Defendants' fraudulent scheme and its implications for LPS emerged. The disclosures of Defendants' fraudulent scheme, and the market's understanding of the resulting and

foreseeable consequences of Defendants' scheme caused LPS's stock price to decline precipitously and Plaintiffs were damaged as a result. The decline caused Plaintiffs economic harm.

303. While the fraudulent and criminal fabrication of mortgage-related documents benefitted LPS and the Individual Defendants, the scheme exposed Plaintiffs to foreseeable and material undisclosed risks that, among other things: (i) LPS's scheme would be discovered by regulators and cause the Company to incur substantial fines and sanctions; (ii) LPS's scheme would be discovered by customers and/or perspective customers, who would decline to do business with LPS and would seek indemnification from the Company for its wrongdoing and subsequent losses suffered by LPS's customers; (iii) LPS's scheme would be uncovered, and the Company would be unable to continue to enjoy such high margins and would have to hire additional employees to perform services for its clients; and (iv) the judicial and other bankruptcy and foreclosure mechanisms that relied upon accurate legal documents prepared by LPS would discover that LPS had robo-signed, falsified and/or fabricated such documents, and such defaults and bankruptcies would be curtailed until problems with LPS's documents could be fixed. These undisclosed material risks and others – which were the foreseeable result of Defendants' fraudulent scheme to fraudulently and criminally fabricate mortgage-related documents – materialized and caused the market value of LPS common stock to decline to the detriment of Plaintiffs.

304. As detailed herein, Defendants' fraudulent scheme artificially inflated LPS's stock price by failing to disclose that: (a) throughout the relevant period, LPS's revenues were the product of illicit practices; (b) LPS employed myriad illicit business practices at its various locations, including the fabrication of documents, robo-signing, surrogate signing, improper notarization, and the violation of security protocols; (c) LPS created a culture which valued speed over accuracy and led to significant errors in the default services it provided; (d) such errors were knowingly concealed

- 104 -

from clients, attorneys, and courts; (e) as a result of these illicit practices, Defendants caused

significant numbers of deficient, erroneous, and otherwise fraudulent documents to be filed with

county recorders' offices and courts throughout the country; and (f) as a result of Defendants'

schemes, LPS's profits, revenues and other financial metrics were artificially inflated.

305.   These false and misleading statements, individually and collectively, concealed LPS's

true financial circumstances and future business prospects, resulting in the stock being artificially

inflated until, as indicated herein, the relevant truth about LPS was revealed.

306.   As a direct and proximate result of Defendants' material misrepresentations,

omissions and conduct as alleged herein, Plaintiffs purchased LPS common stock at prices far

exceeding its true worth.

307.   LPS shareholders, including Plaintiffs, were injured when the scheme was revealed

and it became apparent that LPS had engaged in illegal conduct.  Indeed, a number of LPS senior

officers have testified the Company suffered substantial losses as a result of the illegal signing

practices detailed herein:  (i) LPS's current CEO Hugh Harris has testified "the company had lost a

billion dollars of market cap because of issues around the execution of documents"; (ii) Defendant

Carbiener has testified the signing scandal had a "big impact" on LPS's stock price; (iii) Chief

Operating Officer Daniel Scheuble testified "DocX was very damaging to the [C]ompany" and that

"signing/document execution issues that we discovered in DocX" in 2008 – 2009 had "dramatic . . .

negative impacts on the overall company."; and, (v) LPS Executive Vice President Charles William

Griffin testified LPS's stock price went from $32 per share to $12 per share primarily because of

signing issues.

308.   As a direct and proximate result of Defendants' material misrepresentations,

omissions and conduct as alleged herein, Plaintiffs were damaged when the market value of LPS

common stock declined upon partial disclosures of the fraud, including disclosures that (i) LPS had

in fact illegally executed mortgage-related documents; (ii) LPS would need to investigate the scope

of its illegal document preparation services; (iii) foreclosures around the country could be held-up or

invalidated because of LPS's conduct; (iv) the Defendants were being investigated by the

government for criminal conduct; and (v) Defendants had not acted with integrity and in compliance

with regulatory regulations and ethical mores demanded by the investing community.

309.   Defendants' false and misleading statements and failure to disclose material facts

known to them concealed factors concerning the material and foreseeable risks that: (i) the Company

and/or its executives would be prosecuted criminally for their conduct; (ii) the Company would have

to engage in a lengthy and expensive investigation of its conduct; (iii) there would be a public outcry

calling for foreclosures nationwide to be temporarily suspended as a result of LPS's conduct calling

into question the legitimacy of judicial proceedings; (iv) customers would seek indemnification

and/or reimbursement; and, (v) loss of future business as customers and prospective customers lose

confidence in LPS's ability to perform.   These undisclosed material risks, which were the

foreseeable result of Defendants' fraudulent scheme to illegally cut corners in the processing of

mortgage related documents materialized, causing the market value of the LPS common stock to

decline to the detriment of Plaintiffs.

310.   As a direct and proximate result of Defendants' material misrepresentations,

omissions and conduct as alleged herein, Plaintiffs have been damaged by their purchase of LPS

common stock.

311.   Defendants' false and misleading statements directly or proximately caused, or were a

substantial contributing cause of, the damages and economic loss suffered by Plaintiffs, and

maintained the artificial inflation in the price of LPS Common Stock until the truth was revealed to the market.

## IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

312.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading concerned statements of existing or historical fact or conditions.  To the extent that any of the statements alleged to be false and misleading may be deemed to be forward-looking statements, Defendants are nevertheless liable for those statements because they were not identified as forward-looking statements.  Even if the statements were identified as forward-looking, the statements were material and were not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements and, at the time each of those statements was made, Defendants had actual knowledge that the particular forward-looking statement was false or the forward-looking statement was authorized and/or approved by an officer of LPS who knew that the statement was false when made.  Further, to the extent that any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements that later became inaccurate and/or did not disclose information that undermined the validity of those statements.

## X.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Against Defendants Carbiener, Chan, and LPS for Violations of
§10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5**

313.    Plaintiffs incorporate by reference each of the substantive paragraphs of this Complaint.

314. Defendants Carbiener, Chan and LPS, along with other LPS employees, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of LPS, as specified herein.

315. Defendants Carbiener, Chan and LPS: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit in an effort to maintain an artificially high market price for LPS common stock in violation of §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder.

316. Defendants Carbiener, Chan and LPS also: (i) deceived the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflated and maintained the market price of LPS's common stock; and (iii) caused Plaintiffs to purchase LPS's common stock at an artificially inflated price.

317. Defendants Carbiener and Chan's primary liability, and controlling person liability, arise from the following facts: (i) each was a high-level executive and/or director at the Company; (ii) each, by virtue of his/her responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial performance, projections and/or reports; and (iv) each was aware of the Company's dissemination of information to the investing public, which each knew or disregarded with severe recklessness was materially false and misleading.

318.    Defendants Carbiener and Chan, because of their positions with the Company, possessed the power and authority to control the contents of LPS's publicly disseminated information.  Defendants Carbiener and Chan were provided with copies of the Company's reports, press releases and documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, Defendants Carbiener and Chan knew that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

319.    Defendants Carbiener, Chan and LPS had actual knowledge of the misrepresentations and omissions of material facts alleged herein, or acted with reckless disregard for the truth by failing to ascertain and disclose such facts, even though such facts were available.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing LPS's adverse operating condition and financial condition, including its illegal falsification of mortgage-related documents, from the investing public and supporting the artificially inflated price of its securities.  As alleged herein, Defendants had actual knowledge of the misrepresentations and omissions alleged, or were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

320.    As a result of the fraudulent activities of Defendants described above, the market price of LPS common stock was artificially inflated.  In ignorance of the fact that the market price of LPS common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which LPS

common stock traded at the time when such statements were made, Plaintiffs acquired LPS common stock at artificially high prices and was damaged thereby, as evidenced by, among other factors, the stock price declines identified herein that released the artificial inflation from LPS common stock. At the time of the alleged misrepresentations and omissions, Plaintiffs were unaware of their falsity, and believed the false statements to be true. Had Plaintiffs known the true nature of the operations of LPS and the non-compliance with federal and state law, Plaintiffs would not have purchased or otherwise acquired LPS common stock.

321.    Plaintiffs actually read (and/or listened to) and relied upon Defendants' false and misleading statements as set forth herein.

322.    Plaintiffs are entitled to the presumption of reliance established by the fraud-on-the-market doctrine. At all times relevant to this Complaint, the market for LPS common stock was an efficient market. LPS common stock was listed and actively traded on a highly efficient and automated market; LPS filed periodic public reports with the SEC; LPS was followed by numerous securities analysts employed by leading brokerage firms and investment banks who wrote reports about the Company; and, LPS regularly issued press releases, which were carried by national and international news wires, and which were publicly available and entered into the public marketplace. As a result, the market for LPS equity securities promptly digested current information regarding LPS from all publicly-available sources and reflected such information in the LPS common stock price.

323.    Plaintiffs are also entitled to the presumption of reliance established by the *Affiliated Ute* doctrine as Defendants failed to disclose material known facts to the market concerning Defendants' illegal falsification of mortgage-related documents.

324.     The market prices for LPS common stock declined materially upon the various public

disclosures of the true facts that had been misrepresented or concealed as alleged herein.

325.     As a direct and proximate result of the alleged wrongful conduct, Plaintiffs suffered

damages in connection with their purchase of LPS common stock.

326.     By virtue of the foregoing, Defendants violated §10(b) of the Securities Exchange Act

of 1934 and Rule 10b-5, promulgated thereunder.

### SECOND CAUSE OF ACTION

### Against Defendants Carbiener and Chan for Violations of
### §20(a) of the Securities Exchange Act of 1934

327.     Plaintiffs incorporate by reference each of the substantive paragraphs of this

Complaint.

328.     During the relevant period, Defendant Carbiener participated in the operation and

management of the Company, and conducted and participated, directly and indirectly, in the conduct

of LPS's business affairs.  Because of Carbiener's senior positions, he knew the adverse non-public

information about LPS's illegal falsification of mortgage-related documents.

329.     As an officer of a publicly owned company, Defendant Carbiener had a duty to

disseminate accurate and truthful information with respect to LPS's financial condition and results of

operations, and to correct promptly any public statements issued by LPS which had become

materially false or misleading.

330.     Because of Carbiener's position of control and authority as a senior officer of LPS,

Carbiener was able to, and did, control the contents of the various reports, press releases and public

filings which LPS disseminated in the marketplace during the relevant period concerning the

Company's results of operations.  Throughout the relevant period, Carbiener exercised his power and

authority to cause LPS to engage in the wrongful acts complained herein.  Carbiener, therefore, was

a "controlling person" of LPS within the meaning of §20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of LPS common stock.

331.    During the relevant period, Defendant Chan participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of LPS's business affairs.  Because of Chan's senior positions, he knew the adverse non-public information about LPS's illegal falsification of mortgage-related documents.

332.    As an officer of a publicly owned company, Chan had a duty to disseminate accurate and truthful information with respect to LPS's financial condition and results of operations, and to correct promptly any public statements issued by LPS which had become materially false or misleading.

333.    Because of his position of control and authority as a senior officer of LPS, Chan was able to, and did, control the contents of the various reports, press releases and public filings which LPS disseminated in the marketplace during the relevant period concerning the Company's results of operations.  Throughout the relevant period, Chan exercised his power and authority to cause LPS to engage in the wrongful acts complained herein.  Chan, therefore, was a "controlling person" of LPS within the meaning of §20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of LPS common stock.

334.    As set forth herein, and without conceding the necessity of such pleading, the Defendants Carbiener and Chan knew the statements issued by LPS during the relevant period were materially false and misleading.

335.    By reason of the above conduct, Defendants Carbiener and Chan are each jointly and severally liable pursuant to §20(a) of the Exchange Act for LPS's primary violations of the Exchange Act as alleged herein.

## THIRD CAUSE OF ACTION

### Against LPS and the Individual Defendants for Common Law Fraud

336.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.  This claim is asserted against all Defendants based on common law principles of fraud and conspiracy.

337.    As alleged herein, each of the Defendants made material misrepresentations and omitted to disclose material facts about LPS, its business practices and its financial condition.

338.    In addition, the Defendants conspired with each other for the purpose of misleading Plaintiffs and the investing public regarding LPS's financial condition and prospects, and each committed overt acts, including the making of false and misleading statements, in furtherance of such conspiracy.

339.    The aforesaid misrepresentations and omissions by the Defendants were made intentionally, or at a minimum recklessly, to induce reliance thereon by Plaintiffs and the investing public when making investment decisions.

340.    The aforesaid misrepresentations and omissions by the Defendants constitute fraud and deceit under common law.

341.    Plaintiffs reasonably relied upon the Defendants' misrepresentations when deciding to purchase LPS's common stock, and did not know of any of the misrepresentations and omissions, as alleged with further detail herein.

342.    As a direct and proximate result of Defendants' fraud and deceit, Plaintiffs suffered

damages in connection with its purchase of LPS common stock.

343.    Defendants' fraud and deceit was intentional and/or involved conscious acts that

willfully and wantonly disregarded the rights of others, including not only Plaintiffs, but the

investing public.  As a result, Defendants should be required to pay punitive damages to Plaintiffs.

### FOURTH CAUSE OF ACTION

### Against Defendants LPS, DocX, and Brown for Violation of Georgia Civil RICO

344.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set

forth herein.

345.    This claim for relief arises under O.C.G.A. § 16-14-6 of the Georgia RICO Act, and

seeks relief from Defendants LPS, DocX and Brown for activities described herein for violations of

O.C.G.A. § 16-14-4 (a), (b).  Plaintiffs further seek relief from Defendants LPS, DocX and Brown

for conspiring to violate O.C.G.A. § 16-14-4 (a), (b), pursuant to subsection (c) thereof.  Defendants

Carbiener and Chan are not named under this account.

346.    This action is timely under O.C.G.A. § 16-14-8, as this civil action has been

commenced within five years after Defendants' racketeering conduct and within five years of

Plaintiffs suffering injuries causing their cause of action to accrue.  Further, Plaintiffs bring this

cause of action within two years of the pendency of the criminal prosecution of Defendant Brown.

347.    Defendants named, along with unnamed others, herein operate and constitute an

enterprise within the meaning of O.C.G.A. § 16-14-3, which affects interstate and foreign commerce

and transacts business in the State of Georgia (whether or not they are registered to do so).

Defendants own a substantial interest in the enterprise and were at all relevant times associated with

the enterprise and conspirators forming the enterprise as partners, principals, members, managers,

officers, directors, and significant shareholders thereof (as applicable). Defendants, directly or indirectly, and through the acts of their agents, employees and servants, participated in and controlled the conduct and affairs of the enterprise through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4 (a) - (b).

348.    Defendants conspired, furthermore, to undertake the foregoing, in violation of O.C.G.A. § 16-14-4 (c).

349.    Pursuant to O.C.G.A.§ 16-14-3(8)(A), Defendants and/or their agents and employees have engaged in a pattern of racketeering activity by providing false and misleading information to Plaintiffs as an inducement to invest in the shares of LPS and by engaging in two or more acts of racketeering activity, as such term is defined in O.C.G.A. § 16-14-3, such acts having occurred within the last five (5) years.

350.    The scheme described throughout the complaint perpetrated by Defendants consisted of multifarious racketeering activities. In carrying out the overt acts in furtherance of their scheme described herein, defendants engaged in, *inter alia*, conduct in violation of federal and Georgia state laws, including, without limitation:

(a) mail fraud in violation of 18 U.S.C. § 1.341 and O.C.G.A. § 16-14-3 (9)(A)(xxix);

(b) wire fraud in violation of 18 U.S.C. § 1343 and O.C.G.A. § 16-14-3 (9)(A), (xxix);

(c) forgery in the first degree in violation of O.C.G.A. § 16-14-3 (9)(A)(viii);

(d) perjury and other falsifications in violation of § 16-14-3 (9)(A)(xv);

(e) tampering with evidence in violation of § 16-14-3 (9)(A)(xvi); and,

(f) residential mortgage fraud in violation of § 16-14-3 (9)(A)(xxxx).

- 115 -

351.    Such conduct constitutes predicate acts under Georgia RICO.  The foregoing violations of federal and Georgia state law constitute racketeering activities pursuant to O.C.G.A. § 16-14-3 (9)(A).

352.    All of the conduct herein alleged was committed by Defendants willfully, knowingly and maliciously and with reckless disregard of the rights of Plaintiffs.

353.    At all material times, Defendants controlled and/or conducted the enterprise described herein which engaged in substantial interstate and foreign commerce, and transacted business in the State of Georgia (whether or not they are registered to do so).  The transactions complained of herein negatively impacted interstate and foreign commerce by the use of the instrumentalities of such commerce for illegal purposes.

354.    At all material times, in connection with the activities giving rise to this action, Defendants willfully and knowingly conspired with each other, as well as others known and unknown to Plaintiffs and the Class, to engage in various activities set forth herein and aided and abetted one another in these activities, all as proscribed and prohibited by O.C.G.A. §16-14-4 (a), (b) and (c) thereof.

355.    In furtherance of and for the purpose of executing the scheme, Defendants used the United States Mail and wire communications.

356.    As is described more fully above, Defendants engaged in a "pattern of racketeering activity," as defined in O.C.G.A. § 16-14-3(8)(A), by committing and/or conspiring to or aiding and abetting a scheme for at least two such acts of racketeering activity, as described above.  Defendants' scheme involved the illegal falsification of over a million mortgage-related documents, transfer of some of those illegally falsified documents through the instrumentalities of the U.S. Mails and/or wires, and lies and false statements covering up the scheme to illegally falsify mortgage-related

- 116 -

documents, each of which was an act of racketeering activity.  Said scheme took place over the span

of six years, with many thousands of acts of falsification of mortgage-related documents occurring

within four years of other such acts.

357.    Defendants' acts of racketeering activity were related.  Defendants falsified

mortgage-related documents – thereby committing perjury, wire fraud, mail fraud, evidence

tampering, and residential mortgage fraud, and lied about such conduct – as part of an overarching

scheme employing similar methods of commission as documented by LPS's internal policies and as

evidenced by Defendants' admissions detailed herein.

358.    In furtherance of their scheme to defraud, Defendants sent misleading information to

Plaintiffs to keep Plaintiffs from discovering the misrepresentations and to discourage Plaintiffs from

pursuing their legal rights.

359.    Each such act of racketeering activity was related, had similar purposes, involved the

same or similar participants and methods of commission, and had similar results impacting upon

similar victims, including Plaintiffs.  The acts of racketeering activity committed by Defendants had

the same or similar objectives.  The racketeering activity was intended to enable LPS's clients to

foreclose on homeowners while keeping LPS's costs to a minimum so that LPS could record higher

profits and increase its share price without disclosing the truth to the public, including LPS investors,

that LPS's reported earnings were built on an illegal enterprise.

360.    The multiple acts of racketeering activity committed and/or conspired to or aided and

abetted by defendants, as described above, were related to each other and amount to racketeering

activity, and therefore constitute a "pattern of racketeering activity," as defined in O.C.G.A. § 16-14-

3(8)(A).

361.    As demonstrated in detail herein, Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering actions in furtherance of the conspiracy including systematic violations of federal and state law described herein, designed to defraud Plaintiffs.

362.    Defendants and their co-conspirators' pattern of illegal racketeering acts include, *inter alia*, misrepresentations and omissions regarding the falsification of mortgage-related documents and the means by which LPS falsely drove up its earnings and share price by reducing costs through the illegal processing and/or fabrication of documents for use in court proceedings.

363.    The nature of the above-described acts, material misrepresentations, omissions, and violations of federal and state law in furtherance of the conspiracy give rise to the inference that defendants not only agreed to the objective of the violations of O.C.G.A. § 16-14-4 (c), by conspiring to violate O.C.G.A. § 16-14-4 (a), (b), but were also aware that their ongoing fraudulent and otherwise illegal acts have been and are a part of an overall pattern of racketeering activity.

364.    Absent Defendants' conspiracy and joint efforts, Defendants' scheme would have been unsuccessful.  Acting jointly, Defendants were able to successfully engage in the activities set forth herein and to report false and misleading financial results that concealed the truth from their unwitting victims, including Plaintiffs.

365.    Defendants received income derived from the pattern of racketeering activity. Defendants re-invested racketeering income in LPS to perpetuate the enterprise.

366.    As a direct and proximate result of Defendants' overt and predicate acts in furtherance of violating O.C.G.A. § 16-14-4 (a), (b), and by conspiring to violate such provisions, pursuant to O.C.G.A. § 16-14-4 (c), Plaintiffs were injured when the truth was revealed and LPS's stock price declined significantly, as set forth herein.

- 118 -

367.    Plaintiffs were injured by Defendants' re-investment of racketeering income in LPS. Among other things, Defendants' illegal enterprise created racketeering income that was used to perpetuate the Defendants' illegal scheme by hiring more employees to create more fictitious mortgage-related documents.  Furthermore, Defendants' illegal enterprise was used by LPS to win market share and cross-sell other mortgage-related services to clients, thereby painting a false and misleading picture of LPS's business prospects – the revelation of which damaged Plaintiffs.

368.    Defendants' fraudulent scheme and enterprise had many victims, including thousands of investors, borrowers, servicers, and court systems throughout the country.

369.    Defendant LPS is liable under this count directly, and vicariously for the actions of its employees.

370.    In accordance with O.C.G.A. § 16-14-6, Plaintiffs and the Class are entitled to recover three times the actual damages sustained, plus punitive damages from Defendants as well as attorneys' fees in the trial and appellate courts and costs and expenses of investigation and litigation reasonably incurred.

## FIFTH CAUSE OF ACTION

### Against Defendants LPS, DocX, and Brown for Violation of Florida Civil RICO

371.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

372.    This is an action for violations of the Florida Civil Remedies for Criminal Practices Act, Fla. Stat. sec. 772.101 et seq., also known as the Florida Civil RICO Act.

373.    Fla. Stat. sec. 772.104 provides that any person who has been injured by reason of the provisions of sec. 772.103 shall have a civil cause of action for threefold actual damages and also for reasonable attorneys' fees and court costs through the trial and appellate courts.

374.    Fla. Stat. sec. 772.103 details the prohibited activities under the Florida Civil RICO Act.

375.    As detailed herein, Defendants engaged in "criminal activity" as defined in Fla. Stat. sec. 772.102(1)(a)22 (fraud); 24 (forgery); 27 (perjury); and 34 (tampering with evidence).   In addition, as detailed herein, Defendants engaged in "criminal activity" as defined in Fla. Stat. sec. 772.102(1)(b) by engaging in conduct subject to indictment or information as a criminal offense as listed in 18 U.S.C § 1961(1)(B) (wire fraud and mail fraud).

376.    As set forth above, Defendants participated in a scheme to fabricate mortgage-related documents and were responsible for more than a million fraudulent documents being filed with property recorders' offices throughout the country and used in bankruptcy and other court proceedings.  Defendants directed Company employees to forge and falsify documents relied on by property recorders, title insurers and others.  Defendants did this so the Company could keep costs down while processing loan documents, thereby reporting higher earnings to the public, and inflating the Company's stock price.  Moreover, Defendants repeatedly lied to the public about the illegal practices, which lies Plaintiffs relied upon when purchasing LPS stock.

377.    As set forth above, the Plaintiffs reasonably relied upon Defendants' false and misleading representations, which directly and proximately caused the Plaintiffs to suffer damages as a direct and proximate cause of the pattern of criminal activity engaged in by Defendants.  When the truth was partially revealed, and the risks associated with Defendants' conduct materialized, LPS's stock dropped substantially and Plaintiffs were injured.

378.    Defendants' fraudulent scheme and enterprise had many victims, including thousands of investors, borrowers, servicers, and court systems throughout the country.

379.    In order to accomplish their objective, Defendants developed and were part of an enterprise, which consisted of Defendants LPS, DocX, and Brown, as well as numerous other employees of LPS who participated in the fraudulent scheme and various law firms that knowingly utilized the false and/or illegally fabricated mortgage-related documents in bankruptcy and foreclosure proceedings in the State of Florida and elsewhere.  The participants in the enterprise worked together for the specific purpose of furthering the pattern of criminal activity set forth herein, including notary fraud and a regular pattern and practice of filing false and perjured documents in the public records and the courts.

380.    As alleged herein, Defendants and others engaged in a pattern of criminal activity lasting over six years that involved numerous incidents resulting in the filing of over a million fraudulent documents in courts and recording offices around the country.

381.    Defendants received proceeds, both directly and indirectly, from their pattern of criminal activity as LPS was able to charge clients for the illegal services the Company provided, and artificially inflate the Company's stock price as a result.

382.    Plaintiffs were injured by Defendants' re-investment of racketeering income in LPS. Among other things, Defendants' illegal enterprise created racketeering income that was used to perpetuate the Defendants' illegal scheme by hiring more employees to create more fictitious mortgage-related documents.  Furthermore, Defendants' illegal enterprise was used by LPS to win market share and cross-sell other mortgage-related services to clients, thereby painting a false and misleading picture of LPS's business prospects – the revelation of which damaged Plaintiffs.

## SIXTH CAUSE OF ACTION

**Against All Defendants for Negligent Misrepresentation Under Florida Common Law**

383.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

384.    Defendants made and/or caused to be made material false and misleading statements to shareholders, including direct statements to Plaintiffs, concerning, among other things, LPS's business practices and illegal falsification of mortgage-related documents, as alleged herein.

385.    Defendants knew, or should have known, that their statements to shareholders, including Plaintiffs, were false and misleading and/or Defendants made the false statements without knowledge of their truth or falsity.

386.    Indeed, LPS has, at the very least, admitted its own negligence.  LPS's current Chief Executive Officer, Hugh Harris, has testified that "all the issues with Doc-X . . . were issues that [Clay Cornett, formerly a member of LPS senior management] either knew or should have known about.  His failure to do so was negligent and led to his termination."

387.    Defendants' false and misleading statements to shareholders, including Plaintiffs, concerning LPS's business practices and illegal falsification of mortgage-related documents, were made for a serious purpose, and Defendants intended to induce shareholders, including Plaintiffs, to rely upon Defendants' false statements when making investment decisions when purchasing LPS stock.

388.    Plaintiffs justifiably relied upon Defendants' false and misleading statements to Plaintiffs' detriment.  Plaintiffs purchased LPS common stock at artificially inflated prices and the market prices for LPS common stock declined materially upon the various public disclosures of the true facts that had been misrepresented or concealed as alleged herein.  The market prices for LPS

common stock declined materially when the foreseeable risks concealed by Defendants' misleading statements materialized. As a direct and proximate result of the alleged wrongful conduct, Plaintiffs suffered damages in connection with their purchase of LPS common stock.

389.    Plaintiffs' reliance was justifiable in that Plaintiffs conducted an ongoing, reasonable and thorough investigation of LPS prior to their purchases of LPS common stock. This investigation included, among other things, review of relevant LPS SEC filings, conference calls, media and analyst reports, as well as meetings and communications with LPS representatives. This investigation did not reveal the truth to Plaintiffs.

## SEVENTH CAUSE OF ACTION

### Against All Defendants for Negligent Misrepresentation Under New York Common Law

390.    Plaintiffs incorporate by reference each of the substantive paragraphs of this Complaint except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly. For the purposes of this claim, Plaintiffs assert only negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

391.    LPS had a legal duty to provide shareholders, including Plaintiffs, with correct information concerning the Company's business operations.

392.    The Individual Defendants, as officers and directors of LPS, had a legal duty to report accurate information concerning the Company's business operations so that information could be reported to shareholders and/or had a personal duty to provide shareholders, including Plaintiffs, with correct information concerning the Company's business operations.

393.    Plaintiffs were wholly without knowledge of LPS's fraudulent and illegal signing practices, and could not reasonably have been expected to know of such practices, and sought assurances from Defendants with regards to LPS's compliance with relevant regulations and laws.

- 123 -

This is particularly true with respect to the time period after April 2009, when LPS was publicly criticized in a judicial opinion, as alleged herein. As LPS had exclusive knowledge of the facts concerning its signing practices and reassured Plaintiffs LPS there were no material problems with the Company's practices, among other factors alleged herein, there existed a special relationship between the parties.

394. Defendants made and/or caused to be made false and misleading statements to shareholders, including Plaintiffs, concerning, among other things, LPS's business practices and illegal falsification of mortgage-related documents, as alleged herein.

395. Defendants knew, or should have known, that their statements to shareholders, including Plaintiffs, were false and misleading.

396. Defendants' false and misleading statements to shareholders, including Plaintiffs, concerning LPS's business practices and illegal falsification of mortgage-related documents, were made for a serious purpose, and Defendants knew that shareholders, including Plaintiffs, desired this information for a serious purpose, *i.e.*, to make multi-million dollar investment decisions.

397. Plaintiffs intended to rely and act upon Defendants' false and misleading statements, and did in fact reasonably rely upon Defendants' false and misleading statements to Plaintiffs' detriment.

398. The market prices for LPS common stock declined materially upon the various public disclosures of the true facts that had been misrepresented or concealed as alleged herein.

399. The market prices for LPS common stock declined materially when the foreseeable risks concealed by Defendants' misleading statements materialized.

400. As a direct and proximate result of the alleged wrongful conduct, Plaintiffs suffered damages in connection with their purchase of LPS common stock.

## EIGHTH CAUSE OF ACTION

### Against the Post-Merger Defendants for Successor and Vicarious Liability

401.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

402.    The Post-Merger Defendants are jointly and severally liable for any and all damages resulting from the wrongful actions of LPS, as alleged herein, because the Post-Merger Defendants are successors in liability to LPS, including Lender Processing Services, Inc. and Lender Processing Services, Inc.'s wholly owned subsidiary DocX.

403.    As set forth in § III.C. *supra*, FNF acquired LPS through a partial stock-for-stock merger and subsequently integrated FNF's business and LPS's businesses in Black Knight Financial Services.  Consideration for the acquisition was paid directly to LPS's shareholders, not to LPS itself.  Plaintiffs, who were no longer LPS shareholders, received no benefit from the acquisition.

404.    As set forth in § III.C. *supra*, FNF and Black Knight Financial Services, through their websites and public statements, publicly represent that Black Knight Financial Services is the integration of LPS and FNF's former ServiceLink business units.  FNF did not maintain LPS as a separate legal entity after acquiring the Company.  Rather, FNF merged LPS and FNF's businesses.

405.    As set forth in § III.C. *supra*, after acquiring LPS, which survived the merger, FNF stripped the old-LPS entity of valuable assets and transferred those assets to the Black Knight Financial Services entities.  Little, if any, consideration was paid for the LPS assets.  FNF saddled LPS with massive debts, leaving the old-LPS entity effectively insolvent.  FNF took these actions knowing about LPS's actual and contingent (tort and other) liabilities stemming from the conduct alleged herein.  FNF's actions caused contingent creditors (like Plaintiffs) to be harmed in their ability to collect a judgment from LPS.

- 125 -

406.    Because FNF and its Black Knight Financial Services subsidiaries have merged with LPS, and acquired substantially all of the assets of LPS, FNF and the Black Knight Financial Services entities are the successors in liability to LPS, and are jointly and severally or otherwise vicariously liable for the wrongful conduct, as alleged herein, of LPS.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Requiring Defendants to pay damages sustained by Plaintiffs by reason of the acts and transactions alleged herein.

B.    Requiring Defendants to pay punitive damages for their violations of common law fraud and Georgia RICO and by reason of the acts and transactions alleged herein.

C.    Requiring Defendants to pay treble damages sustained by Plaintiffs in accordance with Georgia and/or Florida RICO and by reason of the acts and transactions alleged herein.

D.    Awarding Plaintiffs prejudgment interest and post-judgment interest as allowed pursuant to statutory and common law, as well as their reasonable attorneys' fees, expert fees and other costs.

E.    Awarding such other and further relief as the Court may deem just and proper.

## XII.    JURY TRIAL DEMAND

Plaintiffs demand a trial by jury.

DATED:  February 7, 2014                      DIETRICH SIBEN THORPE LLP


By:    /s/ Matthew P. Siben
MATTHEW P. SIBEN (*pro hac vice*)

- 126 -

2173 Salk Avenue, Suite 250
Carlsbad, CA  92008
Telephone: (760) 579-7368
Facsimile: (760) 579-7369
matthew@dstlegal.com

– and –

DAVID A. THORPE (*pro hac vice*)
9595 Wilshire Blvd., Suite 900
Beverly Hills, CA 90212
Telephone: (310) 300-8450
Facsimile: (310) 300-8401
david@dstlegal.com


CRITTON, LUTTIER & COLEMAN, LLP
STEPHEN E. WALKER
Florida Bar No. 0497851
303 Banyan Blvd., Suite 400
West Palm Beach, FL 33401
Telephone: (561) 842-2820
Facsimile: (561) 844-6929
swalker@bclclaw.com

Attorneys for Plaintiffs Maverick Fund, L.D.C.,
Maverick Fund USA, Ltd., Maverick Fund II, Ltd.,
Maverick Neutral Fund, Ltd., Maverick Neutral
Levered Fund, Ltd., Maverick Long Fund, Ltd., and
Maverick Long Enhanced Fund, Ltd.

# EXHIBIT A



DIETRICH SIBEN THORPE LLP

*A Partnership of Professional Corporations*

*Office 760.579.7368*
*Fax 760.579.7369*

Matthew P. Siben, Esq.
matthew@dstlegal.com

January 21, 2014

**<u>Via E-MAIL</u>**

George Anhang
Cooley LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, D.C., 20004

   Re: *Maverick Fund, L.D.C., et al., v. Lender Processing Services, Inc., et al.*

Dear George:

   As set forth in my email to you of January 16, 2014, and as we have discussed, it is the parties' intent to meet-and-confer with regard to Plaintiffs' desire to amend the operative Complaint and add all appropriate Defendants. As indicated, we currently believe there is a strong basis to include various Black Knight entities and Fidelity National Financial, Inc ("FNF"). I write in an effort to provide you with some of our thinking to facilitate our meet-and-confer.

   For starters, to facilitate our discussions concerning the proper Defendants to be named, I ask that you provide me with a current organizational chart showing the structure of FNF and its subsidiaries.

   As we discussed, the parties agree that Black Knight InfoServe, LLC ("BKI") is an appropriate Defendant as it is the former Lender Processing Services, Inc., and it assumed the liabilities of Lender Processing Services, Inc. ("LPS") after the merger (as per the Merger Agreement). Please let me know if this is incorrect.

   Having reviewed BKI's SEC filings (and those of FNF), I believe BKI distributed its assets to various other Black Knight entities all subsidiaries of FNF. Ultimately, the former-LPS assets wound up (along with certain FNF assets) in Black Knight Financial Services, LLC and ServiceLink Holdings, LLC. Information on how these asset transfers/distributions were structured is difficult to find, and incomplete, but very important to naming the right Defendants. Though I currently believe Black Knight Financial Services, Inc., Black Knight Financial Services, LLC, ServiceLink Holdings, LLC, and FNF are proper Defendants in our action, I ask that you provide me with information on how these transactions/distributions were structured so I can better assess the issue.



DIETRICH SIBEN THORPE LLP
A Partnership of Professional Corporations

Office 760.579.7368
Fax 760.579.7369

With regard to the corporate restructuring, some basic questions that we need to address include:

- What legal entity (entities) do you believe is/are currently responsible for LPS's legal liabilities with respect to our action? The class action? The State of Nevada action?
- What legal entity (entities) do you believe is/are responsible for compliance with the consent order that LPS entered into with the Board of Governors of the Federal Reserve System (among others) by which LPS agreed to engage an independent third party to conduct a risk assessment and review of its default management businesses and the document execution services LPS provided to servicers from January 1, 2008 through December 31, 2010.
- Does BKI conduct any business currently? Is BKI capable of conducting any business of its own independent of FNF?
- What assets and liabilities does BKI currently have? What is the value of these assets/liabilities?
- What entities did BKI distribute assets to after the closing of the merger on January 2, 2014? (There is some description of this in the SEC filings, but I want to make sure we are on the same page.)
- When BKI distributed assets to other legal entities (such as, but not limited to, Black Knight Financial Services, Inc. as set forth in BKI's SEC filings) did BKI receive consideration for the distributed assets? Was this fair value? If so, how did FNF determine it was fair value?
- Has FNF and/or its non-BKI subsidiaries (including Black Knight Financial Services, Inc., Black Knight Financial Services, LLC and ServiceLink Holdings, LLC) hired former LPS employees? How many? Senior management?
- Has FNF and/or its non-BKI subsidiaries (including Black Knight Financial Services, Inc., Black Knight Financial Services, LLC and ServiceLink Holdings, LLC) utilized LPS's former physical buildings? LPS's former technology platforms?
- LPS's former website states "LPS is now Black Knight Financial Services" – and provides a link to Black Knight Financial Services, Inc.'s website. Is this accurate? Have all of LPS's businesses been integrated into Black Knight Financial Services, Inc.?
- Was the transfer/distribution of BKI's assets approved by BKI's board of directors and shareholders?
- What legal entity (entities) have assumed LPS's contractual obligations?

Based on my current research, the answers to these issues should provide the parties with a substantial basis for addressing which Defendants may be properly named. Should you have any questions or concerns about my request, please do not hesitate to contact me.



DIETRICH SIBEN THORPE LLP

A Partnership of Professional Corporations

Office 760.579.7368
Fax 760.579.7369

Best regards,

/s/ Matthew P. Siben

Matthew P. Siben

# EXHIBIT B



ABOUT US    EXECUTIVE BIOGRAPHIES    NEWS ROOM

# Executive Biographies



### Don Blanchard
*General Counsel*
ServiceLink
A Black Knight Financial Services
Company

Don Blanchard is General Counsel for ServiceLink, a Black
Knight Financial Services company. Don has extensive
experience in corporate, contract and real estate law and he has
served as Senior Counsel to three national settlement service
operations during the past 14 years.

Prior to joining ServiceLink, Don served as Deputy General
Counsel for Lender Processing Services (LPS), where he focused
on compliance, regulatory and government affairs. Before
working with LPS, Don served as General Counsel at LandSafe,
Inc., the settlement services affiliate of Countrywide Home
Loans and Bank of America. He also served as General Counsel
and a member of the executive management group at LSI, a
leading settlement services company and division of LPS.
Through his many years of experience, Don has become an
expert in the development and operation of national service
platforms and the substantive laws that control the appraisal,
credit, flood, title, default and closing products that these
platforms deliver to regional and national lenders and servicers.

Don served as General Counsel of a midsized commercial bank
in Connecticut prior to entering the mortgage services industry.
He was also a Section Chief at the Federal Deposit Insurance
Corporation (FDIC), where he litigated and managed large asset
resolutions for failed banks. Don began his legal career as a real
estate lawyer and title agent in private practice, closing
hundreds of residential and commercial real estate transactions.
He has served as the President of the Title/Appraisal Vendor

Mortgage Origination
Technology

Mortgage Origination
Services

Loan Servicing
Technology

Loan Servicing
Services

Default Servicing
Technology

Default Servicing
Services

Data & Analytics for the
Mortgage Market

Data & Analytics for
Non-mortgage Markets

Technology for Multiple
Listing Services



# Executive Biographies



## Robert J. (Bob) Caruso

*Executive Vice President, Servicing*
ServiceLink
A Black Knight Financial Services
Company

Robert J. (Bob) Caruso is the Executive Vice President, Servicing, for ServiceLink, a Black Knight Financial Services company. In this role, Bob will lead the company's Field Services, Servicing Solutions and LoanCare divisions.

Previously, Bob was the Executive Managing Director, Transaction Services at Lender Processing Services (LPS). In this role, Bob was focused on enhancing LPS' origination and default relationships with the nation's top mortgage lenders and servicers. In addition, Bob addressed the strategic and tactical operational needs of LPS' appraisal, valuation, title, flood, field services and default service lines.

Bob also served as LPS' Executive Vice President and Managing Director of the Default Management Services division, where he focused on providing the highest quality technology solutions and service to support clients' needs for the evolving default industry.

In addition, Bob was LPS' Executive Vice President of Strategy and Business Development, where he focused on furthering relationships with leading financial institutions nationwide by addressing their strategic and tactical needs with LPS' integrated technology, services and data solutions.

Before joining LPS, Bob was the Servicing and Post-Closing Executive for the Consumer Real Estate and Insurance Services Group at Bank of America. In this role, Bob oversaw Bank of America's mortgage servicing, home equity and non-real estate

Mortgage Origination
Technology

Mortgage Origination
Services

Loan Servicing
Technology

Loan Servicing
Services

Default Servicing
Technology

Default Servicing
Services

Data & Analytics for the
Mortgage Market

Data & Analytics for
Non-mortgage Markets

Technology for Multiple
Listing Services



ABOUT US     EXECUTIVE BIOGRAPHIES     NEWS ROOM

# Executive Biographies



## C. William (Bill) Griffin

*Executive Vice President, Office of the Enterprise*

Black Knight Financial Services, a technology, data and analytics company

Bill Griffin is Executive Vice President of the Office of the Enterprise for Black Knight Financial Services. In this role, Bill oversees the account management of our clients by identifying, developing and delivering end-to-end solutions to the country's largest financial institutions, leveraging LPS' enterprise-wide resources.

Prior to joining Black Knight Financial Services, Bill was the Executive Vice President of the Office of the Enterprise for LPS, the nation's leading provider of mortgage-related technology and services. Because of his leadership in and knowledge of the mortgage industry, Bill was asked to serve on the Board of Directors for the <u>Mortgage Bankers Association</u> in 2013.

Bill served as Vice Chairman of LSI, a division of LPS, until taking over as LPS' Executive Vice President of the Office of the Enterprise. He joined LSI in 1989 and has served in a variety of key capacities, including Chief Executive Officer and President prior to Fidelity National Financial's acquisition of LSI in February 2003. Over the years, he has built a strong foundation of strategic partnerships throughout the industry from his extensive background in sales, marketing and operations.

Bill has nearly 40 years of experience in the mortgage finance and financial services fields. He began his career in mortgage finance in 1972 with C&S National Bank in Atlanta. In 1975, he joined Ticor Mortgage Insurance where he spent nine years serving in a variety of roles. His senior responsibilities included serving as the Executive Vice President responsible for

Mortgage Origination Technology

Mortgage Origination Services

Loan Servicing Technology

Loan Servicing Services

Default Servicing Technology

Default Servicing Services

Data & Analytics for the Mortgage Market

Data & Analytics for Non-mortgage Markets

Technology for Multiple Listing Services



FINANCIAL SERVICES      ABOUT US    EXECUTIVE BIOGRAPHIES    NEWS ROOM

# Executive Biographies

Mortgage Origination
Technology

Mortgage Origination
Services



## Jerry Halbrook

*President, Origination Technology*
Black Knight Financial Services, a
technology, data and analytics company

Jerry Halbrook is President of the Origination
Technology division for Black Knight Financial
Services, Technology Data & Analytics. In this role, Jerry is
responsible for the Empower®, PCLender® and LendingSpace®
loan origination technologies, as well as the company's
customer relationship management (CRM) offering.

Jerry has more than 27 years of experience focusing on financial
management, technology and operational management.
Previously, he was Senior Managing Director of the Origination
Technology Solutions division for Lender Processing Services
(LPS). His responsibilities included overseeing the strategic
direction and business operations of LPS' Empower and
PCLender product suites.

Prior to his position at LPS, Jerry served as a Senior Managing
Director for NexSpring Group, LLC, which advises private equity
firms, financial institutions, mortgage lenders and service
providers on all aspects of strategic and operational issues in
the residential mortgage and consumer lending markets.

Before joining NexSpring, Jerry served as the Chief Information
Officer for Bank of America's Consumer Real Estate and
Insurance Services division. He was responsible for all aspects
of technology development and delivery for the Consumer Real
Estate and Insurance Services division. Nexstar Financial, a BPO
company co-founded by Jerry and KKR, was a start-up venture
specializing in end-to-end residential lending, technology and
operations management. Jerry served as both Chief Operating
Officer and Chief Information Officer of Nexstar, which was

Loan Servicing
Technology

Loan Servicing
Services

Default Servicing
Technology

Default Servicing
Services

Data & Analytics for the
Mortgage Market

Data & Analytics for
Non-mortgage Markets

Technology for Multiple
Listing Services

Michelle Kersch | Black Knight Financial Services    1/21/14, 9:59 AM



ABOUT US    EXECUTIVE BIOGRAPHIES    NEWS ROOM

# Executive Biographies



## Michelle M. Kersch, APR

*Senior Vice President, Marketing and Corporate Communications*

Black Knight Financial Services, Inc.

Michelle Kersch is Senior Vice President of Marketing and Corporate Communications for Black Knight Financial Services, Inc., the mortgage and finance industries' leading provider of integrated technology, services and data solutions. She is responsible for all branding, advertising, media relations, special events, companywide internal and external communications and other marketing-related activities.

Prior to her position with Black Knight Financial Services, she was Senior Vice President of Marketing and Corporate Communications for Lender Processing Services (LPS), the nation's leading provider of mortgage-related technology and services.

Michelle has a B.A. degree in communications and an M.B.A. degree in business administration from the University of North Florida. Michelle has also earned the designation of Accredited Public Relations Professional.

Return to Executive Biographies

Mortgage Origination Technology

Mortgage Origination Services

Loan Servicing Technology

Loan Servicing Services

Default Servicing Technology

Default Servicing Services

Data & Analytics for the Mortgage Market

Data & Analytics for Non-mortgage Markets

Technology for Multiple Listing Services

® ™ ℠ Trademark of Black Knight Financial Services or an affiliate.
© 2014 Black Knight Financial Services, Inc. All Rights Reserved.



**FINANCIAL SERVICES**          ABOUT US          EXECUTIVE BIOGRAPHIES          NEWS ROOM

# Executive Biographies

Mortgage Origination
Technology

Mortgage Origination
Services

Loan Servicing
Technology

Loan Servicing
Services

Default Servicing
Technology

Default Servicing
Services

Data & Analytics for the
Mortgage Market

Data & Analytics for
Non-mortgage Markets

Technology for Multiple
Listing Services



## Joe Nackashi

*President, Servicing Solutions and Default Technology*
Black Knight Financial Services, a technology, data and analytics company

Joe Nackashi is President of the Servicing Solutions and Default Technology division for Black Knight Financial Services, Technology Data & Analytics.

Joe has more than 22 years experience providing innovative technology solutions to the financial services industry. Previously, Joe was Executive Vice President and Chief Information Officer of Lender Processing Services (LPS), where he was responsible for information technology strategy and management of the company's IT assets. This included application development, technology infrastructure, data center operations, critical facilities, information security, supplier management and telecommunications. Joe was also responsible for LPS' Servicing Solutions & Technology division, where he directed the technology and overall management of LPS' industry-leading MSP® loan servicing platform, LPS Desktop®, Enterprise Content Management, and Customer Support and Services groups. He provided technology leadership to effectively support the business strategies of LPS' customer base.

Prior to LPS, Joe was Senior Vice President and Chief Technology Officer for FIS, the world's largest global provider dedicated to banking and payments technologies. He worked for LPS and FIS' predecessor companies since 1986.

Joe earned a Bachelor of Arts degree in Business Administration from Belmont Abbey College and an M.B.A. degree from Jacksonville University. He currently serves on the Board of



ABOUT US    EXECUTIVE BIOGRAPHIES    NEWS ROOM

# Executive Biographies



## Sheryl L. Newman

*Senior Vice President, Risk and Compliance*
Black Knight Financial Services, Inc.

As Senior Vice President of Risk and Compliance for Black Knight Financial Services, Inc., Sheryl directs risk and compliance efforts for Black Knight Financial Services' technology, data and analytics company and for ServiceLink, its transaction services company.

Previously, Sheryl was Executive Vice President and Chief Risk and Compliance Officer for Lender Processing Services (LPS). In this role, she was responsible for helping to ensure LPS' compliance with regulations, requirements and operational controls. She also served as LPS' primary point of contact for interfacing with regulators, enforcement authorities and other third parties with respect to compliance-related matters. Additionally, Sheryl directed LPS' Enterprise Risk Management Office to protect LPS from potential risks and led LPS' Information Security Office, which is responsible for safeguarding LPS products, services and data from unauthorized access, disclosure or use.

Prior to this, Sheryl served LPS as Chief Compliance Officer and Deputy General Counsel. As Chief Compliance Officer, she was responsible for managing an enterprise-wide compliance organization that develops and implements policies and procedures to ensure compliance with applicable legal requirements and operational controls. In Sheryl's role as Deputy General Counsel, Sheryl worked with LPS' General Counsel to provide counsel and advice to senior management of LPS on a wide array of legal matters, including securities compliance; commercial litigation; employment and labor

Mortgage Origination Technology

Mortgage Origination Services

Loan Servicing Technology

Loan Servicing Services

Default Servicing Technology

Default Servicing Services

Data & Analytics for the Mortgage Market

Data & Analytics for Non-mortgage Markets

Technology for Multiple Listing Services

Tom Peterson | Black Knight Financial Services                                    1/21/14, 10:01 AM



ABOUT US    EXECUTIVE BIOGRAPHIES    NEWS ROOM

# Executive Biographies



## Tom Peterson

*Chief of Staff*
*Senior Vice President, Sales Management Operations*
Black Knight Financial Services, a technology, data and analytics company

Tom Peterson is Chief of Staff and Senior Vice President of Sales Management Operations for the Technology, Data and Analytics Company of Black Knight Financial Services. As Chief of Staff, Tom works closely with the company's CEO and provides executive-level support for a multitude of strategic initiatives. Tom is also responsible for sales management operations, which includes strategic planning and account management and reporting.

Before moving into the role as Chief of Staff, Tom served as Senior Vice President for LPS' Office of the Enterprise where he was responsible for sales strategy and account management, focused on the company's top 50 clients. Prior to joining LPS, Tom served as Senior Vice President, Operations and Support at Fidelity National Information Systems (FIS).

While at FIS, Tom led the company's customer support division, PowerCell. Under his leadership, PowerCell earned numerous awards, including Frost & Sullivan Customer Contact Excellence; American Business Best Support Organization; Help Desk Institute Team Excellence; and Mortgage Technology Excellence. In 2006, Tom was the recipient of the prestigious Stevie Award for the Best Customer Service Executive.

Tom is a 25-year veteran of the U.S. Navy Reserves, retiring as a Captain in 2010. He has served as a Commanding or Executive Officer of numerous units and has received numerous medals for his service.

Mortgage Origination Technology

Mortgage Origination Services

Loan Servicing Technology

Loan Servicing Services

Default Servicing Technology

Default Servicing Services

Data & Analytics for the Mortgage Market

Data & Analytics for Non-mortgage Markets

Technology for Multiple Listing Services

Patrick M. Sheehy | Black Knight Financial Services                                1/21/14, 10:01 AM



**BLACK KNIGHT™**

FINANCIAL SERVICES

ABOUT US     EXECUTIVE BIOGRAPHIES     NEWS ROOM

# Executive Biographies



## Patrick M. Sheehy

*Executive Vice President, Sales & Strategy*
ServiceLink
A Black Knight Financial Services
Company

Patrick M. (Pat) Sheehy is Executive Vice President, Sales & Strategy, for ServiceLink, a Black Knight Financial Services company, which offers a full suite of origination and default-related products and services to leading national and regional mortgage originators. In this role, Pat is responsible for leading sales and strategy across all ServiceLink divisions.

Pat is a long-time veteran of the mortgage banking industry with more than 30 years of professional experience. Previously, Pat was Executive Vice President of Lender Processing Services' (LPS) Data & Analytics business. In this role, he was responsible for managing the sales activities of each of its channels. Prior to joining LPS in April 2013, Pat was employed by Chase Home Mortgage. During his six years at Chase, he held the positions of Executive Vice President, Business-to-Business Production; Executive Vice President, National Production; Executive Vice President, Borrower Assistance (loan modification procurement); and Executive Vice President, Legislative Affairs.

Prior to LPS and Chase Home Mortgage, Pat held senior executive positions at Molton, Allen & Williams Mortgage Company, a wholesale lender based in Fairfax, Va.; Freddie Mac, McLean, Va.; Wells Fargo Home Mortgage, Des Moines, Iowa; and Prudential Home Mortgage Company, St. Louis, Mo.

Pat earned a bachelor's degree in business management and a master's degree in economics from North Carolina State University in Raleigh, N.C.

Mortgage Origination
Technology

Mortgage Origination
Services

Loan Servicing
Technology

Loan Servicing
Services

Default Servicing
Technology

Default Servicing
Services

Data & Analytics for the
Mortgage Market

Data & Analytics for
Non-mortgage Markets

Technology for Multiple
Listing Services



# BLACK KNIGHT™
### FINANCIAL SERVICES

ABOUT US     EXECUTIVE BIOGRAPHIES     NEWS ROOM

# Executive Biographies

<div style="float:right">

Mortgage Origination
Technology

Mortgage Origination
Services

Loan Servicing
Technology

Loan Servicing
Services

Default Servicing
Technology

Default Servicing
Services

Data & Analytics for the
Mortgage Market

Data & Analytics for
Non-mortgage Markets

Technology for Multiple
Listing Services

</div>

## Jill Cadwell

*Executive Vice President, Origination, Title and Close*
ServiceLink
A Black Knight Financial Services Company

As Executive Vice President for Originations Title/Close, Jill
Cadwell leads the Origination, Title and Escrow division for
ServiceLink, a Black Knight Financial Services company that
offers a full suite of origination and default-related products and
services to leading national and regional mortgage originators.

Prior to joining Black Knight Financial Services, Jill worked for
LPS as Senior Vice President, LSI National Title and Closing
Operations and Local Solutions Manager. She was responsible
for all escrow and title production centers in Pennsylvania,
California and Texas and worked directly with the Closing
Management divisions to increase client satisfaction, improve
corporate productivity and ensure partner satisfaction.

Before joining LPS, Jill served as an Area Manager for the Talon
Title Agency and The Talon Group, where she managed all
escrow and title production staff at several locations. In this
role, she conducted sales and marketing initiatives and
managed critical accounting functions.

Jill has also served as a National Department Manager for
Fidelity National Title, where she managed a large escrow and
title production staff. Additionally, Jill has experience as an
Escrow Officer for Spring Mountain Escrow and as an Escrow
Assistant for Wells Fargo Bank Escrow & Title Division.

Return to Executive Biographies

® ℠ ℠ Trademark of Black Knight Financial Services or an affiliate.



**FINANCIAL SERVICES**        ABOUT US     EXECUTIVE BIOGRAPHIES     NEWS ROOM

# Executive Biographies

## Dan Sogorka

*President, RealEC*

Black Knight Financial Services, a technology, data and analytics company

Dan Sogorka is President of the RealEC$^{®}$ division, Black Knight Financial Services, Technology Data & Analytics.

Dan previously served as President of RealEC Technologies, a subsidiary of LPS, where he was responsible for the management of all day-to-day operations of the company, including sales, marketing, infrastructure and technology. Under Dan's leadership, RealEC added many new customers, tripled revenue and grew profitability more than 500 percent under his tenure. Dan joined RealEC Technologies in 2002 and served as an executive officer since January 2006. Prior to his role as President, Dan served as Vice President and Senior Vice President of Sales and as Co-Chief Operating Officer of RealEC Technologies.

Before joining RealEC Technologies, Dan held management positions with Fidelity National Financial; Remedial Technologies Network, LLC; and Thermo Electron. Additionally, he performed consulting work in the engineering and systems design and analysis fields for the U.S. Department of Energy, the U.S. Department of Defense and related industries.

Dan attended Villanova University on a full academic scholarship and earned a degree in engineering.

Return to Executive Biographies

Mortgage Origination
Technology

Mortgage Origination
Services

Loan Servicing
Technology

Loan Servicing
Services

Default Servicing
Technology

Default Servicing
Services

Data & Analytics for the
Mortgage Market

Data & Analytics for
Non-mortgage Markets

Technology for Multiple
Listing Services

® ™ ℠ Trademark of Black Knight Financial Services or an affiliate.
© 2014 Black Knight Financial Services, Inc. All Rights Reserved.