# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

MAVERICK FUND, L.D.C.,
MAVERICK FUND USA, LTD,
MAVERICK FUND II, LTD,
MAVERICK NEUTRAL FUND, LTD,
MAVERICK NEUTRAL LEVERED
FUND, LTD, MAVERICK LONG
FUND, LTD, and MAVERICK LONG
ENHANCED FUND, LTD,

        Plaintiffs,

v.                                                  Case No. 3:13-cv-1585-J-32JRK

LENDER PROCESSING SERVICES
INC, (n/k/a BLACK KNIGHT
INFOSERV, LLC), JEFFREY S.
CARBIENER, FRANCIS K. CHAN,
BLACK KNIGHT HOLDINGS, INC.
(f/k/a BLACK KNIGHT FINANCIAL
SERVICES, INC.), SERVICELINK
HOLDINGS, LLC (f/k/a BLACK
KNIGHT FINANCIAL SERVICES II,
LLC), BLACK KNIGHT FINANCIAL
SERVICES, LLC, and FIDELITY
NATIONAL FINANCIAL, INC.,

        Defendants.

_____

## ORDER ON DEFENDANTS' MOTION TO DISMISS
## PLAINTIFF'S THIRD AMENDED COMPLAINT

      The defendants in this spinoff from a securities class action move for the second

time to dismiss the claims of a group of opt-out plaintiffs largely for the same reasons

that the Court first dismissed the class action complaint. (Mot. to Dismiss, Doc. 87;

Reply, Doc. 92.) The Court earlier granted the defendants' first motion to dismiss the

complaint in this case on technical grounds and allowed the plaintiffs to amend. (Aug. 4, 2014 Order, Doc. 80.) The defendants argue that, just as in the class action, the plaintiffs here have failed to adequately allege under the applicable pleading standards for securities fraud cases that the allegedly fraudulent misrepresentations were made with scienter. The defendants also ask the Court to revisit its ruling in the class action that loss causation had been adequately pleaded and to dismiss plaintiffs' remaining state law causes of action on similar grounds. The plaintiffs respond that they have more than met their obligation to plead scienter and loss causation and that their state law claims are valid. (Resp. to Mot. to Dismiss, Doc. 90.) Upon review of the parties' submissions, the applicable law, and the record, the Court rules as follows.

## I.    BACKGROUND

The plaintiffs in this case, Maverick Fund, L.D.C., Maverick Fund USA, Ltd., Maverick Fund II, Ltd., Maverick Neutral Fund, Ltd., Maverick Neutral Levered Fund, Ltd., Maverick Long Fund, Ltd., and Maverick Long Enhanced Fund, Ltd. (collectively, "Maverick"), are all private investment funds managed by the same registered investment manager, non-party Maverick Capital, Ltd. (3d Am. Compl. ¶¶ 31-32, Doc. 86.) Between October 23, 2009 and October 4, 2010, they allegedly purchased millions of shares of a company then known as Lender Processing Services, Inc. ("LPS"). (Id., ¶ 34.) At the time, LPS was a publicly-traded company that provided mortgage processing services, settlement services, and default solutions, as well as data, servicing, and technology solutions to mortgage lenders. (Id., ¶¶ 2, 35.) According to Maverick, during this period, LPS engaged in a fraudulent scheme to artificially

2

inflate its revenue and stock price by relying on illicit business practices (id., ¶¶ 1-25, 39, 257), and Maverick was damaged as a result (id., ¶¶ 29, 33, 258-67).

On November 23, 2010, LPS shareholders filed a class action in this Court alleging violations of federal securities law based on this alleged fraudulent scheme. (City of St. Clair Shores Gen. Emp. Ret. Sys. v. Lender Processing Servs., Inc., 3:10-cv-1073-J-32JBT ("City of St. Clair"), Doc. 1.) The class action complaint was later amended (City of St. Clair, Doc. 41), but the Court dismissed the amended complaint without prejudice on the defendants' motion to dismiss for failure to state a claim. (City of St. Clair, Doc. 58.) The lead plaintiff amended the complaint again (City of St. Clair, Doc. 61), but Court directed it to file a third amended complaint that complied with the Court's earlier instructions (City of St. Clair, Doc. 76). While a motion to dismiss the third amended complaint was pending, the parties reached a settlement. (See City of St. Clair, Doc. 91.) On August 1, 2013, during the settlement claims process, Maverick elected to opt out of the settlement. (City of St. Clair, Doc. 106.) The Court ultimately approved the settlement with Maverick excluded. (See City of St. Clair, Doc. 118.)

Maverick initially filed this action on August 6, 2013 in the Southern District of New York, naming as defendants LPS, DocX, LLC (a wholly-owned subsidiary of LPS at the heart of the alleged illicit business practices), Jeffrey S. Carbiener (former Chief Executive Officer of LPS), Francis K. Chan (former Executive Vice President and Chief Financial Officer of LPS), and Lorraine Brown (former chief executive of DocX and executive at LPS). (Compl., ¶¶ 17-22, 120, Doc. 1.) Maverick brought federal

securities fraud claims under § 10(b) and § 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, and state law claims for common law fraud, civil RICO under Georgia and Florida law, and negligent misrepresentation under Florida and New York law. (Id., ¶¶ 243-322.)

On December 10, 2013, the Southern District of New York transferred the case to this District.[1] (Dec. 10, 2013 Order, Doc. 35.) Shortly thereafter, LPS was acquired by Fidelity National Financial, Inc. in a process that involved a fair amount of corporate renaming and restructuring. (See Joint Mot. to Modify, Doc. 43.) With the Court's permission, Maverick amended its complaint to add certain corporate entities as defendants and allegations of successor liability. (See Doc. 53, ¶¶ 25-54.)

On March 17, 2014, all the defendants at time, except Lorraine Brown, joined in a motion to dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (Mot. to Dismiss 2d Am. Compl., Doc. 65.) On August 1, 2014, the Court held a hearing on the motion. (Hr'g Tr. Aug. 1, 2014, Doc. 81.) After hearing argument from the parties, the Court granted the motion without prejudice to Maverick repleading the complaint. (Id. at 77-86.) The Court explained that it was doing so on the grounds that the complaint was overlong and constituted a "shotgun pleading," identifying how the complaint ran afoul of Eleventh Circuit pleading precedent. (Id. at 78-80.) The Court was clear that it was not ruling whether the complaint met the strict pleading standards for securities fraud cases (id.

---

[1] Before the transfer, Maverick amended its complaint to add factual allegations. (1st Am. Compl., Doc. 18.)

at 78), but providing the parties guidance as to the issues that remained and advising them that the next complaint would be viewed as presenting Maverick's best case (id. at 80-86). The Court memorialized its ruling in a written order, gave Maverick until September 5, 2014 to file a third amended complaint, and set in place a briefing schedule on any new motion to dismiss. (Aug. 1, 2014 Order, Doc. 80.)

Maverick timely filed its Third Amended Complaint (3d Am. Compl., Doc. 86), and LPS[2] timely moved to dismiss it (Defs.' Mot. to Dismiss 3d Am. Compl, Doc. 87). Maverick responded to the motion (Pls.' Opp'n, Doc. 90), and, with the Court's permission, LPS replied (Defs.' Reply, Doc. 92). The motion is now ripe for ruling.

## II. STANDARDS OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Federal notice pleading requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (citations omitted).

---

[2] Lorraine Brown never appeared in the case and, along with DocX, was dropped as a defendant in the Third Amended Complaint. (See Doc. 86.) The Court will direct that Brown and DocX be terminated as defendants in this case. The current motion to dismiss was filed on behalf of all remaining defendants and attacks the pleading of the complaint as a whole, rather than as to any particular defendant. (Doc. 87 at 1.) Thus, from hereon, the Court refers to the defendants collectively as LPS, except when otherwise necessary to identify them individually.

Though the court assumes the factual allegations in the complaint are true in evaluating a motion to dismiss, it disregards all legal conclusions drawn from the facts, conclusory allegations, and unwarranted deductions of fact. <u>Burroughs v. Broadspire</u>, 323 F. App'x 730, 731 (11th Cir. 2009) (citing <u>Aldana v. Del Monte Fresh Produce, N.A., Inc.</u>, 416 F.3d 1242, 1246 (11th Cir. 2005)).

In pleading claims based on fraud or mistake, a plaintiff must not only demonstrate a basic level of plausibility, but must also "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This standard applies to negligent misrepresentation claims, as well as to federal securities fraud and common law fraud. <u>FindWhat Investor Grp. v. FindWhat.com</u>, 658 F.3d 1282, 1296 (11th Cir. 2011) (securities fraud); <u>Chapman v. Abbott Labs.</u>, 930 F. Supp. 2d 1321, 1324 (M.D. Fla. 2013) (Florida negligent misrepresentation). Specifically, Rule 9(b) requires the complaint to set forth:

> (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

<u>FindWhat Investor Grp.</u>, 658 F.3d at 1296.

A claim under § 10(b) and Rule 10b-5 must additionally satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. <u>Id.</u> A plaintiff states a claim under § 10(b) and Rule 10b-5 by alleging (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss

causation. <u>FindWhat Investor Grp.</u>, 658 F.3d at 1295. The PSLRA demands in securities fraud claims that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). For those securities fraud claims requiring proof of scienter, the PSLRA provides that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." <u>Id.</u> § 78u-4(b)(2)(A). "Although factual allegations may be aggregated to infer scienter, scienter must be alleged with respect to *each defendant* and with respect to *each alleged violation of the statute.*" <u>FindWhat Investor Grp.</u>, 658 F.3d at 1296 (emphasis added). If the PSLRA pleading requirements are not met, "the court shall, on the motion of any defendant, dismiss the complaint . . . ." 15 U.S.C. § 78u-4(b)(3)(A).

Though a court is generally limited in its review of a Rule 12(b)(6) motion to the allegations in the complaint and any exhibits thereto, the court may consider other materials when "'(1) a plaintiff refers to a document in its complaint, (2) the document is central to her claim, (3) its contents are not in dispute, and (4) the defendant attaches the document to its motion to dismiss.'" <u>Fuller v. Suntrust Banks, Inc.</u>, 744 F.3d 685, 695-96 (11th Cir. 2014) (quoting <u>Fin. Sec. Assurance, Inc. v. Stephens, Inc.</u>, 500 F.3d 1276, 1284 (11th Cir. 2007)). "A document is considered 'undisputed' when the 'authenticity of the document is not challenged.'" <u>Id.</u> at 696 (quoting <u>Day v. Taylor</u>,

7

400 F.3d 1272, 1276 (11th Cir. 2005)). "Moreover, in securities fraud actions, a court may take judicial notice of the contents of documents filed with the SEC." <u>FindWhat Investor Grp.</u>, 658 F.3d at 1297 n.15.

## III.   ANALYSIS

The defendants in the now-settled class action had moved to dismiss the case on the grounds that the lead plaintiff had not adequately pleaded (1) that the individual defendants had "made" the allegedly false statements, (2) that the statements were materially false or misleading, (3) a strong inference of scienter on the part of each defendant, and (4) that the class actually sustained a loss as the result of the alleged fraud. (<u>City of St. Clair</u>, Doc. 45.) The Court found most of the defendants' arguments not well-taken, except with respect to scienter. (<u>City of St. Clair</u>, Doc. 58 at 4-8.) The Court concluded that the complaint had not alleged scienter "with respect to each defendant and with respect to each alleged violation," and directed the plaintiff to file a second amended complaint that "state[d] with particularity facts giving rise to a strong inference of scienter . . . for each defendant with respect to each alleged violation, i.e., what, how, and when did each defendant know (or should have known)." (<u>Id.</u> at 8.)

LPS has not repeated in this case the argument from the class action as to the sufficiency of the allegations of who made the statements and has addressed the statements' falsity only to the extent their content might reflect LPS's state of knowledge at the time. The Court correspondingly does not address who made the statements or their falsity. LPS does ask the Court to reaffirm its prior ruling on

scienter (Doc. 87 at 5-19) and to revisit its ruling regarding loss causation (id. at 19-22). LPS also moves to dismiss the remaining state law claims, which had not been asserted in the class action.[3] (Id. at 23-25.) Having previously ruled on technical grounds, the Court now rules on the substantive arguments presented.[4]

## A.   Scienter

In the Eleventh Circuit, "'scienter consists of intent to defraud or severe recklessness on the part of the defendant.'" FindWhat Investor Grp., 658 F.3d at 1299-1300 (quoting Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc., 594 F.3d 783, 790 (11th Cir. 2010)).

> "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."

Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1238 (11th Cir. 2008) (quoting Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282 n.18 (11th Cir. 1999)). The PSLRA requires

---

[3] Maverick has dropped from the Third Amended Complaint three state law causes of action for civil RICO under Georgia and Florida law and for negligent misrepresentation under New York law. (Compare Doc. 53, ¶¶ 344-82, 390-400, with Doc. 86.) The current complaint still includes a "Fifth Cause of Action" that is not actually a standalone cause of action, but one for successor and vicarious liability on the part of the post-merger defendants. (Id., ¶¶ 307-12.)

[4] The Court does note, however, that, while the Third Amended Complaint has trimmed nearly thirty pages (or ninety-four numbered paragraphs) from the Second Amended Complaint, it still comes in at a total of 119 pages (or 312 numbered paragraphs), which includes sixteen pages of exhibits, an eight-page summary, a two-page table of contents, and a more than full-page introductory paragraph written as a kind of bibliography (though none of the sources are attached later as exhibits). A "short and plain statement" it is not.

that the complaint create a "strong inference" of scienter, 15 U.S.C. § 78u-4(b)(2), a difficult but not insurmountable requirement, <u>Mizzaro</u>, 544 F.3d at 1257. The inference of scienter "'must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" <u>FindWhat Investor Grp.</u>, 658 F.3d at 1300 (quoting <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 314 (2007)). "'In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter as strong as any opposing inference?'" <u>Mizarro</u>, 544 F.3d at 1239 (quoting <u>Tellabs, Inc.</u>, 551 U.S. at 326 and distinguishing summary judgment inquiry into what a reasonable person *could* think).

The scienter inquiry must be undertaken as to each defendant and each alleged violation. <u>FindWhat Investor Grp.</u>, 658 F.3d at 1296. "Corporations, of course, have no state of mind of their own. Instead, the scienter of their agents must be imputed to them." <u>Mizzaro</u>, 544 F.3d at 1254. Even then, "'[i]t is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another knows to be false. A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter . . . .'" <u>Southland Sec. Corp. v. INSpire Ins. Sols., Inc.</u>, 365 F.3d 353, 366 (5th Cir. 2004) (quoting <u>In re Apple Comput., Inc. Sec. Litig.</u>, 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002)). Corporate intent cannot be aggregated based on the collective knowledge of the corporate officers. <u>Id.</u> at 366-67.

From the Court's review of the most recent complaint, Maverick has alleged

10

that LPS made false or misleading statements on at least seventeen occasions. The motion to dismiss sorts the statements into four time periods based on particular events and LPS's supposed state of knowledge at the time: (1) the end of October 2009, (2) November 2009, (3) February 2010, and (4) between April 3, 2010 and October 5, 2010.[5] Maverick follows this formulation in its response. The Court finds it useful as well and evaluates the parties' arguments in the same manner.

### 1.   **Statements at the End of October 2009**

Maverick identifies two (technically three) statements by LPS at the end of October 2009 that were allegedly false or misleading: (a) an October 22, 2009 earnings press release also concurrently filed on Form 8-K with the SEC and (b) Carbiener's and Chan's October 23, 2009 conference call with analysts touting LPS's third quarter 2009 financial results. (Doc. 86, ¶¶ 188-194.) Maverick alleges the reports of LPS's financial performance in these statements were false and misleading, not because they were not technically accurate, but because they did not disclose that the financials and other statements were built on the illicit business practices at DocX. (Id., ¶ 193.) As the sole proof that LPS knew these statements were misleading when they were made in late October 2009, the Third Amended Complaint quotes the May 14, 2013 trial testimony of Clay Cornett, a former senior executive at LPS, in his employment lawsuit against LPS, during which he said that he first learned of DocX's practices in

---

[5] Gone from the Third Amended Complaint are the direct allegations that LPS affirmatively knew of DocX's activities before the end of October 2009. Maverick still alleges LPS should have known (Doc. 86, ¶¶ 176-80), but no longer seeks recovery based on allegedly false or misleading statements before the end of October 2009.

a whistleblower letter he received from LPS's Chief Litigation Officer Sheryl Newman in "September/October of 2009."[6] (Id., ¶¶ 143-44, 194). This thin reed of recollection is inconsistent with other, more specific allegations in the complaint and is inadequate to support a strong inference of scienter with respect to the October 2009 statements.

To begin with, Cornett's recollection of receiving the letter in "September/October of 2009" does not necessarily imply he received it before October 22 or 23. But, more than that, the same section of the complaint that quotes Cornett's testimony also quotes Newman's testimony from the Cornett trial that she herself had only "'received a copy of the whistleblower letter on or about November 2nd [2009] . . . .'" (Id., ¶ 148.) That same section also cites Carbiener's testimony from the trial that he received the letter from LPS's auditors in "early November 2009." (Id., ¶ 145.) When read together with Cornett's testimony, Newman's and Carbiener's more specific recollections either contradict Cornett's testimony or put a finer point on his general memory that he received a copy of the whistleblower letter in the fall of 2009. Either way, with these potentially contradictory quotations all found in the complaint itself, it is impossible to "strongly" infer that LPS knew of the illicit signing practices before

_____

[6] Maverick does reference the supposed "huge red flag" of an April 15, 2009 opinion entered by Bankruptcy Judge Diane Weiss Sigmund of the Eastern District of Pennsylvania in In re Taylor. (Id., ¶¶ 137-41; Doc. 90 at 4-5.) But as the Court noted at the August 4, 2014 hearing, the Taylor opinion had nothing to do with the fraudulently signed and notarized mortgage documents at DocX, but dealt with the LPS attorney network and LPS software used by clients and attorneys in handling foreclosures. (Doc. 81 at 80; see Doc. 65-14.) The class action complaint pled allegations about the attorney network (see, e.g., City of St. Clair, Doc. 81, ¶¶ 30-50), but Maverick never has. Moreover, the Third Amended Complaint no longer identifies as "false and misleading" any LPS statements before October 2009, making Maverick's continued attempt to use the Taylor opinion as a red flag of the issues at DocX confusing.

it made its October 22 and 23 earnings reports.[7]

Maverick argues that it has not had any discovery and therefore cannot know whether the whistleblower communicated with LPS before writing the letter attached to the motion to dismiss. (Doc. 90 at 6.) As support for its theory, Maverick points to Cornett's testimony that what he saw was "a demand letter or petition – I can't remember which." (Id.; Doc. 86, ¶ 143.) Based on this passing phrase in Cornett's testimony, Maverick suggests the letter LPS attaches to its motion is not the same letter Cornett saw. (Doc. 90 at 6.) But even the relatively liberal pleading standards of Rule 8 require more than such speculation. LPS correctly notes that there is no hint in the complaint or elsewhere in Cornett's testimony of the existence of another, earlier letter from the whistleblower. (Doc. 92 at 2.) Maverick's conjecture that there might be such a letter is an insufficient basis from which to infer scienter. Maverick's claims with respect to LPS's October 22 and 23, 2009 statements are due to be dismissed.

Though the date on the letter itself might be conclusive, the Court is somewhat restrained at this point from considering the letter. Maverick certainly refers to a letter from the whistleblower in the complaint, and its central role in Maverick's claims of fraud is beyond dispute. But Maverick represents it had never seen the letter before LPS attached a copy to the motion to dismiss (Doc. 90 at 6), so the letter's authenticity is not presently undisputed. Additionally, the copy submitted by LPS

---

[7] Maverick's odd pleading method—setting forth testimony rather than affirmatively alleging when LPS received the whistleblower letter—is likely the cause of the potential contradiction. This method of pleading is further grounds for the Court to review other parts of the testimony not quoted in the complaint without needing to convert LPS's motion to dismiss into a motion for summary judgment.

appears incomplete, as the letter (which is actually two letters, with one attached to the other) mentions additional attachments that have not been provided. (Doc. 87-3 at 5 ("With this letter, I forward copies of some of the questionable documents that demonstrate the liberties taken in the stamp and sign department.").) So while it has no reason to doubt the letter's authenticity, the Court does not base its decision to dismiss the claims for fraud at the end of October 2009 on the letter.[8] See Fuller v. Suntrust Banks, Inc., 744 F.3d 685, 695-96 (11th Cir. 2014).

## 2. **Statements in November 2009**

According to Maverick, by at least November 4, 2009, Carbiener, Chan, and other executives at LPS had actual knowledge of the extent of the illicit practices taking place at DocX. They had received the whistleblower letter and sent a legal team, including Newman, to DocX headquarters to investigate. (Doc. 86, ¶¶ 142-48.) Newman knew within thirty minutes of arriving that "there were 'some significant issues,' and Brown was immediately fired." (Id., ¶¶ 148-49.) Carbiener also testified later that it "'was apparent'" on the same day that there a "'real'" and "'glaring'" problem not limited to isolated incidents. (Id., ¶ 146-47.) Cornett goes further in his testimony to state, among other things, that he learned shortly after the investigation

---

[8] Some of the other exhibits submitted by LPS in support of the instant motion and its initial motion to dismiss are properly considered, however, as they are referenced in the complaint, central to Maverick's claims, and not in dispute. (See, e.g., Docs. 65-14, 87-4, 87-7, 87-11; also Doc. 86 at 1-2 (listing sources relied upon in drafting complaint).) The September 23, 2010 *Washington Post* article might also be appropriately considered, if LPS had submitted more than just the first page of a three-page online version of the article. (See, e.g., Docs. 65-19, 87-8.) Others of LPS's exhibits are beyond the pleadings and would be more appropriate for review on summary judgment. (See, e.g., Doc. 87-9.)

began, but apparently before Brown was fired, that "there was a whole program of surrogate signing." (Id., ¶ 144.) Yet LPS's statements, first to Maverick and other investors in meetings on November 9 and 10, 2009, and then to the public in LPS's November 16, 2009 Form 10-Q, allegedly included less than the full truth LPS knew at the time. (Id., ¶¶ 195-204.) Maverick alleges that LPS continued to tout positive financial results and robust internal controls in an effort to hide the truth from the public, even as it disclosed the "surrogate signing" program to one of its clients, American Home Mortgage Servicing, Inc. ("AHMSI"), in late November 2009, after first trying on November 12 to have AHMSI "ratify" the documents created by DocX. (Id., ¶¶ 151-57.)

LPS accuses Maverick of taking out of context testimony from the Cornett trial and allegations from AHMSI's lawsuit against LPS to suggest that LPS had full knowledge of the scope of DocX's illicit practices in November 2009, even though LPS's investigation and remediation efforts had just begun. (Doc. 87 at 7-11; Doc. 92 at 3-6.) LPS argues that, at that point, the investigation results were not in and that, even if they were, the complaint does not set forth what they showed. (Doc. 87 at 7.) LPS cites to two cases from outside the Eleventh Circuit, one of which is unpublished, for the principle that LPS had no obligation to disclose what its investigation uncovered while the investigation was still in progress. (Id. at 8, 10.)

In the first of these case, Higginbotham v. Baxter International, Inc., the Seventh Circuit affirmed the dismissal of a securities fraud class action against defendant Baxter for an undisputed fraud perpetrated by its Brazilian subsidiary to

show revenue growth by misreporting, and later falsifying, sales reports. 495 F.3d 753,

755-56 (7th Cir. 2007). The appellate court concluded that the plaintiffs put forth no

concrete evidence Baxter's headquarters knew of the fraud until confidential sources

told the CFO about it in May 2004. Id. at 757-58. But the court did not believe this

May 2004 revelation meant that whoever signed the 10-Q report filed that month had

knowledge of its falsity, just that "sometime during May 2004, Baxter learned enough

to lead a reasonable person to conduct an investigation," which Baxter did over the

next two months. Id. at 758. "Knowing enough to launch an investigation (Baxter could

not simply assume that the initial report of bad news was accurate) is a very great

distance from convincing proof of intent to deceive." Id. Similarly, receipt of

accusations of wrongdoing does not necessarily equate with knowledge of the truth of

the accusations. Id. Recognizing a legitimate duty to correct false disclosures, the

Seventh Circuit rejected the suggestion "that corrections must occur as soon as the

statements have been questioned." Id. at 760.

> Prudent managers conduct inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention. Baxter might more plausibly have been accused of deceiving investors had managers called a press conference before completing the steps necessary to determine just what had happened in Brazil.
>
> Taking the time necessary to get things right is both proper and lawful. Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal. After all, delay in correcting a misstatement does not cause the loss; the injury to investors comes from the fraud, not from a decision to take the time necessary to ensure that the corrective statement is accurate. Delay may affect which investors bear the loss but does not change the need for *some* investors to bear it, or increase its amount.

Id. at 760-61 (citations omitted). LPS encourages the Court to consider its actions in

16

late October and early November 2009 to be the same kind of prudent inquiry before LPS ultimately disclosed the issues at DocX in its February 23, 2010 Form 10-K. (Doc. 87 at 9-10.)

Maverick distinguishes Higginbotham by noting that, unlike Baxter, LPS received the whistleblower letter before speaking with investors on November 9 and 10, 2009 and issuing its 10-Q on November 16, 2009. (Doc. 90 at 16.) But with the relatively short time between LPS's receipt of the letter and the issuance of the 10-Q, the principles of Higginbotham still hold. Maverick alleges that the fraud at DocX was wide-ranging and massive. Even with the testimony from Cornett and Carbiener that they recognized they had a "glaring problem" shortly after the investigation started, a reasonable person would not find Maverick's inference that LPS knew the full extent of the fraud by November more compelling than the inference that, at that point, LPS knew enough to prompt an investigation, which LPS did in fact commence.

LPS cites an unpublished memorandum opinion and order from the Southern District of New York for the same basic holding as Higginbotham: that after receipt of a whistleblower letter, "'[d]efendants are permitted a reasonable amount of time to evaluate potentially negative information and to consider appropriate responses before a duty to disclose arises.'" City of Brockton Ret. Sys. v. Avon Prods., Inc., No. 11 Civ. 4665(PGG), 2014 WL 4832321, at *24 (S.D.N.Y. Sept. 29, 2014) (quoting In re Elan Corp. Sec. Litig., 543 F. Supp. 2d 187, 217 (S.D.N.Y. 2008) and citing Higginbotham). In response, Maverick notes that the defendant there later disclosed the whistleblower letter and its preliminary investigation and announced that the

letter's allegations appeared credible, whereas LPS's November 2009 statements mentioned nothing about the letter it received or its investigation. (Doc. 90 at 17.) As discussed below, the Court finds Maverick's note on this point more relevant with respect to certain of LPS's later statements. But a reasonable person would not infer that LPS had full knowledge after only roughly two weeks of investigation.

For similar reasons, Maverick's citation to the brief discussion of scienter in Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309 (2011) is unavailing with respect to these statements. The Supreme Court was unwilling to give much credence to the argument that the defendant drug company appropriately delayed disclosure of a negative side-effect so it could review the evidence because the defendant had contemporaneously issued a patently misleading press release claiming it had studies that disproved the side-effect, when it did not. Id. at 1324 n.15. That kind of knee-jerk public statement directly addressing the issue certainly would refute an argument that a defendant needed time to investigate before speaking. And legitimate questions can be raised about some of LPS's later statements regarding DocX. But the complaint identifies no equivalent statements issued in November while LPS's investigation was still ramping up.

In an effort to allege scienter by demonstrating the incongruity between LPS's public statements and private actions, Maverick points to LPS's interactions with AHMSI in November 2009 and cites the recent Eleventh Circuit opinion in 100079 Canada, Inc. v. Stiefel Labs., Inc., 596 F. App'x 744, 748 (11th Cir. 2014). (Doc. 90 at 8; Doc. 96.) But when Maverick's editorializing is removed, the allegations in the

complaint about AHMSI remain deficient. Maverick alleges that LPS first tried to convince AHMSI to "ratify" the surrogate-signed documents on November 12, 2009, and then, in late November 2009, "disclosed to AHMSI it used a surrogate signing practice, but again failed to disclose the scope of the fraudulent/illegal practices at DocX." (Doc. 86, ¶ 151.) This begs the question what LPS knew about the scope of the practices at this point, a question unanswered in the complaint.[9]

Maverick's allegations regarding internal controls are also flawed. The current complaint omits certain references to Carbiener's testimony about LPS's installation of internal controls at smaller business units like DocX. (See 2d Am. Compl. ¶¶ 89-92, Doc. 53.) The current complaint essentially alleges that, once LPS discovered the problems at DocX, it should have known its internal controls were inadequate, but continued to certify them as adequate. (Doc. 86, ¶¶ 100-07.) Certainly, the discovery of the fraud occurring at DocX indicated LPS's internal controls were inadequate at the time, particularly since the fraud only came to the attention of LPS management through an outsider. See Higginbotham, 495 F.3d at 760 ("[B]y definition, *all* frauds demonstrate the 'inadequacy' of existing controls . . . ."). But the complaint says very little about what LPS learned in its investigation about the inadequacies of its internal controls and when LPS learned it. To the extent many of the certifications referenced

---

[9] Maverick also relies upon this Court's findings of fact in the Cornett case that "'LPS learned of the 'signing issues' within the DOCX unit'" in November 2009. (Doc. 86, ¶ 17; Doc. 90 at 7.) The Court also found that the surrogate signing practice had been concealed from LPS's auditors and managements and that LPS only learned of the practice when it received the whistleblower letter. (Doc. 86, ¶ 17; Doc. 90 at 7.) The Court did not make any finding as to when LPS either knew the full scope of the improper practices or completed remediation.

in the complaint refer to internal controls on financial reporting, the complaint says nothing about when those were determined to be flawed (if ever). (Doc. 86, ¶ 197); see Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006). The scienter allegations in the complaint regarding internal controls are also inadequate.

It is worth repeating that the heightened pleading standard of the PSLRA is not that the plaintiff must *make* strong inferences of scienter in its complaint, but that the complaint must "state with particularity *facts giving rise to* a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). In other words, it is not enough for a plaintiff to supply its own conclusions without also providing the facts to support them. See Jabil Circuit, Inc., 594 F.3d 783 at 792 (rejecting shareholder's demand that the court accept all allegations in the complaint as true, including the legal conclusion that defendant's actions were severely reckless and therefore had the requisite scienter). Even when a plaintiff pleads facts to support its allegations of scienter, "'the court must take into account plausible opposing inferences.'" FindWhat Investor Grp., 658 F.3d at 1300 (quoting Tellabs, Inc., 551 U.S. at 323).

After setting aside any unsupported conclusions, the Court concludes that the allegations with respect to the November 2009 statements do not create an inference of scienter "at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314. Maverick's scienter theory with respect to these statements hinges on its conclusion that LPS knew the full extent and impact of the DocX document signing issues upon receipt of the whistleblower letter and commencement

of the internal investigation on or about November 4, 2009. But the allegations in the complaint do not support an inference of such a broad base of knowledge at that time. Maverick's claims as to LPS's November 2009 statements are due to be dismissed.[10]

### 3.   Statements in February 2010

By February 2010, after roughly three months of investigation, LPS knew more about the activities at DocX and their impact, or so Maverick alleges. Yet, in a February 8, 2010 press release on its fourth quarter 2009 financials, filed concurrently with the SEC on Form 8-K, and in an earnings conference call the next day, LPS continued to reinforce the strength of its position, with no mention of the issues at DocX. (Doc. 86, ¶¶ 205-10.) The first mention of the problems came instead on February 23, 2010 in LPS's annual 10-K report for fiscal year 2009:

> Recently, during an internal review of the business processes used by our document solutions subsidiary, we identified a business process that caused an error in the notarization of certain documents, some of which were used in foreclosure proceedings in various jurisdictions around the country. The services performed by this subsidiary were offered to a limited number of customers, were unrelated to our core default management services and were immaterial to our financial results. We immediately corrected the business process and began to take remedial actions necessary to cure the defect in an effort to minimize the impact of the error. We subsequently received an inquiry relating to this matter from the Clerk of Court of Fulton County, Georgia, which is the regulatory body responsible for licensing the notaries used by our document solutions subsidiary. In response, we met with the Clerk of Court, along with members of her staff, and reported on our identification

---

[10] Additionally, the complaint identifies only the general topics discussed over the two days of meetings between LPS and institutional investors, including Maverick, on November 9 and 10, 2009. (Doc. 86, ¶ 195.) These allegations do not provide the level of detail required by Rule 9(b) and the PSLRA. Similarly, the complaint does not set forth with specificity the other allegedly false statements or omissions made during the "tens, if not a hundred" of meetings and phone calls Maverick had with LPS throughout the period in question. (See id., ¶ 253.)

of the error and the status of the corrective actions that were underway. We have since completed our remediation efforts with respect to the affected documents. Most recently, we have learned that the U.S. Attorney's office for the Middle District of Florida is reviewing the business processes of this subsidiary. We have expressed our willingness to fully cooperate with the U.S. Attorney. We continue to believe that we have taken necessary remedial action with respect to this matter.

(Doc. 65-6 at 3; see Doc. 86, ¶ 215.)

Maverick faults this disclosure for painting an inaccurate picture of the situation by attributing the problems to a "business process" dealing with "notarization" that LPS discovered on its own and had since fully resolved, when, in fact, a whistleblower had alerted LPS to criminal conduct that LPS was still remediating in 2011 and beyond and that had a huge financial impact on the company. (Id., ¶ 216.) Additionally, though the 10-K disclosed that the U.S. Attorney's Office was "reviewing the business processes of this subsidiary," it did not disclose that LPS knew the federal investigation was criminal in nature. (See Doc. 90 at 13-14, 19.)

LPS views all these allegations as reliant upon the contention that LPS "must have known" more than it admitted in its 10-K, a line of reasoning that the Eleventh Circuit has been skeptical could support scienter. (Doc. 87 at 11); see Mizzaro, 544 F.3d at 1250. Addressing each alleged falsity or omission, LPS argues that it had no obligation to disclose the criminal nature of the federal investigation, citing to City of Pontiac Policeman's & Fireman's Retirement System v. UBS AG, 752 F.3d 173, 184 (2d Cir. 2014), and that the complaint contains no evidence as to when LPS was supposed to have known the conduct at DocX was criminal. (Doc. 87 at 12-14.) While defending the accuracy of its characterization of the conduct as "a *business process that caused an error in the notarization of certain* documents," LPS says it emphasized

notarization because it was particularly concerned about the added legal requirements applicable to notaries. (Id. at 14-15.) LPS also defends the representations in the 10-K about the "limited" scope of the problem and the completion of remediation, while arguing that the complaint fails to support Maverick's allegations that LPS knew at the time that these representations were incorrect. (Id. at 15-17.) Urging a "holistic" view of the complaint, LPS contends it "attempt[ed] to keep investors informed of the problems at DocX, not hide them." (Id. at 17-18.)

A holistic reading is not as favorable to LPS as it thinks. As the Court expressed at oral argument on the first motion to dismiss, it is difficult to read the February 23 10-K disclosure as much more than "corporate speak" intended to downplay problems that were indisputably much more serious than first disclosed. (Doc. 81 at 21.) Vague phrases like "a business process" and "an error in the notarization of certain documents" obfuscate more than they illuminate. While LPS may have been more focused on "errors" in notarization, the allegations in the complaint are that the issues at DocX extended beyond errors to actual forgery. And the complaint points to LPS's later consent order with the federal banking agencies as an indication that LPS's remediation efforts were not complete in February 2010. (See Doc. 86, ¶ 127.)

Still, a gap remains between what is now widely known and much of what the complaint alleges LPS knew at the time it made these statements in February 2010. Maverick tries to bridge the gap primarily with testimony from the Cornett trial. Again, Cornett, Carbiener, and Newman all quickly realized there was a serious problem. (Id., ¶¶ 145-48.) Without drawing an arbitrary line, surely at some point the

prudent manager discussed in <u>Higginbotham</u> entitled to investigate before speaking has learned enough to inform shareholders. <u>See</u> 495 F.3d at 760-61. The defendant there took a little over two months to review the fraud allegations before issuing a correction in its next quarterly report. <u>Id.</u> at 758. By February 23, 2010, LPS had known of the issues at DocX for nearly four months. The testimony from the <u>Cornett</u> trial set forth in the complaint was that, shortly after initiating the investigation in early November 2009, the team discovered "a whole program of surrogate signing." (Doc. 86, ¶ 144.) But there is no indication at all in the 10-K of the existence of a surrogate signing program, only the disclosure of an error in notarization being addressed with the government body responsible for licensing the notaries at DocX. (<u>Id.</u>, ¶ 215.) Though LPS views notarization as covering the surrogate signing program (Doc. 87 at 14), one cannot read the disclosure in the 10-K and come away with any understanding that anything resembling forgery had taken place.[11]

LPS also chalks up its chosen phrasing to its singular focus on notarization due to the additional legal scrutiny on notaries. (<u>Id.</u>) That could be true. But the complaint adequately alleges that, by February 23, 2010, LPS knew there was more to the story than just problematic notarizations.[12] The Court cannot conclude, as LPS suggests,

---

[11] Again, the falsity of LPS's statements are not at issue at this stage of the proceedings, though some of LPS's arguments touch on falsity to the extent that it contends LPS could not have had scienter because its statements were technically accurate. (<u>See</u> Doc. 87 at 14; Doc. 92 at 8.)

[12] The discrepancies between what LPS knew on this point and what it disclosed is a key distinction between the facts in this case and those presented in <u>I.B.E.W. Local 697 Pension Fund v. Limited Brands, Inc.</u>, 788 F. Supp. 2d 609, 630-31 (S.D. Ohio 2011). It is true, though, that "disclosure is not a rite of confession" such that companies must disclose mid-investigation every detail about potential

that the more compelling inference is that LPS believed disclosure of its notarization problems "sufficiently conveyed the surrogate signing practices to investors." (Doc. 92 at 8.) Thus, while the Court finds inadequate Maverick's scienter allegations with respect to the earlier February statements, the Court will not dismiss Maverick's claims regarding the February 23, 2010 10-K disclosures.

### 4.   Statements Between April 5, 2010 and October 5, 2010

Maverick alleges that, after the initial disclosure on February 23, 2010, LPS made material misstatements regarding the issues at DocX on ten additional occasions between April 5, 2010 and October 5, 2010.[13] Some of these statements characterize the issues in the same language as the February 23, 2010 10-K, and so, are subject to the same scienter analysis. (Id., ¶¶ 218, 229, 232; see id., ¶ 226.) Others include additional allegedly false or misleading statements (id., ¶¶ 235, 244), while still others do not reference DocX at all (id., ¶¶ 220-21, 234, 237-43). Maverick relies on the same evidence to establish scienter as to each of these statements as it has with respect to LPS's earlier statements. In its response to the motion to dismiss, Maverick tries to

---

wrongdoing. City of Pontiac, 752 F.3d at 184 (quotations omitted).

[13] The ten occasions include: (a) an April 5, 2010 press release in response to an April 3 *Wall Street Journal* article; (b) its April 22, 2010 earnings release also filed with the SEC concurrently on Form 8-K; (c) Carbiener's and Chan's conference call with analysts the next day, April 23, 2010; (d) its May 6, 2010 Form 10-Q; (e) Carbiener's May 20, 2010 letter to the editor of the *Florida Times-Union*; (f) Carbiener's statements about the company's success at the May 20, 2010 annual shareholder meeting; (g) quotes from LPS spokesperson Michelle Kersch in a June 7, 2010 *National Mortgage News* article; (h) its July 22, 2010 earnings release also filed with the SEC on Form 8-K; (i) Carbiener's and Chan's conference call with analysts on July 23, 2010; and (j) its August 9, 2010 Form 10-Q. (Doc. 86, ¶¶ 218-45.) It does not appear that Maverick alleges the quotes attributed to Kersch in the April 3 *Wall Street Journal* article were false or misleading. (See id., ¶¶ 110, 217.)

frame the case for scienter in the statements after April 2010 by setting Carbiner's admission at the <u>Cornett</u> trial in 2013—he recognized there was a "real problem" at DocX on the day the team arrived to investigate in November 2009—against his statement during the April 23, 2010 analyst call—"We are satisfied there's not a problem. We are satisfied there's not bad intent." (<u>Id.</u>, ¶¶ 146, 226.)

To the extent Carbiener's statements in April and May 2010 mirror those in the February 23, 2010 10-K, Maverick sufficiently alleges scienter. While Carbiener may be able to explain that, in proper context, he did not have a culpable state of mind regarding the surrogate signing problem and LPS's efforts to remediate it, Maverick has alleged enough to require him to do so. As to the other April 2010 to October 2010 allegations, they are only actionable to the extent they parrot the February 23, 2010 explanation.

### 5.   Events after October 2010

While Maverick only seeks recovery for LPS stock purchases between October 23, 2009 and October 4, 2010, both the complaint and Maverick's response brief reference a number of allegations regarding events after that period with little or no explanation of their relevance in terms of scienter or loss causation. Though the Court does not agree with LPS that events after the alleged misstatements could never be evidence of scienter at the time of the statements (Doc. 87 at 19 n.14), events like Chan's termination and Carbiener's resignation, without more, do not create a strong inference of scienter. Maverick also does not explain the significance of a December 6, 2010 *Reuters* story cited in the complaint and how the story fits with its theory of

liability. (See Doc. 86, ¶¶ 162-64.)

In a notice of supplemental authority, Maverick suggests that Carbiener's resignation was not what it seemed at the time. The notice attaches a July 6, 2011 press release announcing Carbiener's resignation as CEO "for significant health-related reasons" and contrasts that announcement with a motion for partial summary judgment in a lawsuit by Carbiener for disability benefits in which LPS disputes that he has any serious medical conditions. (Compare Doc. 100-2, with Doc. 100-3.) Citing to a recent Eleventh Circuit case, Maverick argues that the proximity of his resignation to a *60 Minutes* television report on LPS creates a strong inference of scienter. (Doc. 100 at 2 (citing Brophy v. Jiango Pharm., Inc., 781 F.3d 1296, 1305 (11th Cir. 2015) ("[A]n executive officer's resignation can strengthen an inference of scienter when it occurs around the same time as an investigation.")).)

The Court disagrees. First, any inference due to proximity is not particularly compelling since Carbiener's resignation came three months after the *60 Minutes* report, more than a year after Maverick alleges the truth about DocX starting becoming public, including news of the federal criminal investigation, nearly a year after the last allegedly false statement by LPS, and nine months after Maverick sold its LPS stock. (Doc. 86, ¶¶ 110, 126, 128.) Second, LPS's business judgment to honor Carbiener's "decision to resign" as CEO "because of recent changes in [his] health" is not necessarily inconsistent with LPS's litigation position that he is not entitled to disability benefits such that the inference of wrongdoing is more compelling than an innocent one. This is particularly so since Carbiener continued on with LPS as a

consultant. (Doc. 100-2; Doc. 100-3 at 4-5); Brophy, 781 F.3d at 1305. Like the Eleventh Circuit in Brophy, the Court does "not reflexively credit" LPS's assertion that Carbiener resigned for health reasons, but finds that any weight his resignation might add to the overall inference of scienter is small and not made more substantial by the pleadings in Carbiener's lawsuit against LPS.[14] Brophy, 781 F.3d at 1305.

The Eleventh Circuit has held that the "strong inference of scienter" requirement of the PSLRA "is difficult to meet." Mizzaro, 544 F.3d at 1257. Maverick has now had four chances to meet this heightened pleading requirement. The undersigned advised Maverick that this latest chance was to be "the plaintiffs' best shot" and would be ruled on accordingly. (Doc. 81 at 82.) Maverick has met the requirement with respect to LPS's five statements on February 23, 2010, April 5, 2010, April 23, 2010, May 6, 2010, and May 20, 2010. (Doc. 86, ¶¶ 215, 218, 226, 229, 232.) Maverick's claims as to the rest of the allegedly false statements identified in the complaint are due to be dismissed with prejudice.[15]

---

[14] Maverick's notice of supplemental authority also cites Brophy for the new theory that LPS obstructed a United States Trustee investigation that began in April 2009. (Doc. 100 at 2 (quoting Brophy, 781 F.3d at 1305 ("[O]bstruction of an investigation supports an inference of scienter, particularly where defendants affirmatively make efforts to conceal fraud.").) The complaint makes only one passing mention of the Trustee investigation, stating that Judge Sigmund referenced its existence in her order in In re Taylor. (Doc. 86, ¶ 137.) As noted earlier, the Taylor case had nothing to do with the alleged fraud at issue in this case. Moreover, the complaint includes no allegations about what the Trustee was investigating or that LPS obstructed that investigation in any way. Brophy is helpful, however, in reinforcing the notion this Court has recognized before that allegations based only on the seriousness of the alleged fraud and a defendant's position with the company are generally inadequate to establish scienter. 781 F.3d at 1304-05.

[15] Maverick's § 20(a) controlling person claims in the second count of the complaint are similarly limited to those based on the statements dealing with the

## B.    Loss Causation

LPS alternatively urges the Court to reconsider the issue of loss causation, relying primarily on Eleventh Circuit's opinion in Meyer v. Greene, 710 F.3d 1189 (11th Cir. 2013), issued after the Court's ruling in the class action. The Court has reviewed Meyer, but reaches the same conclusion. Viewing the factual allegations in the light most favorable to Maverick, the complaint adequately establishes a causal connection between the remaining alleged misstatements and Maverick's alleged injury. The Court emphasizes that this ruling, and all rulings in this Order, are made in the context of a motion to dismiss and may be revisited as appropriate.

## C.    State Law Claims

In what LPS once labeled "tag-along claims," the complaint also alleges state law causes of action for common law fraud and negligent misrepresentation. (Doc. 86, ¶¶ 292-306.) LPS contends these state law claims either are rehashes of the securities fraud claims that should be dismissed for the same reasons or are unfounded attempts to recover treble damages.[16] (Doc. 87 at 23-25.) Maverick responds that each count has a basis in fact and is adequately pleaded in the complaint. (Doc. 90 at 20.)

### 1.    Common Law Fraud

The parties agree that the elements of common law fraud in Florida[17] "are

---

statements listed above. See FindWhat Investor Grp., 658 F.3d at 1294 n.9 ("[N]o § 20(a) claim can lie without first establishing a successful § 10(b) claim."); In re Recoton Corp. Sec. Litig., 358 F. Supp. 2d 1130, 1153 (M.D. Fla. 2005).

[16] Because the Court has not dismissed all of Maverick's federal securities claims, LPS's invitation to decline to exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c)(3) is rejected. (See Doc. 87 at 23.)

[17] Unlike with its negligent misrepresentation count, the complaint does not

substantially similar to those governing § 10(b), except the scienter requirement for a common-law fraud claims is more stringent. It requires that one plead actual knowledge of falsity, as opposed to the scienter requirement of severe recklessness . . . ." <u>Bruhl v. Price Waterhousecoopers Int'l</u>, No. 03-23044-Civ, 2007 WL 983263, at *6 (S.D. Fla. Mar. 27, 2007). On the other hand, Maverick is not required to plead a "strong inference" of scienter in its common law fraud claim. <u>See Ashland, Inc. v. Oppenheimer & Co.</u>, 648 F.3d 461, 471 (6th Cir. 2011); <u>Flaherty & Crumrine Preferred Income Fund Inc. v. TXU Corp.</u>, 565 F.3d 200, 213 (5th Cir. 2009).

The parties reference their arguments regarding the securities claims in support of their positions on common law fraud. (Doc. 87 at 23-24; Doc. 90 at 20.) Recognizing that only Rule 9(b), and not the PSLRA applies to this claim, the Court nevertheless reaches the conclusion that, for the reasons set forth above, the motion to dismiss Maverick's common law fraud claims should be denied to the extent stated above, but otherwise granted.

## 2.   **Negligent Misrepresentation**

LPS's arguments regarding Maverick's negligent misrepresentation claims again restate their arguments made with respect to the securities fraud claims and the common law fraud claims, but with two main additions. First, LPS discounts as legal conclusions the allegations in the complaint that Cornett, as a senior executive at LPS, "knew or should have known of the DocX fraud" and that "'[h]is failure to do

_____

specify that the fraud count is being brought pursuant to a specific state's common law, but the parties seem to agree that Florida law controls. (Doc. 87 at 23-24; Doc. 90 at 20.)

so was negligent and led to his termination.'" (Doc. 87 at 25 (citing Doc. 86, ¶ 303).) Second, Cornett is not alleged to have made any misrepresentations, so LPS does not believe his scienter can be imputed to the corporation. (Id.) Maverick responds by restating its arguments about LPS's state of knowledge and contending it was at least negligent. (Doc. 90 at 20.)

Again, the Court finds that Maverick has pleaded actual knowledge with respect to the statements as previously stated, but not as to the rest of the alleged misrepresentations. Trying to short-circuit the requirement that it actually plead negligence, Maverick cites the testimony of the current LPS CEO, who opines that Cornett was negligent and should have known about the fraud at DocX. (Doc. 86, ¶ 303.) The complaint contains no information to support this legal conclusion. The complaint also does not identify any statement made by Cornett that Maverick then justifiably relied upon to its detriment. So Maverick's Florida negligent misrepresentation claim is due to be dismissed as to all LPS statements other than those previously allowed in the securities claims.

## IV.   CONCLUSION

Based upon this ruling, some but not all of Maverick's claims are due to be dismissed with prejudice, and LPS is due to answer those claims that remain. But what specific allegations in the lengthy Third Amended Complaint remain to answer is unclear. The Court will therefore direct to Maverick to replead its complaint to include only those allegations not foreclosed by this Order. Maverick should take care to hew closely to the rulings in this Order when drafting the repleader.

Accordingly, it is hereby

**ORDERED**:

1.      Defendants' Motion to Dismiss Third Amended Complaint (Doc. 87) is **GRANTED in part** and **DENIED in part**.

2.      Plaintiffs' Third Amended Complaint for Violations of the Federal Securities Laws and State Law (Doc. 86) is **DISMISSED with prejudice** to the extent set forth above.

3.      On or before **October 30, 2015**, Maverick shall file a fourth amended complaint including only those allegations not foreclosed by this Order.

4.      On or before **December 3, 2015**, LPS shall file its answer to the fourth amended complaint.

5.      The Clerk should terminate as defendants in this case Lorraine Brown and DocX, LLC **only**.

6.      With the pleadings now settled, the Court believes the parties should try to settle. No later than **December 3, 2015**, the parties should advise the Court of the identity of a mediator and a proposed date for mediation.

**DONE AND ORDERED** at Jacksonville, Florida this 21st day of September, 2015.

TIMOTHY J. CORRIGAN
United States District Judge

bjb
Copies to:

Counsel of record